1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

7   OSTERHAUS PHARMACY, INC. on behalf
of itself and all others similarly situated,

8                    Plaintiff,

9        v.

10   CVS HEALTH CORPORATION, CVS
PHARMACY, INC., CAREMARK Rx,
11   L.L.C. (f/k/a/ CAREMARK Rx, INC.),
CAREMARK, L.L.C., CAREMARKPCS,
12   L.L.C., CAREMARK PCS HEALTH L.L.C.,
CAREMARK IPA, L.L.C., CAREMARK
13   PART D SERVICES, LLC, AETNA INC.,
AETNA HEALTH HOLDINGS, LLC, AND
14   AETNA HEALTH MANAGEMENT, LLC,

15                    Defendants.

16

NO.

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

CLASS ACTION

17        Plaintiff Osterhaus Pharmacy, Inc. ("Osterhaus" or "Osterhaus Pharmacy" or "Plaintiff")

18   brings this action on behalf of itself and all others similarly situated pursuant to Rule 23 of the

19   Federal Rules of Civil Procedure against defendants Caremark Rx, L.L.C. (f/k/a Caremark Rx,

20   Inc.), Caremark, L.L.C., CaremarkPCS, L.L.C., Caremark PCS Health L.L.C., Caremark IPA,

21   L.L.C., Caremark Part D Services, LLC, Aetna Health Management, LLC, CVS Health

22   Corporation, CVS Pharmacy, Inc., Aetna Inc., and Aetna Health Holdings, LLC (collectively,

23   "CVS Caremark"). Plaintiff seeks damages for violation of Sections 1 and 2 of the Sherman Act,

24   15 U.S.C. §§ 1, 2, and breach of the covenant of good faith and fair dealing.

25        Plaintiff also seeks equitable and declaratory relief on the basis of claims for unjust

26   enrichment, unconscionability, and quantum meruit.

27

CLASS ACTION COMPLAINT - 1
CASE NO.

## I.    NATURE OF THE ACTION

Plaintiff is a pharmacy that brings five claims on behalf of itself and a proposed class.

The first is a tying claim under federal antitrust law. It is based on CVS Caremark denying pharmacies access to its network of Medicare Part D beneficiaries to fill and dispense their prescriptions unless the pharmacies also enter a second transaction involving a performance program that compels the pharmacies to pay fees for the "opportunity" to provide other performance-related services. As explained below, those fees are called "DIR fees."

The second claim is for breach of the covenant of good faith and fair dealing. CVS Caremark forced pharmacies—including Plaintiff and members of the proposed class—to agree to grant it discretion in setting metrics for and calculating the DIR fees pharmacies must pay. CVS Caremark then exercised that discretion in bad faith and thereby breached the covenant.

The third claim is for a declaratory judgment that the DIR fees that CVS Caremark imposed are unconscionable.

The fourth claim is for unjust enrichment, requiring CVS Caremark to return to Plaintiff and the members of the proposed class DIR fees that CVS Caremark's unconscionable contracts required them to pay.

A fifth claim is for quantum meruit, requiring CVS Caremark to pay Plaintiff and the members of the proposed Class for the value of the DIR services they provided.

## II.    JURISDICTION, VENUE, AND INTERSTATE COMMERCE

1.    Plaintiff brings this action pursuant to Section 4 of the Clayton Act, 15 U.S.C.§§ 15(a), to recover treble damages, cost of suit, and reasonable attorneys' fees for CVS Caremark's violation of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a). The Court possesses supplemental jurisdiction over Plaintiff's claims for breach of covenant of good faith and fair dealing, unconscionability, unjust enrichment, and quantum meruit under 28 U.S.C. § 1367.

2.    This Court has personal jurisdiction over the defendants pursuant to, among other statutes, Section 12 of the Clayton Act, 15 U.S.C. § 22.

CLASS ACTION COMPLAINT - 2
CASE NO.

3.      Venue is proper in this Court pursuant to, among other statutes, Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391 because CVS Caremark regularly transacts business within this district, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and CVS Caremark resides in this district.

4.      The services at issue in this case are sold in interstate commerce. The unlawful activities alleged in this Complaint have occurred in, and have had substantial effect upon, interstate commerce in the United States.

### III.      PARTIES

5.      Until January 1, 2022, Osterhaus operated as Osterhaus Pharmacy and M&M Care at 918 W Platt St #2, Maquoketa, IA. Osterhaus brings this action on behalf of itself individually and on behalf of a proposed class of pharmacies that:

(i)      are not part of the same corporate family as any of the three largest Pharmacy Benefits Managers ("PBMs"), as defined below, and so are independent of the three largest PBMs ("Independents");

(ii)      are located in the United States; and

(iii)      paid any DIR fees directly to CVS Caremark from September 26, 2019 until the time of trial.

6.      CVS Health Corporation ("CVS") is one of the largest healthcare companies in the world. CVS Caremark is the name of CVS's PBM business, and it is the largest PBM in the United States.  While various legal entities within CVS perform PBM activities, they all do so under the CVS Caremark name. All are direct or indirect subsidiaries of CVS. CVS also owns Aetna, Inc. ("Aetna"), one of the largest health insurance companies in the United States, and CVS Pharmacy, Inc., which operates the largest retail pharmacy chain in the nation, with approximately 10,000 locations and an online mail-order pharmacy business. In 2022, the CVS corporate family generated over $322 billion in gross annual revenues.[1]

---

[1] CVS Health 2022 Annual Report:
https://www.annualreports.com/HostedData/AnnualReports/PDF/NYSE_CVS_2022.pdf

CLASS ACTION COMPLAINT - 3
CASE NO.

7.     CVS has reported to the public since at least 2007 that it and its subsidiaries are the largest provider of prescription and related healthcare services in the United States, filling or managing more than one billion prescriptions annually.[2]

**CVS Caremark Entities**

8.     CVS Caremark provides PBM services to Medicare Part D beneficiaries through numerous legal entities.

9.     Defendant CVS Health Corporation is a Delaware corporation with its principal place of business in Rhode Island.

10.     Defendant CVS Pharmacy, Inc. is a subsidiary of CVS incorporated under the laws of Rhode Island with principal place of business also in Rhode Island.

11.     Defendant Caremark Rx, L.L.C. (f/k/a Caremark Rx, Inc.) ("Caremark Rx") is a subsidiary of CVS Pharmacy, Inc. and one of the largest pharmaceutical services companies in the United States. It is incorporated under the laws of Delaware, with its principal offices in Woonsocket, Rhode Island.

