1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

THE HONORABLE RICARDO S. MARTINEZ

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

OSTERHAUS PHARMACY, INC. on behalf
of itself and all others similarly situated,

Plaintiff,

v.

CVS HEALTH CORPORATION, CVS
PHARMACY, INC., CAREMARK Rx, L.L.C.
(f/k/a CAREMARK Rx, INC.), CAREMARK,
L.L.C., CAREMARKPCS, L.L.C.,
CAREMARK PCS HEALTH L.L.C.,
CAREMARK IPA, L.L.C., CAREMARK
PART D SERVICES, LLC, AETNA INC.,
AETNA HEALTH HOLDINGS, LLC, AND
AETNA HEALTH MANAGEMENT, LLC,

Defendants.

Case No. 2:23–cv–01500–RSM

Hon. Ricardo S. Martinez

**MOTION TO COMPEL
ARBITRATION**

Note on Motion Calendar: March 1, 2024

ORAL ARGUMENT REQUESTED

## INTRODUCTION

Osterhaus Pharmacy Inc. is required to arbitrate its claims against Caremark[1]—to the extent it still has any[2]—based on the mandatory arbitration provision in the parties' contract. Because Osterhaus's claims are subject to mandatory arbitration, the Court should enter an order under section 4 of the Federal Arbitration Act (i) compelling Osterhaus to bring its claims against Caremark in arbitration, if at all, and (ii) dismissing the claims alleged against Caremark. *See* 9 U.S.C. § 4.

---

[1] "Caremark" refers collectively to all the named defendants.
[2] On November 1, 2021, Osterhaus sold and assigned all its assets to Maquoketa Pharmacy Inc., as further discussed below. (*See infra* Background Part IV.)

MOTION TO COMPEL ARBITRATION – 1
CASE NO. 2:23–CV–01500–RSM

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    From approximately January 18, 1996, through January 1, 2022, Osterhaus participated in

2    pharmacy-provider networks managed by Caremark. On November 1, 2021, Osterhaus assigned

3    its assets to Maquoketa, and Maquoketa began participating in Caremark's networks under a new

4    provider agreement with Caremark.

5    Osterhaus's participation in the networks was governed by a provider agreement that

6    expressly incorporates Caremark's provider manual, which sets forth the terms and conditions for

7    participating in Caremark's networks. The provider agreement contains an arbitration provision

8    stating that "[a]ny and all controversies in connection with or arising out of this Agreement will

9    be exclusively settled by arbitration . . . ." (Declaration of Steven D. McCall ("McCall Decl."), Ex.

10   1, Osterhaus Provider Agreement, p. 7, § 9.5.) Similarly, the provider manual contains an

11   arbitration provision requiring the parties to arbitrate "[a]ny and all disputes between [Osterhaus]

12   and Caremark . . ., including but not limited to, disputes in connection with, arising out of, or

13   relating in any way to, the Provider Agreement or to [Osterhaus's] participation in one or more

14   Caremark networks or exclusion from any Caremark networks . . . ." (*See id.*; *see also* McCall

15   Decl., Ex. 6, 2020 Manual, p. 91, § 15.09.)

16   The arbitration agreement between Caremark and Osterhaus unambiguously reflects the

17   parties' intent to resolve any disputes in arbitration, not in court. Consistent with this intent, courts

18   throughout the country have uniformly enforced Caremark's arbitration agreements with

19   pharmacies participating in Caremark's networks and held that the pharmacies must arbitrate their

20   claims against Caremark. *See, e.g., Caremark LLC v. Chickasaw Nation*, 43 F.4th 1021, 1034 (9th

21   Cir. 2022) (affirming order granting motion to compel arbitration based on arbitration provision

22   in Caremark's 2020 provider manual); *Caremark LLC v. Choctaw Nation*, 2022 WL 768098, at

23   *6 (D. Ariz. Mar. 14, 2022) (granting motion to compel arbitration based on arbitration provision

24   in Caremark's 2020 provider manual); *Lackie Drug Store, Inc. v. Ark. CVS Pharmacy, LLC*, 2021

25   WL 5567360, at *4 (E.D. Ark. Nov. 29, 2021) (same); *Bowie's Priority Care Pharmacy, L.L.C. v.*

26   *CaremarkPCS, L.L.C.*, 2018 WL 1964596, at *7 (N.D. Ala. Apr. 26, 2018) (same for Caremark's

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

2018 provider manual); *W. Va. CVS Pharmacy, LLC v. McDowell Pharmacy, Inc.*, 796 S.E.2d 574, 590 (W. Va. 2017) (reversing order denying motion to compel arbitration based on arbitration provision in Caremark's 2009 provider manual); *RX Pros, Inc. v. CVS Health Corp.*, 2016 WL 316867, at *4 (W.D. La. 2016) (granting motion to compel arbitration based on arbitration provision in Caremark's 2016 provider manual); *Grasso Enters., L.L.C. v. CVS HealthCorp,* 143 F. Supp. 3d 530, 544 (W.D. Tex. 2015) (same for Caremark's 2014 provider manual); *Burton's Pharmacy, Inc. v. CVS Caremark Corp.*, 2015 WL 5430354, at *12 (M.D.N.C. Sept. 15, 2015) (same for the then-operative version of Caremark's provider manual), *report and recommendation adopted*, 2015 WL 5999386, at *1 (M.D.N.C. Oct. 14, 2015); *Hopkinton Drug, Inc. v. CaremarkPCS, L.L.C.*, 77 F. Supp. 3d 237, 249, 255 (D. Mass. 2015) (same for Caremark's 2014 provider manual); *Paduano v. Express Scripts, Inc.*, 55 F. Supp. 3d 400, 422 (E.D.N.Y. 2004) (same); *Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 259–63 (5th Cir. 2014) (same for the then-operative version of Caremark's provider manual); *Uptown Drug Co., Inc. v. CVS Caremark Corp.*, 962 F. Supp. 2d 1172, 1183–87 (N.D. Cal 2013) (same for Caremark's 2011 provider manual); *MedfusionRx, LLC v. Aetna Life Ins. Co.*, 2012 U.S. Dist. LEXIS 191045, at *17 (S.D. Miss. Dec. 21, 2012) (same); *CVS Pharmacy, Inc. v Gable Family Pharmacy*, 2012 U.S. Dist. LEXIS 191047, at *37 (D. Ariz. Oct. 19, 2012) (same for the then-operative version of Caremark's provider manual); *Muecke Co., Inc. v. CVS Caremark Corp.*, 2012 WL 12535439, at *20–23 (S.D. Tex. Feb. 22, 2012) (same for Caremark's 2007 and 2009 provider manuals), *report and recommendation adopted*, 2012 WL 12535440, at *1 (S.D. Tex. Mar. 29, 2012), *modified*, 2014 WL 11342572, at *6 (S.D. Tex. June 27, 2014), *aff'd*, 615 F. App'x 837, 841–42 (5th Cir. 2015).