12.     Defendant Caremark, L.L.C. is incorporated under the laws of California and a subsidiary of Caremark Rx.

13.     Defendant CaremarkPCS, L.L.C. is incorporated under the laws of Delaware and a subsidiary of Caremark Rx.

14.     Defendant CaremarkPCS Health LLC ("CaremarkPCS Health") is a subsidiary of CaremarkPCS, L.L.C. incorporated under the laws of Delaware. CaremarkPCS Health is a PBM and provides PBM services to health plans, including Aetna, that serve Medicare Part D beneficiaries.

15.     Defendant Caremark IPA, L.L.C. is a subsidiary of CaremarkPCS, L.L.C. and incorporated under the laws of New York.

---

[2] CVS Caremark 2007 Annual Report to Stockholders:
https://www.sec.gov/Archives/edgar/data/64803/000119312508040019/dex13.htm

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

16. Defendant Caremark Part D Services, LLC is a CVS Caremark subsidiary that provides PBM services to SilverScript and other health plans serving Medicare Part D beneficiaries.

17. Defendant Aetna, Inc. ("Aetna") is a health care company incorporated under the laws of Pennsylvania with a principal place of business in Connecticut. Aetna is a subsidiary of CVS Pharmacy, Inc.

18. Defendant Aetna Health Holdings, LLC is a subsidiary of Aetna and incorporated under the laws of Delaware.

19. Defendant Aetna Health Management, LLC is a subsidiary of Aetna Health Holdings, LLC and incorporated under the laws of Delaware.

## IV.    FACTS

### Independent Pharmacies

20. In 1965, Bob and Ann Osterhaus purchased a family-owned pharmacy in Maquoketa, a town of a few thousand residents in Northeast Iowa. Their son, Matt Osterhaus, began working at the pharmacy in 1983, and eventually operated it with his wife Marilyn Osterhaus. In 2005, Bob Osterhaus was awarded the Remington Medal, the highest recognition given in the pharmacy profession for his dedication. In 2005, Matt Osterhaus was awarded the Distinguished Achievement Award in Community Pharmacy Practice for his contributions to the conversion of the pharmacy into a pharmaceutical care model of practice. Not only has Osterhaus Pharmacy served the community, but it also has trained the next generation of Iowa pharmacists. Since 1995, Osterhaus Pharmacy has served as a teaching site for Doctor of Pharmacy candidates, including from the University of Iowa, located around 90 miles away. In 1997, Osterhaus Pharmacy, another pharmacy, and the University of Iowa teamed up to offer a post graduate residency program—the first community-based residency in Iowa.

21. In January 2022, in part because of CVS Caremark's actions at issue in this case, Matt Osterhaus sold Osterhaus Pharmacy.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

22.     Like Osterhaus Pharmacy, many Independents have a substantial impact on their communities. Independents meet the needs of their patient populations like no other institution. They provide wellness services, health screening, case management, medication synchronization, adherence packaging, personal delivery, long-term care support, immunizations, customized compounding services, and wound care products. Pharmacists at Independents routinely develop supportive relationships with their patients in ways that large corporate pharmacies and mail-order pharmacists do not. Independents fully subscribe to their mantra: "We believe in doing what is right for the patient."

23.     Bob, Ann, Matt, and Marilyn Osterhaus, and Osterhaus Pharmacy, like most Independent owners and pharmacists, are community leaders. They are actively involved in community-oriented public health, civic, and volunteer projects. They are committed to high-quality pharmacist care and to restoring, maintaining, and promoting the health and well-being of the public they serve.

24.     Independent pharmacists work with patients to fill and dispense prescriptions, help manage medication, counsel patients on the use of both prescription and over-the-counter medications, and provide other health-related services, such as vaccine shots.

25.     Independents are rooted in their communities. They are America's most accessible health care professional—and one of only a few in many parts of the country.[3]  The independent pharmacist plays an essential role in those areas, which frequently have shortages of healthcare workers.

26.     Independents are closing in significant numbers in key locations across the nation. They face increasing financial pressure from PBMs, which keep reducing reimbursements to increase their own profits. The trend toward vertical consolidation in the pharmaceutical services

---

[3] *See* David M. Scott, et al., *Assessment of Pharmacist's Delivery of Public Health Services in Rural and Urban Areas in Iowa and North Dakota*, Pharmacy Practice (2016); Megan Undeberg, et al., *A Case of Pharmacist-Led Care Team Interventions to Maximize Rural Patient Quality of Life*, Exploratory Research in Clinical and Social Pharmacy (Mar. 8, 2021).

CLASS ACTION COMPLAINT - 6
CASE NO.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

1   industry has exacerbated matters, as PBMs now benefit by placing Independents at a

2   disadvantage to their in-house pharmacies.

3        27.   According to a University of Iowa study, 1,231 of the 7,624 independent rural

4   pharmacies in the nation closed between 2003 to 2018.[4]  That has left 630 rural communities that

5   had at least one retail pharmacy in 2003 with none in 2018.[5]  Since 2018, many more stores—

6   often called "practices"—have closed. Those closures are forcing rural populations to travel

7   greater distances to obtain needed medications, a particular hardship for low-income individuals

8   and the elderly.[6]

9        28.   Because of the loss of Independents, over 40% of counties in the United States are

10  considered "pharmacy deserts," where most people must travel significant distances to reach the

11  nearest pharmacy.[7]  That can be insurmountable for people who lack transportation, time, or

12  both, especially the poor and the elderly.

13       29.   The loss of Independents has been particularly damaging in areas where they not

14  only distributed prescription medications, but also delivered services such as immunizations,

15  medication counseling and educational services, patient consultations, and treatment of mild

16  illnesses amenable to over-the-counter medications.[8]  During the Covid-19 pandemic,

17  Independents were essential, dispensing vaccinations and testing for Covid-19. Closure of such

18  pharmacies can have a devastating impact on a community's access to healthcare services.

19       30.   In contrast to the growth of national pharmacy chains, the market share of non-

20  corporate-affiliated independent pharmacies has shrunk 50% over recent decades.[9]

21

22

23  [4] *Id.*

24  [5] University of Iowa Center for Rural Health Policy Analysis: https://rupri.public-health.uiowa.edu/publications
    /policybriefs/2018/2018%20Pharmacy%20Closures.pdf.

25  [6] *Id.*
    [7] Kristine Pisikian, *How Pharmacy Deserts Impact Communities*, GoodRx Health (Mar. 30, 2022),
    https://www.goodrx.com/hcp/providers/pharmacy-deserts.

26  [8] University of Iowa Study: https://rupri.public- health.uiowa.edu/publications/policybriefs
    /2018/2018%20Pharmacy%20Closures.pdf

27  [9] https://www.mckinsey.com/industries/healthcare/our-insights/meeting-changing-consumer-needs-the-us-retail-
    pharmacy-of-the-future.

CLASS ACTION COMPLAINT - 7
CASE NO.