Here, as in the cases cited above, Osterhaus voluntarily chose to participate in Caremark's pharmacy networks. By doing so, it was able to seek reimbursement from Caremark for pharmacy services provided to group-health-plan participants who received benefits sponsored, administered, or insured by Caremark's clients. Having accepted the benefits of participating in

MOTION TO COMPEL ARBITRATION – 3
CASE NO. 2:23–CV–01500–RSM

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1  Caremark's networks, Osterhaus is subject to the obligations imposed by its provider agreement

2  with Caremark and the provider manual, including the obligation to arbitrate any disputes with

3  Caremark.

4      The claims asserted against Caremark, which are based on Osterhaus's participation in

5  Caremark's networks, fall squarely within the scope of the parties' valid, enforceable arbitration

6  agreement. (*Compare* Compl., ECF No. 1, ¶¶ 118–36, *with* McCall Decl., Ex. 6, 2020 Manual, p.

7  91, § 15.09.) Moreover, even if questions existed regarding the enforceability or scope of the

8  arbitration agreement (which they do not), the arbitration agreement expressly delegates "any

9  dispute relating to the interpretation, applicability, enforceability, or formation of the agreement"

10  to an arbitrator, not a court. (*See* McCall Decl., Ex. 6, 2020 Manual, p. 91, § 15.09.) For these

11  reasons, and as further discussed below, the Court should (i) grant Caremark's motion to compel

12  arbitration and (ii) dismiss the claims alleged against Caremark.

13                          **BACKGROUND**

14  **I.    Caremark's PBM Services**

15      Caremark offers PBM services to insurers, third-party administrators, business coalitions,

16  and employer sponsors of group health plans. (McCall Decl., ¶ 13.) Those services include

17  administering and maintaining pharmacy networks. (*Id.*, ¶ 14.) In return for access to these

18  networks, pharmacies agree to fill prescriptions for participants in Caremark's clients' health

19  plans. (*Id.*, ¶ 15.)

20      Caremark's clients include private health insurers that offer prescription-drug plans to

21  Medicare beneficiaries under part D of the Medicare program. (*Id.*) Medicare is a federally funded

22  health-insurance program, primarily for the elderly and disabled, established under title XVIII of

23  the Social Security Act. (*Id.*, ¶ 16.) *See also* 42 U.S.C. § 1395, *et seq.* Medicare part D is a private

24  market-based prescription-drug program in which the costs are shared between the government

25  and private health insurers who offer plans. (*Id.*) *See also* 42 C.F.R. § 423.4. Under the Medicare

26  Act, part D plan sponsors contract with the Centers for Medicare & Medicaid Services to offer part

MOTION TO COMPEL ARBITRATION – 4
CASE NO. 2:23–CV–01500–RSM

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1  D prescription-drug plans to Medicare beneficiaries. (*Id.*) *See also Uhm v. Humana, Inc.*, 620 F.3d
2  1134, 1138 (9th Cir. 2010).

3        Caremark serves as a PBM for various part D plan sponsors. (*Id.*, ¶ 17.) As a PBM,
4  Caremark administers prescription-drug benefits for plan members, including part D beneficiaries,
5  and processes and pays prescription-drug claims made by pharmacies. (*Id.*) *See also Park Irmat*
6  *Drug Corp. v. Express Scripts Holding Co.*, 911 F. 3d 505, 511 (8th Cir. 2018).

7  **II.   Osterhaus's Provider Agreement**

8        On or about January 18, 1996, Osterhaus began participating in Caremark's networks by
9  executing a provider agreement (the "Osterhaus Provider Agreement") with Caremark's
10 predecessor, PCS Health Systems Inc. (McCall Decl., ¶ 24 & Ex. 1, Osterhaus Provider
11 Agreement.) The Osterhaus Provider Agreement contained an arbitration provision stating that
12 "[a]ny and all controversies in connection with or arising out of this Agreement w[ould] be
13 exclusively settled by arbitration before a single arbitrator in accordance with the Rules of the
14 American Arbitration Association." (McCall Decl., ¶ 24 & Ex. 1, Osterhaus Provider Agreement,
15 p. 7, § 9.5.) The provision further stated that any arbitration would "be conducted in Scottsdale,
16 Arizona," and the parties' rights would be "governed by the [FAA]." (McCall Decl., Ex. 1,
17 Osterhaus Provider Agreement, p. 7, § 9.5.)

18       In 2000, Advance Paradigm Inc. acquired PCS Health, forming AdvancePCS Inc. (McCall
19 Decl., ¶ 26.) After the acquisition, AdvancePCS notified all the pharmacies in PCS Health's
20 networks, including Osterhaus, that the base provider agreement between each pharmacy and PCS
21 Health, including the Osterhaus Provider Agreement, would remain in effect, would apply with
22 respect to all of AdvancePCS's business, and would be referred to as the "AdvancePCS Provider
23 Agreement." (McCall Decl., ¶ 26 & Ex. 2, AdvancePCS Notice.)

24       In 2004, Caremark acquired AdvancePCS. (McCall Decl., ¶ 27.) After the acquisition,
25 Caremark notified all the pharmacies participating in AdvancePCS's networks, including
26 Osterhaus, that the base provider agreement between each pharmacy and PCS Health, as adopted

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1  by AdvancePCS, including the Osterhaus Provider Agreement, would remain in effect, would

2  apply with respect to all of Caremark's business, and would be referred to as the "Caremark

3  Provider Agreement." (McCall Decl., ¶ 27 & Ex. 3, Caremark Notice.)

4  **III.    Osterhaus's Participation in Caremark's Network's**

5           After Caremark acquired AdvancePCS, Osterhaus continued to participate in Caremark's

6  networks based on the terms of the Osterhaus Provider Agreement and the terms of Caremark's

7  provider manual, as amended from time to time. (McCall Decl., ¶ 28.) In relevant part, Caremark

8  distributed hard copies of the 2016 CVS Provider Manual (the "2016 Provider Manual"), the 2018

9  CVS Caremark Provider Manual (the "2018 Provider Manual") and the 2020 CVS Caremark

10 Provider Manual (the "2020 Provider Manual") to Osterhaus, and Osterhaus submitted

11 reimbursement claims to Caremark after receiving each version of the manual. (McCall Decl., ¶¶

12 29–50 & Ex. 7, Screen Shots.)