1

**Pharmacy Services**

2   31.   Pharmacies vary in the services they provide. Typically, pharmacies fill and

3   dispense prescriptions and receive reimbursement for doing so—a service referred to as "Filling

4   and Dispensing Services."

5   32.   Some Independents also provide other services. They may support medication

6   management, including with medication synchronization (synchronizing chronic medications to

7   a single monthly pick-up date), medication therapy management, chronic disease monitoring,

8   and multi-dose packaging that bundles medications. Those services can improve adherence to

9   patients' medication regimen, benefiting the patients and reducing the costs of healthcare.

10   **Medicare Prescription Drug Benefit (Part D)**

11   33.   Medicare is a federally funded health insurance program for persons aged 65 and

12   older and persons with long-term disabilities. The Medicare prescription drug benefit, Medicare

13   Part D ("Part D"), offers outpatient prescription drug coverage to Medicare beneficiaries across

14   the country. Part D was enacted as part of the Medicare Modernization Act of 2003. Part D

15   coverage is not provided within the traditional Medicare program. Instead, it is administered

16   through private health plans ("Part D Sponsors" or "Plans") that contract with the federal

17   government. Part D Sponsors are often run by large health insurance companies, including Aetna

18   (owned by CVS), Cigna, and United Healthcare.

19   34.   The Part D Sponsors, in turn, contract with corporate intermediaries—i.e.,

20   PBMs—to administer their prescription drug benefits.

21   35.   In 2023, approximately 52 million of the 66 million people covered by Medicare

22   were enrolled in Part D.[10]  Because Medicare recipients are prescribed more drugs on average

23   than the population as a whole, Medicare beneficiaries constitute an outsized percentage of

24   prescriptions filled in the United States.

25

26

27

---

[10] https://medicareadvocacy.org/medicare-enrollment-numbers/

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

**PBMs: Powerful Middlemen**
**Standing Between Patients and their Medications**

36.     PBMs are powerful middlemen in the center of the pharmaceutical industry. They profit at nearly every stage of the drug distribution chain from manufacturing to filling and dispensing to patients.

37.     PBMs act as intermediaries between Part D Plans, pharmacies, and drug manufacturers. Part D Plans own or hire PBMs to negotiate drug pricing with manufacturers, and to determine the amount pharmacies will be reimbursed for dispensing. PBMs use a series of rebates and fees along the supply chain to pocket the difference between what a PBM charges health plans for prescription drugs and what they pay the pharmacy — often called the "spread."

38.     PBMs also offer administrative services to Part D Plans, including organizing networks of pharmacies that contract with the Plans ("in-network pharmacies") and determining the list of drugs ("formularies") covered by the Plans.

39.     In sum, PBMs control every facet of the pharmaceutical filling and dispensing industry. They decide which pharmacies can dispense drugs in Part D Plan networks, which drugs those pharmacies will dispense, and the prices, discounts, and other terms of sale applicable to reimbursement of pharmacies.

40.     Unfortunately, CVS Caremark, like other PBMs, abuses its control of the industry. In 2023, the Ohio Attorney General brought a lawsuit against PBM Express Scripts, describing the impact of PBMs as follows:

> PBMs are modern gangsters… . They were designed to protect and negotiate on behalf of employers and consumers after Big Pharma was criticized for overpricing medications, but instead they have absolutely destroyed transparency, scheming in the shadows to control drug prices on all sides of the market.

41.     Market consolidation and vertical integration has transformed PBMs into sprawling entities with outsized market power and soaring profits.

42.     Today, just six PBMs control 95% of the prescriptions filled in the United States. The "Big Three" PBMs—CVS Caremark, Express Scripts, and OptumRx—control more than

CLASS ACTION COMPLAINT - 9
CASE NO.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

80% of the prescriptions filled in the United States ("PBM Market") and each generates tens of billions of dollars in annual revenue. CVS Caremark alone accounts for 33% of prescriptions filled.

43.    The market power of the Big Three PBMs has been magnified by a trend toward vertical integration. Each of the Big Three is now affiliated with a dominant health insurer: OptumRx (PBM) is affiliated with United Healthcare (health insurer), Express Scripts (PBM) is affiliated with Cigna (health insurer), and CVS Caremark (PBM) is affiliated with Aetna (health insurer). Each of these affiliated health insurers—United Healthcare, Aetna, and Cigna—administers Part D Plans for Medicare beneficiaries. These three health insurers cover almost half of Medicare Part D beneficiaries.

44.    This vertical consolidation has served CVS Caremark well. It now controls not just the pricing of drugs, not just the selection of the drugs covered by Part D Plans, and not just the selection of pharmacies in each Part D network; CVS Caremark also controls access to at least a third of the Medicare beneficiaries enrolled in PBM-affiliated Plans. Pharmacies must accept the increasingly anticompetitive pricing and contract terms set forth by CVS Caremark or face exclusion from its Part D network.

45.    Not participating in CVS Caremark's network would severely limit a pharmacy's access to a critical mass of patients. Participating in other networks is not a substitute—if an Independent does not accept the anticompetitive terms from CVS Caremark, it loses the patients in CVS Caremark's network. Those patients must take their prescriptions to a different pharmacy to enjoy the benefits of their Medicare Part D Plans.

46.    Further, beneficiaries do not choose Part D Plans based on DIR fees. The AARP, for example, offers a guide that recommends beneficiaries consider which pharmaceuticals a Plan covers, its cost, its customer services rating, and other factors.[11]  Nowhere does it mention DIR fees.

---

[11] https://www.aarp.org/health/medicare-qa-tool/choosing-best-drug-plan-for-me.html

CLASS ACTION COMPLAINT - 10
CASE NO.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

47.     To serve the millions of beneficiaries enrolled in CVS Caremark-affiliated Plans, Independent Pharmacies generally have no practical choice but to participate in the CVS Caremark network. Currently, over 65,000 pharmacies across the U.S. do so.

48.     CVS Caremark's vertical integration and the concentrated market create incentives for it to abuse its resulting market power. Its corporate family can and does benefit from imposing anticompetitive pricing on Independents and extracting services from them. If CVS Caremark goes too far, driving Independents out of business, it then benefits from eliminating rivals and steering their customers toward CVS Caremark's brick-and-mortar and mail-order pharmacies. Either way, CVS Caremark wins and the Independents and patients lose.

### **Direct and Indirect Remuneration ("DIR") Fees: The Loophole**

49.     When a prescription drug is dispensed to a Medicare beneficiary (a patient), the beneficiary pays a co-payment to the pharmacy at the point-of-sale. The pharmacy then submits a claim for reimbursement to the PBM that acts on behalf of the beneficiary's Part D Plan. The PBM reimburses the pharmacy based on a discounted average wholesale price of the drug, less fees and the amount of the patient's copayment.