13          The 2018 Provider Manual and the 2020 Provider Manual each contained an arbitration

14 provision. (McCall Decl., ¶ 35, Ex. 5, 2018 Manual, pp. 51–52, & Ex. 6, 2020 Manual, pp. 91–92,

15 § 15.09; *see also* McCall Decl., Ex. 4, 2016 Manual, pp. 44–45.) The 2018 Provider Manual and

16 the 2020 Provider Manual each also contained a provision stating that if a provider "submit[ed]

17 claims to Caremark after the effective date of any notice or amendment," including any notice or

18 amendment regarding "the Provider Manual or other Caremark Documents," then "the terms of

19 the notice or amendment [would be] accepted by [the] Provider and . . . considered part of the

20 Provider Agreement." (McCall Decl., ¶¶ 33–34, Ex. 5, 2018 Manual, p. 51, & Ex. 6, 2020 Manual,

21 p. 90, § 15.07; *see also* McCall Decl., Ex. 4, 2016 Manual, p. 43.)

22          The 2020 Provider Manual's arbitration provision, which governs any claims by Osterhaus

23 against Caremark, states, in relevant part, that:

24          Any and all disputes between Provider and Caremark [including Caremark's
            current, future, or former employees, parents, subsidiaries, affiliates, agents, and
25          assigns (collectively referred to in this Arbitration section as "Caremark")],
            including, but not limited to, disputes in connection with, arising out of, or relating
26          in any way to, the Provider Agreement or to Provider's participation in one or more

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

Caremark networks or exclusion from any Caremark networks, will be exclusively settled by arbitration.

(McCall Decl., Ex. 6, 2020 Manual, p. 91, § 15.09.)

The arbitration provision also grants the arbitrator "exclusive authority" over certain matters, stating:

The arbitrator(s) shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of the agreement to arbitrate, including but not limited to, any claim that all or part of the agreement to arbitrate is void or voidable for any reason.

(*Id.*)

In addition, the arbitration provision prohibits class actions and other consolidated proceedings, stating:

No dispute between Provider and Caremark may be pursued or resolved as part of a class action, private attorney general or other representative action or proceeding . . . . All disputes are subject to arbitration on an individual basis, not on a class or representative basis, or through any form of consolidated proceedings . . . .

(*Id.*)

The arbitration provision further states that "[a]ny . . . arbitration must be conducted in Scottsdale, Arizona," and that the parties' rights are "governed by the [FAA]." (*Id.*)

## IV.   Maquoketa's Purchase of Osterhaus's Assets

On November 1, 2021, Osterhaus and Maquoketa executed an asset-purchase agreement transferring Osterhaus's business assets to Maquoketa. (McCall Decl., ¶ 54 & Ex. 8, Asset-Purchase Agreement.) The agreement, which Maquoketa provided to Caremark when Maquoketa enrolled in Caremark's networks, stated that Osterhaus "convey[ed], transfer[red], s[old] and assign[ed]" Osterhaus's assets to Maquoketa, including but not limited to "all . . . choses in action[] and other intangible assets of [Osterhaus] relating to the Business." (McCall Decl., ¶ 55 & Ex. 8, Asset-Purchase Agreement, p. 2, ¶ 1(d).) As of January 1, 2022, Osterhaus stopped participating in Caremark's networks. (McCall Decl., ¶ 57.)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

**V.    Osterhaus's Claims**

On September 26, 2023, Osterhaus filed a five-count complaint against Caremark challenging the direct-and-indirect remuneration fees, or "DIR fees," that Caremark assesses on the pharmacies participating in its Medicare part D networks. (Compl., ECF No. 1.) The complaint alleges claims for (i) violations of the Sherman Antitrust Act, (ii) breach of the implied covenant of good faith and fair dealing, (iii) unconscionability, (iv) unjust enrichment, and (v) quantum meruit. (*Id.*, ¶¶ 118–36.) The claims purport to cover the period "from September 26, 2019," through trial. (*Id.*, ¶ 107.)

According to Osterhaus, which identifies itself as operating "[u]ntil January 1, 2022" (*id.*, ¶ 5), its antitrust claim "is based on CVS Caremark denying pharmacies access to its network of Medicare Part D beneficiaries to fill and dispense their prescriptions unless the pharmacies also enter a second transaction involving a performance program that compels the pharmacies to pay fees for the 'opportunity' to provide other performance-related services" (*id.*, p. 2). Osterhaus's remaining claims, all of which pertain to Caremark's DIR fees, allege that Caremark (i) "exercised [its] discretion in bad faith" in "calculating the DIR fees pharmacies must pay," (ii) imposed DIR fees that are "unconscionable," (iii) unjustly enriched itself by collecting DIR fees based on its "unconscionable contracts" with participating pharmacies, and (iv) failed "to pay [Osterhaus] and the members of the proposed Class for the value of the DIR services they provided." (*Id.*)

The complaint openly acknowledges Caremark's arbitration agreements with the pharmacies that participate in its networks. (*See id.*, ¶ 106.) However, it mischaracterizes the agreements as containing "a forced arbitration clause with several unconscionable terms," including the terms governing discovery, arbitration costs, fee-shifting, and amendments to the arbitration provision. (*See id.*)

**LEGAL STANDARDS**

Under section 2 of the FAA, arbitration agreements are "valid, irrevocable, and enforceable" when "in writing." 9 U.S.C. § 2. Under section 4 of the FAA, "[a] party aggrieved

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

by the alleged failure . . . of another to arbitrate under a written agreement for arbitration" is entitled to "an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4; *see also Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (section 4 entitles an aggrieved party to "an order compelling arbitration").