50.     The PBM is then reimbursed by the patient's Part D plan, which in turn submits a record to the Centers for Medicare and Medicaid Services ("CMS" or "Medicare") for reimbursement for the cost of the drug.

51.     The Medicare statute provides that a sponsor or organization *shall* provide enrollees with access to negotiated prices used for payment for covered part D drugs, even if no benefits may be payable under the coverage with respect to such drugs. 42 U.S.C. § 1395w-102(d)(1)(A). The statute further states that "negotiated prices *shall* take into account negotiated price concessions, such as discounts or indirect subsidies, rebates, and direct or indirect remunerations, for covered part D drugs, and include any dispensing fees for such drugs." 42 U.S.C. § 1395w-102(d)(1)(B) (emphasis added).

52.     Congress was clear that it wanted all negotiated price concessions to be included in negotiated prices to beneficiaries at the point-of-sale. The Conference Report to the Medicare

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

Prescription Drug, Improvement, and Modernization Act of 2003 stated the following: "Qualified drug plans would be required to provide beneficiaries with access to negotiated prices (including all discounts, direct or indirect subsidies, rebates, other price concessions, or direct or indirect remunerations), regardless of the fact that no benefits may be payable." H.R. Rep. No. 108-391, at 438 (2003) (Conf. Rep.). The legislative history further added that "all PDP plans will be required to make available to their enrollees the benefit of *all* price discounts." H.R. Rep. No. 108-178, pt. 1, at 184 (2003) (emphasis added).

53.     In 2014 rulemaking, CMS declared that "we believe that the best interpretation of statutory intent is that all pharmacy price concessions must be reflected in the negotiated price." 79 Fed. Reg. 1973.The concept of DIR was introduced by CMS, the federal agency that administers Medicare. CMS sought to increase transparency for the true price of prescription drugs and promulgated regulations to require Part D Sponsors and other entities to report to CMS all direct and indirect remuneration received for a drug—including all rebates or reimbursements received from drug manufacturers—so that CMS could base reimbursement rates to the Plans on the "true cost" of a prescription.

54.     Before 2016, CMS required that the "negotiated price" for any drug—i.e., the price upon which patient cost-sharing is based at the point-of-sale—must be "reduced by those discounts, direct or indirect subsidies, rebates, other price concessions, and direct or indirect remuneration that the Part D sponsor has elected to pass through to Part D enrollees at the point-of-sale." 42 C.F.R. §423.100 (2014).

55.     However, effective January 1, 2016, CMS created what it intended to be a narrow exception to this rule. It excluded from the definition of negotiated price "those contingent price concessions that cannot reasonably be determined at the point-of-sale." 42 C.F.R. 423.100 (2016). CMS did not expect this change to have significant effects. But it did.

56.     CVS Caremark exploited the new regulation to unlawfully extract huge sums of money from Independent Pharmacies.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

57.     From 2010 to 2020, pharmacy DIR fees increased by more than 100,000%—that is, they grew more than 1,000 times larger. In 2021, DIR fees increased an additional 33% from 2020 levels to $12.6 billion.[12]

58.     In 2018, CMS informed PBMs and Part D Sponsors that their manipulation of pharmacy price concessions after the point of sale is anti-competitive: "The one-sided nature of the pharmacy payment arrangements that currently exist also *creates competition concerns* by discouraging independent pharmacies from participating in a plan's network and thereby increasing market share for the sponsors' or PBMs' own pharmacies. Part D is a market based approach to delivery of prescription drug benefits, and relies on healthy market competition. Thus, adopting policies that promote competition is an important and relevant consideration in protecting Medicare beneficiaries and the Medicare trust fund from unwarranted costs. Market competition is best achieved when a wide variety of pharmacies are able to compete in the market for selective contracting with plan sponsors and PBMs." 83 Fed. Reg. 62,176 (emphasis added).

59.     As the market power of the PBMs continues to grow, Independent Pharmacies continue to close in significant numbers amidst the stress from PBM-imposed DIR fees.[13]

60.     CVS Caremark benefits whether Independent Pharmacies survive and continue to pay DIR fees or whether the fees drive Independents out of business. On one hand, CVS Caremark's corporate family profits from DIR fees in various ways, including by retaining them as a source of revenue. On the other hand, CVS Caremark's corporate family runs brick-and-mortar and mail-order pharmacies. When other pharmacies fail, CVS Caremark's corporate family faces less competition and can acquire existing pharmacies at a discount, if it chooses. Either way it benefits.

---

[12] Medicare Payment Advisory Comm'n, Medicare Payment Policy (March 2023), https://www.medpac.gov/document/march-2023-report-to-the-congress-medicare-payment-policy/
[13] Kaiser Family Health News: How Rural Communities are Losing Their Pharmacies (Nov. 15, 2021), https://kffhealthnews.org/news/article/last-drugstore-how-rural-communities-lose-independent-pharmacies/

CLASS ACTION COMPLAINT - 13
CASE NO.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

## V.    A SQUARE PEG IN A ROUND LOOPHOLE

61.    CVS Caremark's distortion and exploitation of the "DIR loophole" is unlawful in part because it delays the fees it imposes on Independents largely without a legitimate basis.

62.    For example, CVS Caremark imposes minimum DIR fees on every Independent Pharmacy no matter how it performs. CMS requires CVS Caremark to calculate that minimum percentage at the point of sale.

63.    Further, for over half a decade, CVS Caremark has imposed increasing DIR fees on Independent Pharmacies based on "performance criteria" metrics, many of which make no sense for pharmacies.

64.    Realizing an opportunity to pilfer money from Independents purportedly under the 2016 CMS changes, CVS Caremark fabricated fees that "could not be calculated at the point of sale."

65.    CVS Caremark forced Independent Pharmacies to join "network" programs where pharmacies are assessed DIR fees, supposedly based on their performance and purportedly to encourage better performance by pharmacies. Under CVS Caremark's scheme, DIR fees are not assessed until months or even years after pharmacies fill and dispense medications because the fees supposedly rely on patient data and outcomes. Therefore, according to CVS Caremark, DIR fees cannot "reasonably be determined at the point-of-sale."

66.    Various attributes of CVS Caremark's DIR fees are striking. First, they force pharmacies to *pay* for the opportunity to provide services ("DIR Services"). CVS Caremark charges Independent Pharmacies DIR fees in amounts that depend on how it assesses their performance.