The FAA "establishes a national policy favoring arbitration . . . ." *Preston v. Ferrer*, 552 U.S. 346, 349 (2008); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) (discussing the "liberal federal policy favoring arbitration"); *AT&T Mobility L.L.C. v. Concepcion*, 563 U.S. 333, 339 (2011) (same). It also reflects "the fundamental principle that arbitration is a matter of contract." *Concepcion*, 563 U.S. at 339 (internal quotation marks omitted). "In line with these principles, courts must place arbitration agreements on an equal footing with other contracts . . . and enforce them ***according to their terms***." *Id.* (emphasis added) (internal citations omitted); *see also Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1415 (2019).

A corollary to this rule is that parties are allowed to shape arbitration agreements "to their liking by specifying with whom they will arbitrate, the issues subject to arbitration, the rules by which they will arbitrate, and the arbitrators who will resolve their disputes." *Lamps Plus*, 139 S. Ct. at 1415. When construing an arbitration agreement, courts and arbitrators must "give effect to the contractual rights and expectations of the parties." *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (internal quotation marks omitted). Because of "the consensual nature of private dispute resolution, . . . parties are generally free to structure their arbitration agreements as they see fit." *Id.* (internal quotation marks omitted).

Notably, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 213 (1985) (emphasis in original). Thus, in proceedings under section 4 of the FAA, a "court's role . . . is . . . limited to determining (1) whether a valid agreement to arbitrate exists and, if it

MOTION TO COMPEL ARBITRATION – 9
CASE NO. 2:23–CV–01500–RSM

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1   does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho*

2   *Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).

3                                                    **ARGUMENT**

4   **I.      A valid arbitration agreement exists that covers the parties' dispute.**

5           The claims asserted in the complaint must be arbitrated because a valid arbitration

6   agreement exists that covers the parties' dispute. *See Chiron*, 207 F.3d at 1130.

7           **A.      Arizona law applies.**

8           As an initial matter, any question regarding the existence or scope of the arbitration

9   agreement is governed by Arizona law because the Osterhaus Provider Agreement contains a valid

10  Arizona choice-of-law clause. (McCall Decl., Ex. 1, Osterhaus Provider Agreement, p. 7, § 9.4.)

11  The Osterhaus Provider Agreement expressly states that "[u]nless otherwise specifically provided

12  herein or mandated by applicable Law, this Agreement will be construed, governed and enforced

13  in accordance with the laws of the State of Arizona without regard to choice of law provisions."

14  (*Id.*)

15          Multiple courts enforcing Caremark's arbitration agreements with participating pharmacies

16  have applied Arizona law based on the agreements' choice-of-law clauses. *See, e.g., Grasso*, 143

17  F. Supp. 3d at 536–37; *Burton's*, 2015 WL 5430354, at *3–4; *Crawford*, 748 F.3d at 257–59;

18  *Medfusion*, 2012 U.S. Dist. LEXIS 191045, at *12; *Muecke*, 2012 WL 12535439, at *14. This

19  Court should do the same.

20          "Federal courts sitting in diversity look to the law of the forum state . . . when making

21  choice law determinations." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir.

22  2014). Washington courts "generally enforce choice-of-law provisions in contracts." *Karpenski v.*

23  *Am. Gen. Life Cos., LLC*, 999 F. Supp. 2d 1235, 1242 (W.D. Wash. 2014). A Washington court

24  will only disregard a choice-of-law provision and apply Washington law "(1) if, without the

25  provision, Washington law would apply; (2) if the chosen state's law violates a fundamental public

26  policy of Washington; and (3) if Washington's interest in the determination of the issue materially

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

outweighs the chosen state's interest." *Id.* (internal quotation marks omitted). None of these conditions are satisfied here.

*First*, even without the choice-of-law clause, Washington law still would not apply. In resolving "contract choice of law issues," Washington courts apply the most-significant-relationship test from the Restatement (Second) of Conflict of Laws. *See Mulcahy v. Farmers Ins. Co. of Wash.*, 95 P.3d 313, 317 (Wash. 2004); Restatement (Second) of Conflict of Laws § 188 (1971). Relevant "contacts to be taken into account" include "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties." *Id.* (internal quotation marks omitted).

None of these factors support applying Washington law. Osterhaus admits that it has no connection to Washington, alleging that "[u]ntil January 1, 2022, [it] operated as Osterhaus Pharmacy" in "Maquoketa, [Iowa]." (Compl., ECF No. 1, ¶ 5.) Osterhaus does not allege that any of the events underlying its claims took place in Washington or that it had any contacts with Washington. (*See id.*, ¶¶ 20–106.) Although Osterhaus claims that "CVS Caremark resides in this district" (*id.*, ¶ 3), it does not plead any facts to support this assertion and acknowledges that each named defendant is incorporated, and has its principal place of business, in a state other than Washington (*id.*, ¶¶ 8–19).

Additionally, Osterhaus's claims relate to participating in pharmacy networks Caremark administers and maintains in Arizona, the "hub" of Caremark's PBM business. (*See* McCall Decl., ¶ 18.) *See also Burton's*, 2015 WL 5430354, at *4 (concluding that Arizona, the 'hub' of Caremark's PBM operations," had "a substantial relationship to the parties and the transactions at issue"). Among other things, (i) the contact address for Caremark's "Network Management" division is in Scottsdale, Arizona (McCall Decl., Ex. 6, 2020 Manual, p. 6, § 1.05); (ii) "inquiries and grievances," network-enrollment payments, claim disputes, and audit appeals must be submitted to Caremark's Scottsdale, Arizona, office (McCall Decl., Ex. 6, 2020 Manual, p. 6, §

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1.05, p. 10, § 2.01.02, p. 43–44, § 6.06.02, pp. 52–53, § 8.07); and (iii) Medicare part D claims must be submitted to Caremark's Phoenix, Arizona, address (McCall Decl., Ex. 6, 2020 Manual, pp. 69–70, § 10.05.14). In other words, Osterhaus's dispute with Caremark is governed by an agreement that was negotiated and executed, in part, in Arizona and contemplated an ongoing business relationship between Caremark and Osterhaus in which significant contractual performance would occur in Arizona through Caremark's corporate offices, and corporate personnel, in that state. Because there are no relevant "contacts" with Washington, even without an Arizona choice-of-law clause, Washington law would not apply. *See Mulcahy*, 95 P.3d at 317; *Karpenski*, 999 F. Supp. 2d at 1242.