67.    A second striking attribute of DIR fees is that they coerce pharmacies to produce outcomes over which they have little or no control. Although CVS Caremark claims that its "performance criteria" are designed to measure pharmacy performance, many of them either do not do so or they do so poorly. CVS Caremark's metrics for measuring pharmacy performance are loosely based on Medicare's Star Rating system, Medicare's system for rating the

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  performance of *Part D Plans*. The "performance criteria" monitor things such as adherence to

2  certain prescription drugs, including for diabetes and high cholesterol, and formulary

3  compliance.[14]

4      68.    But the Star Ratings were developed to rate health plans, not pharmacies. As a

5  result, many of the performance criteria established by CVS Caremark make little or no sense for

6  pharmacies. A large number are outside pharmacy control—dependent upon physician

7  prescriptions or the performance of unrelated pharmacies within a network—or are most heavily

8  influenced by patient characteristics—such as poverty or access to information.

9      69.    For example, for a pharmacy to achieve a high score on statin adherence, *a*

10  *physician or other provider with prescriptive authority* (hereinafter a physician) must prescribe a

11  statin as part of a cholesterol program. But physicians may have good reasons not to do this,

12  including if a statin is contraindicated due to drug interactions for a particular condition (such as

13  prescription drugs treating HIV). In any event, the pharmacy whose performance is purportedly

14  being measured has little or no control over whether a physician prescribes a particular

15  medication. Pharmacists do not have prescriptive authority and thus cannot prescribe

16  medications and cannot control their "performance" under CVS Caremark's standards.

17      70.    Other factors CVS Caremark uses, such as formulary compliance, are not within

18  the sole control of the pharmacy and are poorly designed to encourage better performance. Yet

19  pharmacies are forced to pay to provide those services to be part of the network. For example,

20  physicians may prescribe medications that are not on the formulary for a variety of reasons, such

21  as allergies or intolerances to formulary medications, or the need for a specific medication that is

22  not available on the formulary. Yet pharmacies are punished and forced to pay higher DIR fees

23  even though they have little or no influence over the decision not to comply with the formulary.

24

25

26  ---
[14] Specifically, at one point, CVS Caremark used the following criteria to "assess performance": Renin Angiotensin
System (RAS) Antagonists Adherence, Statin Adherence, Diabetes Adherence, Specialty Adherence, GAP Therapy

27  (Statin Use in Persons with Diabetes), Comprehensive Medication Review (CMR), Completion Rate (MTM), and
Formulary Compliance.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

71.     The purported performance standards particularly harm specialty pharmacies, such as those treating patients with the most severe diseases, including cancer and HIV. Specialty pharmacies often do not dispense generic drugs or common "maintenance medications," like statins. Yet CVS Caremark still penalizes them for failing to do so.

72.     Not only are many of the metrics nonsensical, but so are the ways in which CVS Caremark applies them. Application of performance metrics is at CVS Caremark's complete discretion—a discretion CVS Caremark exercises in bad faith.

73.     For example, CVS Caremark penalizes an Independent Pharmacy on adherence if a patient discontinues fulfilling her prescriptions at the pharmacy, regardless of circumstances. The cause may be that the patient spends winters in a different part of the country and fills her prescriptions there, or the patient was told by the physician to discontinue using a drug, or the patient died, or the manufacturer has discontinued manufacturing the drug. CVS Caremark could assess performance so that Independent Pharmacies are not penalized for these events, none of which is within pharmacy control or actually measures pharmacy performance, but it has chosen not to do so.

74.     The way that CVS Caremark purports to measure performance of each pharmacy against other pharmacies is also illegitimate. CVS Caremark ranks all participating pharmacies for a Plan, and then charges higher ranked pharmacies lower DIR fees and lower ranked pharmacies higher DIR fees. Thus, a pharmacy can perform very well but still be assessed high DIR fees because it did not perform as well as other pharmacies. Pharmacies that cannot perform well on the criteria—such as specialty pharmacies or pharmacies that serve medically underserved areas—will be assessed high DIR fees even if they perform well given their circumstances, including the patient population mix that they serve. Again, Independents are often forced to pay high DIR fees based on circumstances they cannot control.

75.     A third striking feature of CVS Caremark's DIR fees is their lack of transparency. For incentives to be effective, pharmacies need to know what they are, how they are doing, and how they can improve their performance. But CVS Caremark is opaque about the correlation

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

between performance on metrics, relative performance, and the amount of DIR fees. Pharmacies often cannot predict whether actions they take will reduce the DIR fees CVS Caremark imposes on them, undermining their efficacy as incentives.

76.     A fourth striking feature of CVS Caremark's DIR fees is that they are delayed. Pharmacy assessments occur long after performance. Pharmacies thus cannot adjust their conduct in real time. That too renders the DIR fees ineffective at encouraging improved performance.

77.     CVS Caremark does not report pharmacies' performance or the amount of DIR fees for many months or even years. By the time the DIR fees are assessed, so much time has passed that an Independent Pharmacy cannot meaningfully contest any factual basis for the PBM's assessed fee, if it is even able to understand why the DIR fees were assessed or what they were assessed for. Further, the pharmacy's circumstances or practices may have already changed by the time they get feedback about how they performed in the past. Untimely feedback and incentives are ineffective.

78.     In sum, the practical effect of the DIR fees is that Independent Pharmacies are forced to pay to provide DIR Services, and the amount they pay is in large part arbitrary, unexplained, unfairly calculated, and untimely.

79.     CVS Caremark's DIR system is unfair and not actuarially based. Among various other flaws, CVS Caremark often uses inappropriately small sample sizes. As a result, small variations in performance can have disproportionate negative effects. In addition, some calculations are entirely arbitrary. For example, if CVS Caremark has no data for some pharmacies on a metric—including because the pharmacies have no relevant sales—it will ascribe to the pharmacies the average from other pharmacies and impose DIR fees accordingly.

80.     The upshot of CVS Caremark's unsound methodology is that pharmacies are unfairly treated to their financial disadvantage. CVS Caremark gains an unfair economic advantage both in revenue to CVS Caremark and in passthrough payments to Plans, enhancing

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    CVS Caremark's competitive posture. CVS Caremark also increases its profits at the expense of

2    the government and Medicare Part D patients—the elderly and the infirm.

### VI.    THE TIE

4        81.    Given the option, Independent Pharmacies would choose to provide Filling and

5    Dispensing Services without also having to pay to provide DIR Services. But CVS Caremark

6    uses its market power to deprive Independent Pharmacies of that option. CVS Caremark will not

7    approve Independent Pharmacies for reimbursement from Medicare Part D Plans for which it

8    serves as the PBM unless the pharmacies agree to pay its DIR fees.