*Second*, there is no conflict between Arizona and Washington law regarding the formation of a binding arbitration agreement. Under each state's law, the basic elements of contract formation are an offer, acceptance, and consideration. *Compare Flory v. Silvercrest Indus., Inc.*, 633 P.2d 383, 390 (Ariz. 1981) (discussing elements of contract formation under Arizona law), *with Storti v. Univ. of Wash.*, 330 P.3d 159, 163 (Wash. 2014) (discussing elements of contract formation under Washington law). Acceptance can be express, such as by signing an agreement, or implied, such as through performance or other conduct. *Compare Barmat v. John & Jane Doe Partners A–D*, 747 P.2d 1218, 1220 (Ariz. 1987) (discussing express and implied contracts under Arizona law), *with Hoglund v. Meeks*, 170 P.3d 37, 46 (Wash. Ct. App. 2007) (discussing express and implied contracts under Washington law). Further, reciprocal promises to arbitrate are sufficient consideration for an arbitration agreement. *Compare Stevens/Leinweber/Sullens, Inc. v. Holm Dev. & Mgmt., Inc.*, 795 P.2d 1308, 1313 (Ariz. Ct. App. 1990) (discussing mutuality of obligation in arbitration agreements under Arizona law), *with Walters v. A.A.A. Waterproofing, Inc.*, 85 P.3d 389, 359–60 (Wash. Ct. App. 2004) (discussing mutuality of obligation in arbitration agreements under Washington law). Because the applicable law is the same in Arizona and Washington, Arizona law does not violate a fundamental public policy of Washington. *See Karpenski*, 999 F. Supp. 2d at 1242.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

*Third*, Washington's interest in this case does not outweigh Arizona's. *See id.* The case does not involve any Washington residents or Washington laws. (*See* Compl., ECF No. 1, ¶¶ 5, 20–106.) By contrast, Caremark's PBM operations are in Arizona, and Osterhaus knowingly entered into a contractual relationship based in that state. (McCall Decl., ¶ 18 & Ex. 6, 2020 Manual, p. 6, § 1.05, p. 10, § 2.01.02, p. 43–44, § 6.06.02, pp. 52–53, § 8.07, & pp. 69–70, § 10.05.14.) Based on these considerations, there is no reason for the Court to disregard the Arizona choice-of-law clause in the Osterhaus Provider Agreement.

**B.      A valid arbitration agreement exists.**

The facts establish that a valid arbitration agreement exists in this case. *See Chiron*, 207 F.3d at 1130.

On or about January 18, 1996, Osterhaus enrolled in PCS Health's networks by entering into the Osterhaus Provider Agreement. (McCall Decl., ¶ 24 & Ex. 1, Osterhaus Provider Agreement.) Osterhaus expressly accepted the Agreement's terms, including the arbitration provision, by signing the Agreement. (McCall Decl., ¶ 25 & Ex. 1, Osterhaus Provider Agreement, p. 7, § 9.5.) *See Barmat*, 747 P.2d at 1220 (express contract "is made by words written or spoken"); *see also Briggs v. Serv. Corp. Int'l*, 2023 WL 2075958, at *4 (W.D. Wash. Feb. 17, 2023) (stating that "[a]cceptance may be manifested expressly, such as by checking a box or clicking on a button").

In 2000, AdvancePCS acquired PCS Health and left the Osterhaus Provider Agreement in effect. (McCall Decl., ¶ 26 & Ex. 2, AdvancePCS Notice.) In 2004, Caremark acquired AdvancePCS and left the Osterhaus Provider Agreement in effect. (McCall Decl., ¶ 27 & Ex. 3, Caremark Notice.)

The Osterhaus Provider Agreement allowed Caremark, "[f]rom time to time," to "amend th[e] Agreement . . . by giving notice to [Osterhaus] of the terms of the amendment and specifying the date when the amendment becomes effective . . . ." (McCall Decl., Ex. 1, Osterhaus Provider Agreement, p. 1, § 1.3.) During the period relevant to this litigation, which alleges claims from

MOTION TO COMPEL ARBITRATION – 13
CASE NO. 2:23–CV–01500–RSM

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

September 26, 2019, forward (Compl., ECF No. 1, ¶ 107), Caremark distributed hard copies of the 2018 Provider Manual and the 2020 Provider Manual to Osterhaus, both of which contain an arbitration provision (McCall Decl., ¶¶ 29–47 & Ex. 7, Screen Shots). After receiving the hard copies from Caremark, Osterhaus accepted the terms of the 2018 Provider Manual and the 2020 Provider Manual by "submit[ting] claims to Caremark after the effective date of [each] amendment." (McCall Decl., ¶¶ 48–50, Ex. 5, 2018 Manual, p. 51, & Ex. 6, 2020 Manual, p. 90, § 15.07.) *See Barmat*, 747 P.2d at 1220 (where contract is implied in fact, "conduct rather than words conveys the necessary assent and undertakings"); *In re Estate of Mariotte*, 619 P.2d 1068, 1069 (Ariz. 1980) (stating that "[a]cceptance of an offer may be implied from acts or conduct"); *Bowie's*, 2018 WL 1964596, at *4 (concluding that the plaintiff's "conduct evince[d] an intent to adopt the terms of [the 2018] Provider[] Manual"). The 2020 Provider Manual was the version in effect at the time Osterhaus assigned its causes of action in this case to Maquoketa on November 1, 2021. (McCall Decl., ¶ 51 & Ex. 8, Asset-Purchase Agreement, p. 2, ¶ 1(d).)

The arbitration agreement was supported by consideration. Caremark and Osterhaus reciprocally promised to arbitrate their disputes, which is sufficient consideration. (McCall Decl., Ex. 6, 2020 Manual, p. 91, § 15.09.) *See Holm*, 795 P.2d at 1313 (discussing mutuality of obligation in arbitration agreements); *Lombardi v. DirecTV, Inc.*, 549 F. App'x 617, 619 (9th Cir. 2013) (holding that arbitration agreement was valid under Arizona law because "reciprocal promise to arbitrate" was "adequate consideration"); *Batory v. Sears, Roebuck & Co.*, 124 F. App'x 530, 533 (9th Cir. 2005) (holding that arbitration agreement was valid under Arizona law based on mutual promises to arbitrate); *Grasso*, 143 F. Supp. 3d at 538–39 (finding that Caremark's arbitration agreement with pharmacy was valid under Arizona law based on mutual promises to arbitrate); *Valdiviezo v. Phelps Dodge Hidalgo Smelter, Inc.*, 995 F. Supp. 1060, 1066–67 (D. Ariz. 1997) (finding that arbitration agreement was valid under Arizona law based on mutual promises to arbitrate).