9        82.    *Separate Markets*. Separate markets exist for Independent Pharmacies (1) to

10   acquire access to PBMs' networks of beneficiaries to provide Filling and Dispensing Services

11   and (2) to acquire the opportunity to provide DIR Services to the Plans that PBMs serve. Neither

12   one is reasonably interchangeable with the other. A PBM can increase its prices to Independent

13   Pharmacies for access to provide Filling and Dispensing Services to its network of beneficiaries

14   without those Independent Pharmacies choosing instead to acquire the opportunity to provide

15   DIR Services to the Plans that the PBM serves and *vice-versa*. A PBM with substantial power in

16   only one of the two markets could thus impose a small but significant non-transitory increase in

17   prices without having substantial power in the other market.

18       83.    Similarly, separate markets exist for Independent Pharmacies (1) to acquire access

19   to the CVS Caremark PBM network of beneficiaries to provide Filling and Dispensing Services

20   and (2) to acquire the opportunity to provide DIR Services to the Plans that the CVS Caremark

21   PBM serves. Neither one is reasonably interchangeable with the other. CVS Caremark as a PBM

22   can increase its prices to Independent Pharmacies for access to provide Filling and Dispensing

23   Services to its network of beneficiaries without those Independent Pharmacies choosing instead

24   to acquire the opportunity to provide DIR Services to the Plans that CVS Caremark as a PBM

25   serves and vice-versa. The CVS Caremark PBM can thus use substantial power in only one of

26   the two markets to impose a small but significant non-transitory increase in prices without

27   having substantial power in the other market.

CLASS ACTION COMPLAINT - 18
CASE NO.

84.     *Power in the Tying Market*. CVS Caremark has substantial power in the market for access to beneficiaries for filling and dispensing Medicare Part D prescriptions (the "Tying Market").

85.     Market circumstances establish CVS Caremark's substantial market power. It is the largest PBM in the United States with control of a third or more of the market. The market is concentrated with the collective market share of the top three PBMs at 80% or more. All three of the dominant PBMs impose DIR fees on Independent Pharmacies as a condition of obtaining reimbursement from Plans for filling and dispensing Medicare Part D prescriptions.

86.     Independents generally cannot afford to reject the terms CVS Caremark imposes for participating in its Medicare Part D network to provide Filing and Dispensing Services. They would lose too many sales to potential patients.

87.     CVS Caremark has even more market power than its market share would ordinarily confer. There are multiple reasons. One of them is that the other dominant PBMs also impose DIR fees. Such parallel anticompetitive behavior is common in markets with a small number of dominant players.

88.     A second reason is that Independents generally cannot complete transactions with beneficiaries in CVS Caremark's Medicare Part D by using a different network. They must be part of CVS Caremark's network or forego reimbursement from the relevant Plan. As a result, this market is different from many others. An automotive repair shop, for example, can avoid a car part manufacturer's tie by purchasing parts from a rival manufacturer. It will lose few, if any, customers or sales by doing so. Independent Pharmacies cannot do the same to avoid losing Medicare Part D customers in CVS Caremark's network.

89.     Independent Pharmacies are purchasers in the Tying Market. They pay CVS Caremark to obtain the opportunity to provide Filling and Dispensing Services to its network of beneficiaries. Those payments involve "spread pricing." CVS Caremark retains a portion of the payments it receives to reimburse Independent Pharmacies. The difference—between the amount CVS Caremark obtains and the amount it passes on to an Independent Pharmacy—is called the

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  "spread." Independents pay the "spread" to CVS Caremark. The "spread" is separate from and in

2  a different market than DIR fees.

3        90.    *Coercion in the Tied Market*. CVS Caremark used its substantial power in the

4  market for filling and dispensing Medicare Part D prescriptions to coerce Independent

5  Pharmacies to agree to pay to provide DIR Services. The market for DIR Services is the "Tied

6  Market."

7        91.    CVS Caremark's tie (the "Tie") conditions transactions in the Tying Market on

8  transactions in the Tied Market. CVS Caremark will not let Independents obtain access to

9  beneficiaries in its Medicare Part D network—transactions in the Tying Market—unless the

10  Independents also agree to pay to provide DIR Services—transactions in the Tied Market.

11        92.    In the absence of the Tie—and CVS Caremark's power in the Tying Market— no

12  Independents would agree to *pay* for the opportunity to provide DIR Services. Some would

13  choose not to provide DIR Services even if they would be paid to do so. The rest would *charge*

14  to provide DIR Services, and they would demand enough compensation to cover their costs (plus

15  some profit). Independent Pharmacies provide, and in the absence of the Tie they would provide,

16  different kinds and degrees of DIR Services.

17        93.    CVS Caremark's successful coercion directly establishes CVS Caremark's

18  substantial power in the Tying Market and its extension of that substantial power into the Tied

19  Market. CVS Caremark's ability to use its substantial power in the Tying Market to coerce

20  Independents to agree to pay DIR fees on terms they would otherwise reject is, by definition,

21  substantial market power.

22        94.    *Distinct Markets*. The Tying Market and Tied Market are distinct. As noted

23  above, in the absence of the Tie, many Independents would acquire access to CVS Caremark's

24  network of Medicare Part D beneficiaries to provide Filling and Dispensing Services without

25  also paying to provide DIR Services. That is what many Independents did before CVS Caremark

26  imposed its Tie. It is what they still do outside of the Medicare Part D context. The pervasive

27

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

imposition of DIR fees by PBMs is a distinctive feature of Medicare Part D Plans over the last seven years.

95.     *Economic Benefit*. The DIR fees benefit CVS Caremark in many ways. The CVS Caremark corporate family, including Aetna, receives and retains DIR fees. Further, those fees can to some extent improve management of the health of Part D beneficiaries, decreasing the costs to CVS Caremark's Plans, including those managed by Aetna. DIR Services can improve adherence, increase the filling and dispensing of prescriptions, and thereby generate revenue for CVS Caremark's corporate family. And the DIR fees give CVS Caremark's pharmacies a competitive advantage over Independents on costs, increasing its pharmacies' sales volumes.

## VII.    CVS CAREMARK'S UNCONSCIONABLE CONTRACTS

96.     CVS Caremark imposes DIR fees and forces pharmacies to provide DIR Services at a loss through contracts that are not the subject of arms-length negotiation. CVS Caremark leverages its market power, vertical integration with the Part D Plans, and access to networks of Medicare beneficiaries to impose numerous, lengthy, one-sided contracts to the Independent Pharmacies as part of a "take it or leave it" package. Independents cannot afford to push back against the dominant PBM because they risk losing access to beneficiaries. The opposite is not true—CVS Caremark can steer and prefers to steer patients to its own pharmacies. To be sure, community members suffer as a result—from losing pharmacy services or receiving inadequate services, including through mail-order pharmacies. Such decreases in output and quality are standard consequences when businesses with market power exclude competition and artificially inflate prices.