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    Additionally, in exchange for entering into the arbitration agreement, Osterhaus obtained

2    the benefits of participating in Caremark's networks, including Caremark's payment of Osterhaus

3    at the agreed-upon reimbursement rates, which independently provided consideration for the

4    agreement. (McCall Decl., ¶¶ 48–49.) *See Diversified Roofing Corp. v. Pulte Home Corp.*, Nos.

5    CV 12–1880 & CV 12–2177, 2012 WL 6628962, at *4–5 (D. Ariz. Dec. 19, 2012) (explaining

6    that, under the FAA, consideration for an arbitration agreement may be based on other aspects of

7    the contract as a whole); *Equal Emp't Opportunity Comm'n v. Cheesecake Factory, Inc.*, 2009 WL

8    1259359, at 4 & n.1 (D. Ariz. May 6, 2009) (same).

9    Based on these facts, a valid arbitration agreement existed between Osterhaus and

10   Caremark. *See also Lackie*, 2021 WL 5567360, at *2, *4 (enforcing arbitration agreement formed

11   between Caremark and participating pharmacy based on the provider agreement between PCS

12   Health and the pharmacy, as adopted by AdvancePCS and later by Caremark, and the provisions

13   of Caremark's provider manual); *Bowie's*, 2018 WL 1964596, at *1, *7 (same); *W. Va. CVS*

14   *Pharmacy*, 796 S.E.2d at 585–87 (same); *Burton's*, 2015 WL 5999386, at *2, *12 (same); *Uptown*,

15   962 F. Supp. 2d at 1176–78, 1187–88 (same); *Gable*, 2012 U.S. Dist. LEXIS 191047, at *5, *37

16   (same); *Muecke*, 2012 WL 12535439, at *15, *20–23 (same).

17       **C.    The arbitration agreement covers the parties' dispute.**

18       The arbitration agreement also covers the parties' dispute. *See Chiron*, 207 F.3d at 1130.

19           **1.    The arbitration agreement covers the claims asserted against**
20                **Caremark.**

21       *First*, the arbitration agreement covers the claims asserted against Caremark. "In the

22   absence of any express provision excluding a particular grievance from arbitration, . . . only the

23   most forceful evidence of a purpose to exclude the claim from arbitration can prevail . . . ."

24   *Steelworkers v. Warrior & Gulf*, 363 U.S. 574, 584–85 (1960). For a claim to be arbitrable, the

25   plaintiff's "factual allegations need only 'touch' matters covered by the contract containing the

26   arbitration clause and all doubts are to be resolved in favor of arbitrability." *Simula, Inc. v. Autoliv,*

MOTION TO COMPEL ARBITRATION – 15
CASE NO. 2:23–CV–01500–RSM

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1   *Inc.*, 175 F.3d 716, 721 (9th Cir. 1999). Courts consistently enforce broad arbitration provisions,

2   such as the one at issue here. *Cf. Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, (9th Cir. 2016)

3   (stating that "[n]o matter how broad the arbitration clause, it may be necessary to file an action in

4   court to enforce an arbitration agreement") (internal quotation marks omitted); *see also Caliente*

5   *Constr. Inc. v. Wildflower Bread Co. LLC*, 2020 WL 6833760, at * 2 (Ariz. Ct. App. Nov. 17,

6   2020) (requiring parties to arbitrate statutory claims because of arbitration clause that referred

7   broadly to claims "relating to" or "arising out of" a contract).

8        The parties' arbitration agreement covers "[a]ny and all disputes between Provider and

9   Caremark . . ., including but not limited to, disputes in connection with, arising out of, or relating

10  in any way to, the Provider Agreement or to Provider's participation in one or more Caremark

11  networks or exclusion from any Caremark networks . . . ." (McCall Decl., Ex. 6, 2020 Manual, p.

12  91, § 15.09.) The claims asserted in the complaint, all of which pertain to the DIR fees imposed

13  by Caremark in connection with Osterhaus's participation in Caremark's Medicare part D

14  networks, represent a "dispute[]" between Osterhaus and Caremark "relating . . . to" Osterhaus's

15  participation in or exclusion from Caremark's networks. (*See* Compl., ECF No. 1, ¶¶ 118–36.)

16       Additionally, at all times relevant to the claims asserted by Osterhaus, which date back to

17  September 26, 2019 (*id.*, ¶ 107), any disputes between Osterhaus, on the one hand, and Caremark,

18  on the other, have been covered by an arbitration agreement. The arbitration provision in the 2018

19  Provider Manual was in effect at the beginning of the period that is the subject of Osterhaus's

20  claims. (McCall Decl., ¶ 51 & Ex. 5, 2018 Manual.) The 2020 Provider Manual then "supersede[d]

21  and replace[d]" the 2018 Provider Manual and remained in effect when Osterhaus assigned its

22  assets to Maquoketa on November 1, 2021. (McCall Decl., ¶ 51 & Ex. 6, 2020 Manual, p. 5, § 1.)

23  An unbroken string of arbitration agreements thus covers the entire time frame at issue in this case.

24       **2.**     **The arbitration agreement applies to each of the entities that was sued.**

25       *Second*, the arbitration agreement applies to each of the named defendants. Because

26  arbitration is "a matter of consent, not coercion," parties "may specify *with whom* they choose to

MOTION TO COMPEL ARBITRATION – 16
CASE NO. 2:23–CV–01500–RSM

1    arbitrate their disputes . . . ." *Stolt–Nielsen*, 559 U.S. at 683 (emphasis in original). Here, the

2    arbitration agreement defines "Caremark" to include ***all*** Caremark's "current, future, or former

3    . . . parents, subsidiaries, affiliates, agents, and assigns . . . ." (McCall Decl., Ex. 6, 2020 Manual,

4    p. 91, § 15.09.) Each of the named defendants falls within this category, as Osterhaus itself alleges.