97.     The CVS Caremark "contracts" consist of numerous documents, including a Provider Agreement, a Caremark Provider Manual, the Caremark Medicare Network Enrollment forms, and numerous addenda ("Caremark Contract"). Out of all these documents, only the Provider Agreement (generally 2-3 pages) is consistently signed by the pharmacy. CVS Caremark frequently and unilaterally amends the other documents.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

98.     The Caremark Provider Manual provides that CVS Caremark reserves the right to amend any part of the contract unilaterally. If a pharmacy submits any claim for reimbursement to CVS Caremark after the effective date of a CVS Caremark amendment, the pharmacy is deemed to have agreed to CVS Caremark's unilateral amendment.

99.     These contracts are one-sided, creating an extraordinary imbalance in obligations. For example, under the contracts CVS Caremark at times reimburses the pharmacies *for less than their cost of acquiring drugs*. In other words, CVS Caremark forces pharmacies to fill prescriptions at a loss. When accounting for administrative costs and DIR fees, it can become financially crippling to fill prescriptions at below acquisition cost under the terms of the CVS Caremark contracts.

100.    CVS Caremark sets the terms of its contracts with Independent Pharmacies. There is no meaningful opportunity to negotiate, as Independents are forced to accept inequitable terms or to lose access to millions of beneficiaries serviced by CVS Caremark and the Plans with which it works. CVS Caremark leverages its market power and unique position as a corporate affiliate of the Plans to coerce Independents to accept the imposition of DIR fees.

101.    The one-sided contracts provide CVS Caremark with sole discretion to determine the methodologies for calculating DIR fees. While the contracts set out purported performance measures related to DIR fees, they are silent on the details of how the final performance scores are calculated, how the final performance score relates to penalties Independent Pharmacies must pay, how Independents are ranked in the network, and how the ranking affects DIR fees. CVS Caremark exploits this silence to its own advantage and to the detriment of Independents.

102.    For example, when an Independent Pharmacy has no data available for a particular performance metric, CVS Caremark often imputes the average performance score for all pharmacies in the network and ascribes it to the pharmacy. Then, CVS Caremark imposes a penalty based on that average. This practice defies any reasonable expectation of the Independent Pharmacy. CVS Caremark touts the performance metrics as a mechanism to improve

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  performance, when, in fact, CVS Caremark often does not measure the independent's

2  performance *at all*.

3     103.   The CVS Caremark contract terms are not merely one-sided and oppressive. They

4  also violate numerous state and federal laws that are set forth in the contract addenda themselves.

5  For example, federal law requires prompt payment of "clean claims" (claims for reimbursement

6  with no defect or impropriety) that are submitted by an Independent Pharmacy within 14 days

7  after the claim has been received, or within 30 days of receiving any other claim. 42 U.S.C.

8  §1395w-112. The CVS Caremark contracts also contain state-specific provisions requiring

9  prompt payment of clean claims. Yet pursuant to the terms of the CVS Caremark DIR fees,

10 Independent Pharmacies must wait—sometimes for up to a year—to receive their final

11 reconciliation on a claim. By CVS Caremark's design, Independent claims are never paid in a

12 timely manner due to the imposition of DIR fees.

13    104.   CVS Caremark also violates its prompt payment obligations through its minimum

14 DIR fees that apply regardless of Independent "performance." Minimum DIR fees can be

15 reasonably determined at the point of sale, so it violates federal and state law to impose them as

16 retroactive penalties under the guise of "DIR." 42 C.F.R. § 423.100 (2016).

17    105.   The CVS Caremark contracts also acknowledge and violate federal and state "any

18 willing provider" laws. Medicare Part D requires Part D Plans—and their PBM representatives—

19 to contract with any willing pharmacy that meets the Plan's standard terms and conditions. 42

20 CFR §423.120(a)(8)(i). Moreover, the terms must be "reasonable and relevant." 42 CFR

21 §423.505. Numerous states have passed their own "any willing provider" statutes, and

22 CVS Caremark's contracts set forth those laws. Yet pursuant to the terms of the contract, CVS

23 Caremark imposes below cost reimbursement, and arbitrary, retroactive DIR fees that are by no

24 means "reasonable." Moreover, many Independents are willing and ready to provide Filling and

25 Dispensing Services, but not DIR Services. CVS Caremark requires Independents to do both.

26    106.   CVS Caremark seeks to shield its unlawful conduct from being challenged by

27 including in its contracts with Independent Pharmacies a forced arbitration clause with several

CLASS ACTION COMPLAINT - 23
CASE NO.

1   unconscionable terms. They include giving CVS Caremark the power to change the terms of the

2   clause unilaterally, to drastically limit Independent discovery, and to impose prohibitive costs on

3   Independents that initiate arbitration. The clause requires Independent Pharmacies to pay CVS

4   Caremark's attorney's fees and other costs if they lose and to pay half the cost of the arbitration.

5   It also requires Independents to place money into escrow at the outset of the arbitration—in an

6   amount determined by the arbitrators, but not less than $50,000—to ensure payment to CVS

7   Caremark of attorney's fees and other arbitration expenses. That amount can easily exceed the

8   profits for an Independent Pharmacy for a year.

9               **VIII.   CLASS ALLEGATIONS**

10       107.    Plaintiff brings this action on behalf of itself and all others similarly situated

11   Independents pursuant to Rule 23 of the Federal Rules of Civil Procedure as a representative of a

12   class (the "Class") defined as follows:

13           All pharmacies in the United States that are not members of the same

             corporate family as a Big Three PBM and that have paid DIR fees

14           directly to CVS Caremark from September 26, 2019 until the time

             of trial (the "Class Period").

15

16       108.    Thousands of Independents have entered contracts with CVS Caremark that

17   impose unlawful DIR fees during the Class Period. The Class is so numerous that joinder is

18   impracticable.

19       109.    Plaintiff's claims are typical of the claims of the Class.

20       110.    Plaintiff and all members of the Class were injured by the unlawful DIR fees

21   imposed by CVS Caremark.

22       111.    Plaintiff will fairly and adequately protect and represent the interests of the Class.

23   The Plaintiff's interests are not antagonistic to those of the Class.

24       112.    Plaintiff is represented by counsel who are experienced and competent in the

25   prosecution of antitrust and other class actions.

26       113.    Questions of law and fact are common to the members of the Class and

27   predominate over questions, if any, that may affect only individual members. CVS Caremark has

CLASS ACTION COMPLAINT - 24
CASE NO.

1   acted on grounds generally applicable to the entire Class. Such generally applicable conduct is

2   inherent in CVS Caremark's unlawful contracts and anticompetitive conduct, as more fully

3   alleged herein.