5    (*See* Compl., ECF No. 1, ¶¶ 8–19 (describing the "CVS Caremark Entities" as including "CVS

6    Health Corporation" and each "subsidiary" entity named as a defendant).) Based on the arbitration

7    agreement's definition of "Caremark," the arbitration agreement covers each of the named

8    defendants. *See, e.g., Shields v. Frontier Tech., LLC*, 2011 WL 13070409, at *7 (D. Ariz. Nov. 30,

9    2011) (allowing nonsignatories to arbitration agreement to compel arbitration where language of

10   agreement was broad enough to cover nonsignatories).

11          Indeed, even if the named defendants were not expressly covered by the terms of the

12   arbitration agreement (which they are), they would still be entitled to invoke the agreement. "[A]

13   litigant who was not a party to the relevant arbitration agreement may invoke [the FAA] if the

14   relevant state contract law allows [the litigant] to enforce the agreement." *Arthur Andersen LLP v.*

15   *Carlisle*, 556 U.S. 624, 632 (2009); *Shivkov v. Artex Risk Sols., Inc.*, 974 F.3d 1051, 1070 (9th Cir.

16   2020). Arizona courts have concluded that, based on principles of "alternative estoppel," a

17   nonsignatory to an arbitration agreement can compel arbitration of a signatory's claims where, as

18   here, "each of a signatory's claims against a nonsignatory makes reference to or presumes the

19   existence of [a] written agreement," such that "the signatory's claims arise out of and relate directly

20   to the written agreement." *See Sun Valley Ranch 308, Ltd. P'ship ex rel. Englewood Props., Inc.*

21   *v. Robson*, 294 P.3d 125, 133–35 (Ariz. Ct. App. 2012) (internal quotation marks omitted)

22   (allowing nonsignatories to arbitration agreement to compel arbitration); *Carey v. K&M Seafood*

23   *Fin., LLC*, 2014 WL 6778859, at *5 (Ariz. Ct. App. Dec. 2, 2014) (same); *see also Schoneberger*

24   *v. Oelze*, 96 P.3d 1078, 1081 & n.5 (Ariz. Ct. App. 2004) (stating that, "[u]nder well-established

25   common law principles, a nonsignatory may be entitled to enforce, or be bound by, an arbitration

26

provision in a contract executed by others"), *superseded by statute on other grounds*, 2008 Ariz. Sess. Laws, ch. 247, § 16 (2d Reg. Sess.).

Federal courts applying Arizona law have followed suit. *See, e.g., Shivkov*, 974 F.3d at 1069–71 (allowing nonsignatories to arbitration agreement to compel arbitration based on "alternative estoppel"); *Guglielmo v. LG&M Holdings LLC*, 2019 WL 3253190, at \*5 (D. Ariz. July 19, 2019) (same). In fact, multiple federal courts enforcing Caremark's arbitration agreements with participating pharmacies have concluded that the agreements applied to defendants that were not parties to the underlying provider agreements. *See Burton's*, 2015 WL 5430354, at \*9–11 (allowing nonsignatory defendants to compel arbitration based on principles of estoppel); *Crawford*, 748 F.3d at 259–62 (same); *Uptown*, 962 F. Supp. 2d at 1183–86 (sam); *Gable*, 2012 U.S. Dist. LEXIS 191047, at \*9–32 (same); *Muecke*, 2012 WL 12535439, at \*23–25 (same). Based on this well-established case law, the arbitration agreement at issue here applies to each of the entities that was sued.

## II.   Any questions regarding the arbitrability of the dispute are for an arbitrator to decide.

Although a valid arbitration agreement exists, and the parties' dispute falls within the scope of the agreement, to the extent any questions exist about the arbitrability of the parties' dispute (which they do not), those questions are for an arbitrator, not a court, to decide, which includes any questions about the arbitration agreement's alleged unconscionability. (*See* Compl., ECF No. 1, ¶ 106.)

### A.   The plain language of the arbitration agreement expressly delegates questions of arbitrability to the arbitrator.

 "[P]arties may delegate threshold arbitrability questions to the arbitrator, so long as the parties' agreement does so by 'clear and unmistakable' evidence." *Henry Schein, Inc. v. Archer & White Sails, Inc.*, 139 S. Ct. 524, 530 (2019). "When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract."

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1  *Id.* at 531. Thus, "if a valid agreement exists, and if the agreement delegates the arbitrability issue

2  to an arbitrator, a court may not decide the arbitrability issue." *Id.* at 530.

3  In this case, the parties clearly and unmistakably agreed that "[t]he arbitrator(s) shall have

4  exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability

5  or formation of the agreement to arbitrate, including but not limited to, any claim that all or part

6  of the agreement to arbitrate is void or voidable for any reason." (McCall Decl., Ex. 6, 2020

7  Manual, p. 91, § 15.09.) The Court may not "override" this delegation provision. *See Henry Schein*,

8  139 S. Ct. at 529. Instead, the Court must allow an arbitrator to decide questions of arbitrability

9  expressly delegated to the arbitrator, including but not limited to questions regarding

10 unconscionability. *See id.*

11 The United States Supreme Court has expressly concluded that, by agreeing to arbitrate

12 questions of "enforceability," contracting parties clearly and unmistakably agree to arbitrate

13 unconscionability. *See Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67–76 (2010). In *Rent-*

14 *A-Center*, an employer sought to arbitrate a former employee's discrimination claims. *Id.* at 65.

15 The former employee argued that the arbitration agreement was unconscionable and therefore

16 unenforceable. *Id.* In response, the employer asserted that the agreement gave the arbitrator, not

17 the court, the exclusive authority to resolve issues regarding the agreement's enforceability,

18 including unconscionability. *Id.* at 65–66. The Supreme Court agreed. *Id.*

19 Similar to the arbitration agreement at issue here, the agreement in *Rent-A-Center* stated

20 that "[t]he Arbitrator . . . shall have exclusive authority to resolve any dispute relating to the

21 interpretation, applicability, enforceability, or formation of this Agreement . . . ." *Id.* The Court

22 held that this provision required threshold issues concerning the enforceability of the arbitration

23 agreement, including unconscionability, to be decided by the arbitrator. *Id.* at 68–69. The Court

24 reasoned that these types of "gateway" provisions, in which the parties agree to arbitrate questions

25 of arbitrability, "reflect[] the principle that arbitration is a matter of contract" and are enforceable

26 under the FAA. *Id.* at 69–70.