4       114.    Questions of law and fact common to the class include:

5          (i)     Whether CVS Caremark has market power;

6          (ii)    Whether CVS Caremark imposed an unlawful tie;

7          (iii)   Whether CVS Caremark's contracts breached the covenant of good faith

8   and fair dealing;

9          (iv)   Whether CVS Caremark's imposition of DIR fees was unconscionable;

10         (v)    Whether Plaintiff and the members of the Class have been injured by

11  paying unlawful DIR fees; and

12         (vi)   The proper measure of damages.

13      115.    The Class is readily identifiable from information and records in the possession of

14  CVS Caremark.

15      116.    Class treatment is a superior method for the fair and efficient adjudication of the

16  controversy than individual treatment in that, among other things, class treatment will permit a

17  large number of similarly situated Independents to prosecute their common claims in a single

18  forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense

19  that numerous individual actions would engender. The benefits of proceeding through the class

20  mechanism, including providing injured entities with a method for obtaining redress for claims

21  that might not be practicable for them to pursue individually, substantially outweigh any

22  difficulties that might arise in management of this class action.

23      117.    Plaintiffs know of no difficulties in maintenance of this action on a class basis.

24               **IX.   CAUSES OF ACTION**

25        ***First Claim for Relief: Tying, Sherman Act, 15 U.S.C. § 1, § 2***

26      118.    Plaintiff incorporates by reference the allegations contained in the preceding

27  paragraphs as if fully set forth herein.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    119.    CVS Caremark has tied access to its network of beneficiaries for Filling and

2    Dispensing Services to purchase of the opportunity to provide DIR Services.

3    120.    Filling and Dispensing Services and DIR Services are distinct.

4    121.    As a direct and proximate result of the foregoing conduct, Plaintiff and the

5    members of the proposed Class have been injured by paying artificially inflated prices for the

6    opportunity to provide DIR Services rather than receiving compensation for providing DIR

7    Services.

8    ***Second Claim for Relief: Breach of Implied Covenant of Good Faith and Fair Dealing***

9    122.    Plaintiff incorporates by reference the allegations contained in the preceding

10   paragraphs as if fully set forth herein.

11   123.    CVS Caremark entered contractual relationships with Plaintiff and members of

12   the proposed Class and owed them a duty to act in good faith and deal fairly.

13   124.    The conduct of CVS Caremark described in this complaint violated the implied

14   covenant of good faith and fair dealing, including because CVS Caremark exercised discretion

15   and performed its contractual obligations in bad faith and in a manner that denied Plaintiff and

16   members of the proposed Class the benefit of their bargains.

17   125.    Such acts and omissions leading to CVS Caremark's breach of duty to deal in

18   good faith and fairly with Plaintiff and the members of the proposed Class were the actual and

19   proximate cause of harm to them.

20   ***Third Claim for Relief: Unconscionability***

21   126.    Plaintiff incorporates by reference the allegations contained in the preceding

22   paragraphs as if fully set forth herein.

23   127.    Plaintiff seeks a declaratory judgment from this Court stating that the imposition

24   of DIR fees was unconscionable.

25   ***Fourth Claim for Relief: Unjust Enrichment***

26   128.    Plaintiff incorporates by reference the allegations contained in the preceding

27   paragraphs as if fully set forth herein.

CLASS ACTION COMPLAINT - 26
CASE NO.

129.    Plaintiff and members of the proposed Class conferred benefits on CVS Caremark by providing Filling and Dispensing Services and DIR Services to beneficiaries covered by Plans CVS Caremark administered.

130.    CVS Caremark benefited from those services at the expense of Plaintiff and members of the proposed Class by receiving compensation under its contracts with its Plans and otherwise.

131.    It would be unjust to allow CVS Caremark to keep the benefits of the services of Plaintiff and members of the proposed Class.

### *Fifth Claim for Relief: Quantum Meruit*

132.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

133.    Plaintiff and members of the proposed Class conferred benefits on CVS Caremark by providing Filling and Dispensing Services and DIR Services to beneficiaries covered by Plans it administered.

134.    CVS Caremark accepted the services or materials.

135.    The unconscionability of CVS Caremark's actions renders the contracts between Plaintiff and members of the proposed Class and CVS Caremark unenforceable as they relate to DIR fees.

136.    CVS Caremark should be required to pay Plaintiff and members of the proposed Class for the value of the DIR Services they provided.

### X.     DEMAND FOR RELIEF

Plaintiff respectfully asks this Court:

(a)     to enter judgment awarding damages to Plaintiff and members of the proposed Class in an amount to be determined, and trebled as provided in Section 4 of the Clayton Act, 15 U.S.C. § 15(a), on their federal antitrust claims;

(b)     to award Plaintiff and members of the proposed Class restitution;

CLASS ACTION COMPLAINT - 27
CASE NO.

(c)   to award Plaintiff and members of the proposed Class the cost of this suit, including reasonable attorney's fees, as provided in Section 4 of the Clayton Act, 15 U.S.C. § 15, based on their federal antitrust claims; and

(d)   to order such other and further relief as this Court deems proper and just.

## XI.   DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED AND DATED this 26th day of September, 2023.

TERRELL MARSHALL LAW GROUP PLLC

By: */s/ Beth E. Terrell*
    Beth E. Terrell, WSBA No. 26759
    Blythe H. Chandler, WSBA No. 43387
    Amanda M. Steiner, WSBA No. 29147
    936 North 34th Street, Suite 300
    Seattle, Washington 98103-8869
    Telephone: (206) 816-6603
    Facsimile: (206) 319-5450
    Email: bterrell@terrellmarshall.com
        bchandler@terrellmarshall.com
        asteiner@terrellmarshall.com

BERGER MONTAGUE P.C.

By: */s/ Joshua Davis*
    Joshua Davis, *Pro Hac Vice Forthcoming*
    Julie Pollock, *Pro Hac Vice Forthcoming*
    505 Montgomery St, Suite 625
    San Francisco, CA 94111
    Telephone: (415) 906-0684
    Email: jdavis@bm.net
        jpollock@bm.net

COHEN & GRESSER LLP

By: */s/ John Roberti*
    John Roberti, *Pro Hac Vice Forthcoming*
    Melissa Maxman, *Pro Hac Vice Forthcoming*
    Derek Jackson, *Pro Hac Vice Forthcoming*

CLASS ACTION COMPLAINT - 28
CASE NO.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

Alisa Lu, *Pro Hac Vice Forthcoming*
2001 Pennsylvania Ave, NW, Suite 300
Washington, DC 20006
Telephone: (202) 851-2070
Email: mmaxman@cohengresser.com
        jroberti@cohengresser.com
        djackson@cohengresser.com
        alu@cohengresser.com

CLASS ACTION COMPLAINT - 29
CASE NO.