Caremark and Osterhaus clearly and unmistakably agreed that any challenges to the arbitration agreement's "enforceability" present an arbitrable issue. (McCall Decl., Ex. 6, 2020 Manual, p. 91, § 15.09.) As in *Rent-A-Center*, to the extent Osterhaus alleges that the arbitration agreement is unconscionable, an arbitrator, not a court, must decide whether the agreement is unconscionable and therefore unenforceable. *See Rent-A-Center*, 561 U.S. at 67–76; *see also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287 (2010) (acknowledging that the ***absence*** of "a valid provision specifically committing . . . disputes" over an arbitration agreement's "enforceability or applicability" to an arbitrator enables a court to decide those issues); *Chickasaw Nation*, 43 F.4th at 1030, 1033–34 (stating, in analyzing Caremark's arbitration agreement, that if parties form an arbitration agreement with an enforceable delegation clause, "all arguments going to the scope or enforceability of the arbitration provision are for an arbitrator to decide" and finding that a statutory challenge to the enforceability of Caremark's arbitration agreement was arbitrable).

### B. The arbitration agreement incorporates arbitration rules that delegate questions of arbitrability to the arbitrator.

In addition to expressly delegating arbitrability determinations to the arbitrator, the arbitration agreement incorporates arbitration rules that do so. (*See* McCall Decl., Ex. 6, 2020 Manual, p. 91, § 15.09.) This incorporation requires any questions about the arbitrability of the parties' dispute to be resolved by an arbitrator.

The Ninth Circuit has concluded that incorporating arbitration rules that delegate arbitrability determinations to an arbitrator "constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *See Oracle Am., Inc., v. Myriad Grp. A.G.*, 724 F.3d 1069, 1074 (9th Cir. 2013). "Virtually every circuit to have considered the issue" has agreed. *Id.* (collecting cases); *see also Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1283–84 (10th Cir. 2017) (collecting additional cases). Multiple courts enforcing Caremark's arbitration agreements with participating pharmacies have done the same. *See, e.g., Bowie's*, 2018 WL 1964596, at *6–7; *W. Va. CVS Pharmacy*, 796 S.E.2d at 585–90; *RX Pros*, 2016 WL 316867, at *3; *Grasso*, 143 F. Supp.

1  3d at 541; *Burton's*, 2015 WL 5430354, at *7–8; *Hopkinton*, 77 F. Supp. 3d at 248–49; *Crawford*,

2  748 F.3d at 262–63; *Medfusion*, 2012 U.S. Dist. LEXIS 191045, at *10–15; *Muecke*, 2012 WL

3  12535439, at *20–22.

4      Here, the arbitration agreement expressly incorporates the AAA Commercial Arbitration

5  Rules and Mediation Procedures. (McCall Decl., Ex. 6, 2020 Manual, p. 91, § 15.09.) The AAA

6  rules state, in relevant part, that "[t]he arbitrator shall have the power to rule on his or her own

7  jurisdiction, including any objections with respect to the existence, scope, or validity of the

8  arbitration agreement or to the arbitrability of any claim or counterclaim, without any need to refer

9  such matters first to a court." AAA Commercial Arbitration Rules & Mediation Procedures, R-

10  7(a), *available at* https://www.adr.org/sites/default/files/Commercial-Rules_Web.pdf (last visited

11  December 20, 2023). In this case, "incorporation of the American Arbitration Association's . . .

12  arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate

13  arbitrability." *See Oracle*, 724 F.3d at 1074.

14                                   **CONCLUSION**

15      For these reasons, Caremark respectfully requests the entry of an order (i) compelling

16  Osterhaus to bring Osterhaus's claims against Caremark in arbitration, if at all; (ii) dismissing the

17  alleged claims against Caremark; and (iii) granting any other relief in Caremark's favor that the

18  Court deems just.

19  Dated: December 22, 2023                    Respectfully submitted,

20                                              */s/ Kevin P. Shea*
                                                _____
21                                              Kevin P. Shea, pro hac vice
                                                Seth A. Horvath, pro hac vice
22                                              Elizabeth Z. Meraz, pro hac vice
                                                Aon Hussain, pro hac vice
23                                              **Nixon Peabody LLP**
                                                70 West Madison Street, Suite 5200
24                                              Chicago, Illinois 60602
                                                Telephone: (312) 977-4400
25                                              Facsimile: (312) 977-4405
                                                kpshea@nixonpeabody.com
26                                              sahorvath@nixonpeabody.com

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

ezmeraz@nixonpeabody.com
ahussain@nixonpeabody.com

*/s/ Shylah R. Alfonso*

Shylah R. Alfonso, WSBA No. 3318
Tiffany Lee, WSBA No. 51979
Nicholas M. Marquiss, pro hac vice
**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Telephone: (206) 359-8000
Facsimile: (206) 359-9000
SAlfonso@perkinscoie.com
TiffanyLee@perkinscoie.com
NMarquiss@perkinscoie.com

In accordance with LCR 7(e)(6), the
signatory certifies that this motion contains
6,933 words, in compliance with the Local
Civil Rules.

*Attorneys for Defendants CVS Health
Corporation, CVS Pharmacy, Inc.,
Caremark Rx, L.L.C. (f/k/a Caremark Rx,
Inc.), Caremark, L.L.C., CaremarkPCS,
L.L.C., CaremarkPCS Health L.L.C.,
Caremark IPA, L.L.C., Caremark Part D
Services, LLC, Aetna Inc., Aetna Health
Holdings, LLC, and Aetna Health
Management, LLC*

MOTION TO COMPEL ARBITRATION – 22
CASE NO. 2:23–CV–01500–RSM

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1

## CERTIFICATE OF SERVICE

2       The undersigned certifies that the foregoing **Motion to Compel Arbitration** was filed

3   electronically on December 22, 2023, in compliance with the Court's Electronic Filing Procedures

4
    for Civil and Criminal Cases Amended 3/27/23 and served on all counsel who have consented to
5
    electronic service in compliance with Federal Rule of Civil Procedure 5(b)(2)(E) and LCR 5(b).
6

7                                          */s/ Kevin P. Shea*
                                           Kevin P. Shea
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

MOTION TO COMPEL ARBITRATION – 23
CASE NO. 2:23–CV–01500–RSM

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000