# EXHIBIT 1

CONFIDENTIAL & PROPRIETARY- FOIA EXEMPT - DO NOT DISCLOSE

# PCS HEALTH SYSTEMS, INC.
# PROVIDER AGREEMENT

This Provider Agreement (the "Agreement") is entered into between PCS Health Systems, Inc., a Delaware corporation ("PCS"), and the undersigned provider ("Provider") and shall become effective, and binding on the Provider, as of the date PCS accepts this Agreement by executing a Network and Plan Enrollment Form (the "Enrollment Form") that has been executed and submitted by Provider (the "Effective Date").

## RECITALS

A.  PCS offers pharmacy benefit management services to its customers and has established a remote electronic claims adjudication and processing system known as the RECAP® System for verifying and processing claims and furnishing other related administrative and clinical services through a nationwide system of pharmacies and other facilities for its pharmacy benefit management services.

B.  PCS' customers sponsor, administer or otherwise participate in prescription benefit and related programs.

C.  Provider wishes to provide pharmacy and related services in connection with PCS' customers' programs.

## AGREEMENTS:

For valuable consideration, the receipt and sufficiency of which are acknowledged, PCS and Provider agree as follows:

### 1. Definition Schedule.

1.1   **Definitions.**  For purposes of this Agreement, unless otherwise defined herein, the terms listed in the attached Schedule of Terms shall have the meanings in that schedule.

1.2   **Schedules**.  References to other schedules mean the schedule in effect from time to time.

1.3   **Amendments**.  From time to time PCS may amend this Agreement, the Schedules to which this Agreement refers, the PCS Manual or On-Line Info by giving notice to Provider of the terms of the amendment and specifying the date the amendment becomes effective, which shall not be less than thirty (30) days after the notice.

### 2. Responsibilities and Rights of Provider.

2.1   **Services and Standards**.  Provider will render or cause to be rendered to all Eligible Persons the Pharmacy Services to which the Eligible Person is entitled in accordance with the Prescriber's directions, the applicable Plan, the PCS Documents and applicable Law (including, without limitation, licensing, certification, and continuing education requirements). Provider and its employees and agents, in providing Pharmacy Services under this Agreement, will exercise their own professional judgment, to the best of their ability, on all applicable questions.

2.2   **Verification of Eligibility**.  Provider will require each person requesting Pharmacy Services under a Plan to verify that he or she is an Eligible Person.

2.3   **Prior Authorization**.  For prescriptions requiring a "prior authorization" as indicated in the RECAP® System, Provider will (a) contact PCS or its designee to receive prior authorization, (b) inform the Eligible Person that prior authorization from the Plan Sponsor is required and (c) provide PCS or the Eligible Person with such other information as PCS shall reasonably require.

2.4   **Collection of Copay**.  With respect to each Covered Item submitted through the RECAP® System, Provider will collect the Copay as indicated in the RECAP® System from the Eligible Person and Provider will not waive, discount, reduce or increase the Copay indicated in the RECAP® System.

2.5   **Documentation; Signature Log**.  Provider will have each Eligible Person (or his or her designated agent to whom prescriptions may be dispensed) sign a log (in such form as may be required by PCS from time to time) that contains all information required by a Plan Sponsor or PCS, including, without limitation, the date, the prescription number, pick-up date, authorization for the release to PCS and Plan Sponsor (and each of their designees) of all information contained in the signature log related to Pharmacy Services and pharmacy benefit management services. Provider will also retain the related prescription and claim, and disclaimer acknowledging receipt of each prescription (retail, delivery and mailed Covered Items) and the Copay amount collected. Provider will maintain documentation evidencing that any (i) counseling required by Law occurred and (ii) the correct DAW code was transmitted.

2.6   **Record Retention**.  PCS and Provider will maintain for a minimum of three years (or longer if required by applicable Law) after the respective record is created, in original form, fiche or on electronic media, the claims and claim forms supporting the invoices and

1

other records sufficient to verify Covered Items dispensed, claims processed, payments made to Provider, and documentation and logs. Notwithstanding the foregoing, Provider shall keep hard copies of prescriptions, and updates thereto, as required by applicable Law and the PCS Manual.

2.7    **Electronic Communication**.  Provider agrees to maintain the capability to send, receive, and display electronic messages to and from PCS in accordance with (i) NCPDP standards, including such new standards from time to time, and (ii) the PCS Documents and program requirements. Provider shall receive and display all messages transmitted by PCS and take appropriate professional action upon receipt of such messages. Provider will use software that has been certified by PCS as meeting both the NCPDP standards and PCS program requirements.

2.8    **Compliance with Drug Formulary**.  Provider shall use reasonable efforts to comply with the PCS or applicable Plan Sponsor formulary to the extent such formulary applies to Pharmacy Services provided to an Eligible Person. Notwithstanding the foregoing, in no event shall Provider be required to comply with the PCS or applicable Plan Sponsor formulary if Provider or the Prescriber, physician or the dispensing pharmacist, deems such compliance contrary to his or her professional judgment.

2.9    **Limitation on Collection**.  Provider agrees that in no event, including, without limitation, non-payment or bankruptcy by a Plan, will Provider seek compensation in any manner from an Eligible Person for Pharmacy Services with respect to a Covered Item provided under this Agreement. This provision does not prohibit Provider from collecting the applicable Copay, coinsurance or deductible amounts that are indicated in the RECAP® System, which amount Provider is obligated to collect and agrees not to waive. Further, these provisions do not prohibit the Provider from collecting fees for items that are not Covered Items. Provider also agrees to be bound by any other applicable Law regarding limitation of collection, including, without limitation, any provisions set forth in the Schedule of Provisions Applicable to Providers in Certain States attached hereto.

2.10    **Maintenance of a PCS RECAP® Terminal**.  If Provider has a PCS RECAP® terminal, Provider agrees to permit maintenance personnel selected by PCS full access to all PCS RECAP® terminals to make routine service checks and any necessary repairs. PCS, at its expense, will use its reasonable good faith efforts to arrange for maintenance of the terminal at Provider's site, during Provider's regular business hours, or at PCS' or its designated representatives' site for repair or replacement. PCS shall not be liable for delays in repairing the terminal or for failure of maintenance personnel to properly perform their duties.

2.11    **Insurance**.  Provider will maintain general and professional liability coverage in such forms and amounts as are reasonable for the industry and for a provider of Pharmacy Services of the type and size of Provider which shall in no event be less than required by applicable Law. Provider will provide PCS with a copy of all professional liability insurance policies in effect from time to time upon request.

2.12    **Credentialing**.  Provider agrees to provide PCS with the necessary information required from time to time to complete PCS' credentialing programs.

2.13    **QUANTUM Alert®**.  Provider acknowledges and agrees that the information generated in connection with QUANTUM Alert® is intended as an economical supplement to, and not a substitute for, the knowledge, expertise, skill, and judgment of Prescribers and pharmacists, including Provider and its employees and agents. Provider and its individual employees and agents are responsible for acting or not acting upon information generated and transmitted through QUANTUM Alert® and for performing Pharmacy Services in each jurisdiction consistent with the scope of their respective licenses.

2.14    **Nondiscrimination**.  Unless Provider's professional judgment dictates otherwise or Provider is being asked to provide Pharmacy Services to an Eligible Person covered by a Plan participating in the RECAP® Network, Provider shall not (i) serve only some Eligible Persons of a particular group and not other Eligible Persons of the same group or (ii) provide only certain Covered Items to Eligible Persons of a particular group unless Provider does not provide such Covered Items to any Eligible Persons of the same group.

2.15    **Eligible Persons Complaint Procedures**.  Provider shall cooperate with the administration of complaints by Eligible Persons. Provider shall make every reasonable effort to resolve all complaints in an informal process and keep written records of events and actions surrounding each complaint that is not resolved to the Eligible Person's satisfaction.

2.16    **Regulations related to Governmental Plan Sponsors**.  The following clauses from the Federal Acquisition Regulations ("FAR") are hereby incorporated by reference to implement certain federal policies:  (i) FAR 52.203-12, "Limitation on Payments to Influence Certain Federal Transactions (31 U.S.C.§ 1352)," (ii) FAR 52.222-26, "Equal Opportunity (E.O. 11246)," (iii) FAR 52.222-35, "Affirmative Action for Special Disabled and Vietnam Era Veterans (38 U.S.C. § 2012(a))" and (iv) FAR 52.222-36, "Affirmative Action for Handicapped Workers (29 U.S.C.§ 793)."

2.17    **Rebate Programs**.  PCS shall have the right to submit all prescriptions relating to this Agreement to manufacturers in connection with PCS' manufacturer rebate programs and any similar programs. Provider shall not submit any of the prescriptions relating to this Agreement to any manufacturer for the purpose of receiving any rebate, discount or the like, except as authorized by PCS in writing.

3.    **Transmission of Claims to PCS for Reimbursement**.

Provider will submit claims for payment in accordance with the PCS Documents and the following:

3.1 **RECAP® Submission**. Provider will submit on-line claims through the RECAP® System within fourteen (14) days from the date of fill. As to those claims, Provider will have the transmission capability to make on-line claim reversals. Provider will submit claim reversals before the close of the cycle following the cycle in which the claim was originally submitted.

3.2 **Other Submissions**. Upon PCS' prior approval, Provider may submit any claims not submitted through the RECAP® System to PCS (whether in a paper, tape or electronic form at) within twelve (12) months of the date of fill. In the case of a PCS National Network or any Plan that may reimburse Provider at the Usual and Customary Price, Provider shall not be permitted to submit a claim in a format that does not provide for the transmission of Usual and Customary Price. Provider shall not be permitted to submit claims in a format that is not authorized by the Plan Sponsor.

3.3 **Information**. Provider will transmit with each claim the information requested by this Agreement, the PCS Documents or the RECAP® instructions. Each claim submitted by Provider through the RECAP® System shall constitute a representation by Provider to PCS that Pharmacy Services were provided to the Eligible Person and the information submitted is accurate and complete.

### 4. Participation in the PCS National Networks, Plan Sponsor Networks and RECAP® Network; Applicable Reimbursement Rates to Provider.

4.1 **Participation in the PCS National Networks, Plan Sponsor Networks and the RECAP® Networks**. Provider shall participate in the PCS National Networks and Plans selected by Provider on the Enrollment Form (or any subsequent enrollment form or addendum that PCS may provide) and those Plan Sponsor Networks that Provider participated on the date prior to the Effective Date. "Plan Sponsor Networks" means the networks established by PCS on behalf of its Plan Sponsors pursuant to (i) this Agreement, an addendum hereto or an Enrollment Form or any subsequent enrollment form, each as may be amended from time to time, or (ii) a written agreement, an addendum thereto or a written enrollment form, each as may have been amended from time to time, that was executed by Provider prior to this Agreement (collectively, "Prior Agreements"). Plan Sponsor Networks do not include PCS National Networks. In addition, Provider shall participate in any Plan participating in the RECAP® Network by submitting a claim as provided for in Section 3. For certain PCS National Networks and Plan Sponsor Networks, PCS may allow Provider to participate in such Network by submitting a claim as provided for in Section 3. Notwithstanding any Prior Agreements, this Agreement shall apply to all transactions under any Network or Plan. Provider agrees to provide Pharmacy Services to all Plans participating in a PCS National Network.

4.2 **Termination of Network Participation**. Except as otherwise may be required with respect to a specific Network or Plan participating in the RECAP® Network, Provider may terminate participation in any Network or any Plan participating in the RECAP® Network by giving PCS ten (10) days' prior written notice specifying the date of termination and the names of the Network(s) and Plan(s) in which Provider will no longer participate. Absent the prior written consent of PCS, Provider may not elect to participate in a Network or Plan that is part of the RECAP® Network for thirty (30) days following Provider's termination of participation in such Network or Plan.

4.3 **Reimbursement to Provider:**

4.3.1 **PCS National Networks**. Claims submitted for a Plan participating in a PCS National Network will be reimbursed at the lower of (i) AWP less the applicable Discount (as defined in the Enrollment Form) plus the applicable Dispensing Fee (as defined in the Enrollment Form) less the applicable Copay, (ii) MAC plus the applicable Dispensing Fee less the applicable Copay, (iii) Ingredient Cost submitted by Provider plus the applicable Dispensing Fee less the applicable Copay or (iv) Usual and Customary Price less the applicable Copay.

4.3.2 **Plan Sponsor Networks**. Claims submitted for a Plan participating in a Plan Sponsor Network will be reimbursed at the lower of (i) AWP less the applicable Plan Sponsor AWP Discount plus the applicable Plan Sponsor Dispensing Fee less the applicable Copay, (ii) MAC plus the applicable Plan Sponsor Dispensing Fee less the applicable Copay, (iii) Ingredient Cost submitted by Provider plus the applicable Plan Sponsor Dispensing Fee less the applicable Copay or (iv) Usual and Customary Price less the applicable Copay. The "Plan Sponsor AWP Discount" shall mean the AWP percentage discount that (i) with respect to Plan Sponsor Networks established after the date of this Agreement, is set forth in this Agreement, an addendum hereto, the Enrollment Form or any subsequent enrollment form, each as may be amended from time to time, or (ii) with respect to Plan Sponsor Networks that were established prior to this Agreement, is set forth the applicable Prior Agreement. A Plan Sponsor AWP Discount contained in a Prior Agreement, may hereafter be amended as provided for in Section 1.3. The "Plan Sponsor Dispensing Fee" shall mean the dispensing fee that (i) with respect to Plan Sponsor Networks established after the date of this Agreement, is set forth in this Agreement, an addendum hereto, the Enrollment Form or any subsequent enrollment form, each as may be amended from time to time, or (ii) with respect to Plan Sponsor Networks that were established prior to this Agreement, is set forth in the applicable Prior Agreement. A Plan Sponsor Dispensing Fee contained in a Prior Agreement may hereafter be amended as provided for in Section 1.3. Except as otherwise provided in Section 4.1, if Provider has not executed and delivered to PCS one of the above described documents with respect to a specific Plan Sponsor Network, claims submitted for such a Plan will be reimbursed at the then current reimbursement rate for the Plan Sponsor Network as indicated in the RECAP® System as to each transaction.

4.3.3 **RECAP® Network**. Claims submitted for a Plan participating in the RECAP® Network will be reimbursed at the then current reimbursement rate for the Plan as indicated in the RECAP® System as to each transaction.

4.3.4 **Non-RECAP® Submissions**. Claims submitted by means other than RECAP® System will be reimbursed in accordance with the applicable reimbursement methodology provided for above. Provider acknowledges that claims that are not adjudicated through the RECAP® System and verified as a Covered Item may not be reimbursed by PCS on behalf of one of its Plan Sponsors due to the

nonpayable nature of the claim (e.g., the individual is not an Eligible Person or the dispensed item is not a Covered Item).

4.3.5   **Taxes**. If Provider requests reimbursements from a Plan Sponsor related to taxes that are imposed by applicable Law on the Pharmacy Services or the Covered Items, Provider shall transmit the applicable tax amount through the RECAP® System. If there is a discrepancy between the amount indicated by PCS in the corresponding RECAP® System response and the amount originally submitted by Provider, the amount indicated by PCS in the RECAP® System response shall govern.

4.4   **PCS' Reimbursement Obligations**. PCS is not obligated to reimburse Provider, on behalf of a Plan Sponsor, and may, if necessary, chargeback Provider, on behalf of a Plan Sponsor, with respect to a given claim if Provider has breached the terms of this Agreement or the PCS Documents with respect to such claim.

4.5   **Timing of Reimbursement; Reports**. PCS will process Provider's claims and pay Provider in accordance with PCS' current schedule of processing and payment and will provide Provider with a report showing the record of all claims submitted, processed and paid in each processing cycle.

4.6   **Correction of Errors**. Except as otherwise provided in this Agreement (including, without limitation, Section 4.7), PCS, on behalf of the Plan Sponsor, will pay to the Provider any underpayment. Additionally, Provider will repay to PCS, for the benefit of the applicable Plan Sponsor, any overpayments made by PCS to Provider, including overpayments due to errors contained in claims and inaccurate submission of claims to PCS irrespective of when such overpayment error are discovered.

4.7   **Time for Objecting to Report**. If Provider fails to advise of any alleged error, miscalculation, discrepancy or basis for questioning the correctness of any claim within six (6) months after receiving the report for a cycle, Provider will be deemed to have confirmed the accuracy of the processing of claims as set forth in that report for that cycle. This provision shall not apply with respect to any overpayments made to Provider by PCS on behalf of a Plan Sponsor that come to PCS' attention in connection with its (or the Plan Sponsor's) auditing efforts.

4.8   **Fees to be Paid to PCS by Provider**.

**Enrollment Fees**. PCS may charge Provider enrollment fees to enable Provider to participate in one or more of the Networks as set forth in the PCS Provider Manual.

**Transmission and Maintenance Fees; Taxes**. Provider may telecommunicate claims to PCS through Provider's computer system or through a RECAP® terminal which may be leased or purchased from PCS. Provider may also submit claims on paper or in batch format. Provider will pay PCS transaction charges per claim verified as a Covered Item according to the Schedule of Transmission and Maintenance Fees depending on the method of transmission and the equipment used. PCS may deduct the appropriate fees from amounts otherwise payable to Provider during each payment cycle. Provider is responsible for all applicable taxes. Transmission fees and maintenance fees are set forth in the Schedule of Transmission and Maintenance Fees attached hereto.

## 5. Responsibilities and Rights of PCS.

5.1   **PCS Limited Agent of Provider; Nonpayment**. Each Plan Sponsor has agreed with PCS to pay the claims of Provider by transmitting sufficient funds to PCS. Provider appoints PCS its agent to accept such payments from Plan Sponsor. PCS' sole duty as agent shall be to remit such payments to Provider. Provider shall have no claim against PCS arising out of such agency relationship above or beyond the amount of such payments made to PCS. PCS is not obligated to reimburse Provider on behalf of a Plan Sponsor if a Plan Sponsor fails to provide PCS with funds for such payment, and PCS has no liability to Provider for nonpayment or for any delay in payment from a Plan Sponsor.

5.2   **Inspection Rights: Discrepant Claims**. PCS may inspect all records of Provider relating to this Agreement including, but not limited to, original signed Prescriber's orders, telephoned Prescriber's orders, signature logs, computer records, and invoices showing purchase or receipt of Covered Items. PCS may also inspect such other documents and items that reasonably relate to Provider's compliance with the PCS Documents, including, without limitation, Section 2.7. Amounts paid to Provider in connection with Claims that are not documented in accordance with the PCS Documents and that are not validated by Provider within thirty (30) days after written request by PCS, shall become due and owing to PCS by Provider at the expiration of such thirty (30) day period. PCS may notify the Plan Sponsor of any discrepancies with respect to claims under its plan.

5.3   **Help Desk**. To assist in resolving Provider's questions or issues, the PCS Pharmacy Help Desk will provide access to Provider to both its Voice Response System and PCS representatives. The PCS representatives shall be available during hours set by PCS from time to time. The PCS Pharmacy Help Desk will use its reasonable efforts to assist Provider while the Eligible Person is still at Provider. During PCS' normal business hours, a licensed pharmacist will be available to answer questions beyond the scope of the PCS Pharmacy Help Desk representatives' knowledge; provided, however, such licensed pharmacist will not provide any professional advice with respect to the provision of Pharmacy Services.

5.4   **Software Certification**. PCS will provide software technical support to assist Provider in complying with PCS requirements for transmitting claims through the RECAP® System. PCS will certify software that meets PCS requirements. Provider hereby authorizes PCS to disclose to a software vendor (i) that Provider is using such vendor's software and (ii) statistical information related to claims processed by Provider through vendor's software.

5.5 **Court Orders, Subpoenas or Governmental Requests**. If PCS receives a court order, subpoena or governmental request relating solely to Provider, PCS may comply with such order, subpoena or request and Provider shall indemnify and hold harmless PCS for, from, and against any and all costs (including reasonable attorneys' fees), losses, damages or other expenses PCS may suffer or incur in connection with the responding to such order, subpoena or request.

### 6. Intellectual Property Rights; Confidentiality

6.1 **Advertising and Trademarks**. PCS retains exclusive rights to, among others, the names "PCS Health Systems, Inc.," "PCS," "RECAP®," "QUANTUM Alert®," together with any distinctive trademarks and service marks that have been used by PCS or may be adopted or used by PCS in the future. Provider may not advertise or use any name, symbol, or trademark of PCS in any advertising other than as specifically permitted in the PCS Documents without the prior written consent of PCS. PCS may (i) use the name and address(es) of Provider in the National Directory, informational brochures or other publications provided to Plan Sponsors and Eligible Persons, (ii) use information regarding Provider's services that is provided to PCS by Provider in publications provided to Plan Sponsors and Eligible Persons and (iii) provide Plan Sponsors with Provider's credentialing information. Upon termination of this Agreement for any reason, Provider will immediately discontinue the use and advertising of, among others, any name, symbol or trademark referring to the Plans, "PCS Health Systems, Inc.," "PCS," "RECAP®," "QUANTUM Alert®," together with any distinctive trademarks and service marks that have been used by PCS or may be adopted or used by PCS in the future.

6.2 **Proprietary Rights**. Provider has no right to use or reproduce any data, work, compilation, computer program, manual, process or invention obtained from or owned by PCS or any Plan Sponsor, including, without limitation PCS' proprietary MAC list or any MAC list used on behalf of a Plan Sponsor, except in connection with and as expressly provided by this Agreement and then only during the term of this Agreement. Provider agrees that the compilations of information contained in the RECAP® System and any prior and future versions of that System by any names and any copyright rights to such compilations are the property of PCS and Provider agrees not claim any right, title or interest in such compilations arising from this Agreement. Subject to applicable Law, Provider will provide to PCS any and all information reasonably available to it that PCS needs to perform its services and to conduct benefit and drug utilization review. Provider may not use the information provided by Eligible Persons for any purpose not related to this Agreement except to the extent such use is in accordance with applicable Law. Subject to any restrictions imposed by applicable Law, PCS has the right to use, reproduce and adapt all information obtained from Provider in any manner it deems appropriate, even if such use is outside the scope of this Agreement, provided such use is in accordance with applicable Law.

6.3 **Confidentiality**. Any information or data supplied by PCS or Plan Sponsor to Provider under this Agreement, including, without limitation, PCS' proprietary MAC list or any MAC list used on behalf of a Plan Sponsor, must be maintained in confidence and may not be sold, assigned, transferred, or given to any third party. This information may be disclosed to employees, agents, or contractors of Provider only to the extent necessary for them to perform their duties and then only if they have undertaken like obligations of confidentiality. No information or data supplied by PCS to Provider may be quoted or attributed to Provider or PCS without the prior written consent of PCS. PCS and Provider must use all necessary security procedures sufficient to insure that all data transmissions are authorized and to protect their business records and data from improper access.

6.4 **Remedies**. Provider acknowledges that any unauthorized disclosure or use of PCS proprietary information would cause PCS immediate and irreparable injury or loss. Accordingly, should Provider fail to abide by this Section 6, PCS shall be entitled to specific performance including immediate issuance of a temporary restraining order or preliminary injunction enforcing this Agreement, and to judgment for damages (including attorneys' fees) caused by the breach and to all other remedies provided by this Agreement and applicable Law.

### 7. Limitation of Liability; Indemnity and Force Majeure.

7.1 **Limitation on Liability**. PCS shall not be liable to Provider for any claim, injury, demand or judgment based upon contract, tort, or other grounds (including warranty of merchantability) arising out of the sale, compounding, dispensing, manufacturing, or use of any drug or device dispensed by or any Pharmacy Services provided by Provider under this Agreement. In no event is either party liable to the other party for indirect, consequential or special damages of any nature (even if informed of their possibility), lost profits or savings, punitive damages, injury to reputation or loss of customers or business.

7.2 **Indemnification**. Provider agrees to indemnify and hold PCS, its shareholders, directors, employees, agents and representatives free and harmless for, from and against any and all liabilities, losses, settlements, claims, demands, and expenses of any kind (including attorneys' fees and costs), that may result or arise out of: (i) any actual or alleged malpractice, negligence or misconduct of Provider in the performance or omission of any act or responsibility assumed by Provider under this Agreement, or (ii) the sale, compounding, dispensing, failure to sell, manufacturing or use of a drug or device dispensed by Provider of Pharmacy Service provided by Provider under this Agreement.

7.3 **Force Majeure**. PCS and Provider shall be excused from performance under this Agreement to the extent that PCS or Provider, as the case may be, is prevented from performing hereunder, in whole or in part, as a result of causes beyond such affected party's reasonable control, including, acts of God, war, civil disturbance, court order, governmental intervention, a change in Law, third party nonperformance, failures or fluctuations in electrical power, heat, light, air conditioning or telecommunications equipment.

### 8. Term of Agreement; Termination and Certain Remedies.

8.1 **Term**. Unless earlier terminated in accordance with the provisions of this Agreement, the Agreement will begin on the

5

Effective Date and will remain in effect for an initial term of one (1) year and will automatically renew for successive terms of one (1) year each.

8.2     **Termination Without Cause on Notice**.  Either party may terminate this Agreement without cause upon ten (10) days' prior written notice to the other, provided, however, that if a particular Plan requires a longer notice period, this Agreement shall not terminate with respect to the affected Plan until the expiration of such longer period.

8.3     **Immediate Termination Rights**.  If (i) unless otherwise precluded by Law, Provider shall make an assignment for the benefit of creditors, file a petition in bankruptcy (whether voluntary or involuntary), is adjudicated insolvent or bankrupt, a receiver or trustee is appointed with respect to a substantial part of its property or a proceeding is commenced against it which will substantially impair its ability to perform hereunder, (ii) any court, governmental or regulatory agency shall issue to Provider an order to cease and desist from providing Pharmacy Services, (iii) ownership of Provider is transferred to a new owner, or if the right to control the operation of the business of Provider is transferred to a different person or entity, (iv) a levy, writ of garnishment, attachment, execution or similar item is served upon Provider and not removed within ten (10) days from the date of service or (v) Provider fails to perform or breaches any term or provisions of the PCS Documents, PCS may terminate this Agreement effective upon notice to Provider.  This termination right is in addition to any and all other rights and remedies that may be available to PCS under this Agreement or at law or equity.

8.4     **PCS' Rights in the Event of Termination**.  In the event of a termination of this Agreement for any reason, PCS has the right to immediate possession of the PCS card imprinter, if furnished by PCS, the PCS RECAP® terminal, if furnished by PCS, the PCS Manual, On-Line Info and all other materials and supplies furnished by PCS to Provider.

8.5     **Provider Event of Default and PCS Remedy and Other PCS Rights**.  In addition to the termination rights contained in this Section 8, if Provider fails to perform under this Agreement or breaches any provision of this Agreement, PCS shall have the right, upon notice to Provider to (i) suspend performance of any and all of PCS' obligations under or in connection with this Agreement, including, without limitation, PCS' obligation to process Claims using the RECAP® System, (ii) impose reasonable handling, investigation and improper use fees (including, without limitation, a fee to be charged for Provider failing to submit a Usual and Customary Price), or (iii) set off against any amounts owing to Provider under the PCS Documents (including amounts which are paid to PCS on behalf of a Plan Sponsor) or under any other agreement between PCS and Provider, any amounts required to be paid by PCS to Provider under the PCS Documents or any other agreement between PCS and Provider.  Nothing in this Agreement shall limit, and the parties agree that in addition to the rights specified in this Section, PCS shall retain, any and all rights PCS may have at law, equity or under this Agreement.

8.6     **Survival of Certain Provisions**.  Notwithstanding the termination of this Agreement, Sections 5.2, 6 and 7 and any obligations that arise prior to the termination of the Agreement shall survive such termination.

8.7     **Notices**.  All notices provided for in this Agreement shall be delivered in person, sent by certified mail, delivered by air courier, or transmitted by facsimile and confirmed in writing (sent by air courier or certified mail) to a party at the address or facsimile number shown in this Agreement, or such other address or facsimile number as a party may notify the other party from time to time in accordance with this Agreement.  All notices will be deemed received on the day received unless such day is not a business day, in which case such notice will be deemed to have been received on the first business day following receipt. Notices may also be transmitted electronically between parties provided that proper arrangements are made in advance to facilitate such communications and provide for their security and verification.

Notices to PCS must be addressed to:

PCS Health Systems, Inc.
Attn:  Provider Enrollment
9501 East Shea Boulevard
Scottsdale, Arizona  85260-6719

Fax Number: (602) 661-3715

Notices to Provider must be addressed as set forth on the Enrollment Form.

### 9.  Miscellaneous

9.1     **Assignment**.  This Agreement may not without the prior written consent of PCS, which consent shall not be unreasonably withheld, be assigned by Provider to any other person or entity, and any attempted assignment will be void and of no force and effect.

9.2     **Independent Contractor; Third Party Beneficiaries**.  The parties to this Agreement are to be considered independent contractors, and they shall have no other legal relationship under or in connection with this Agreement.  Except for the indemnity provisions hereof, no term or provision of this Agreement is for the benefit of any person who is not a party hereto (including, without limitation, any Eligible Person or Plan Sponsor), and no such party shall have any right or cause of action hereunder.

9.3     **Lawful Interpretation**.  Whenever possible, each provision of this Agreement will be interpreted so as to be effective and valid under applicable Law, but if any provision of this Agreement should be rendered unenforceable or invalid under applicable Law, that

provision will be ineffective to the extent of such unenforceability or invalidity without invalidating the remaining provisions of this Agreement. Any such determination shall not invalidate or render unenforceable the remaining provisions of the Agreement in any other jurisdiction or under any other circumstances.

9.4 **Jurisdiction**. Unless otherwise specifically provided herein or mandated by applicable Law, this Agreement will be construed, governed and enforced in accordance with the laws of the State of Arizona without regard to its choice of law provisions.

9.5 **Arbitration**. Any and all controversies in connection with or arising out of this Agreement will be exclusively settled by arbitration before a single arbitrator in accordance with the Rules of the American Arbitration Association. The arbitrator must follow the rule of law, and may only award remedies provided in this Agreement. The award of the arbitrator will be final and binding on the parties, and judgment upon such award may be entered in any court having jurisdiction thereof. Arbitration under this provision will be conducted in Scottsdale, Arizona, and Provider hereby agrees to such jurisdiction, unless otherwise agreed to by the parties in writing or mandated by Law, and the expenses of the arbitration, including attorneys' fees, will be paid for by the party against whom the award of the arbitrator is rendered. This Section 9.5 and the parties' rights hereunder shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq.

9.6 **Waiver**. Failure to exercise any of the rights granted under this Agreement for any one default will not be a waiver of the right to exercise any of these rights for subsequent defaults.

9.7 **Entire Agreement**. This Agreement, its schedules, and the PCS Manual, On-Line Info, RECAP System instructions and terminal, contain the entire agreement between Provider and PCS relating to the rights and the obligations of all parties concerning the provision of Pharmacy Services hereunder. Any prior agreements, promises, negotiations, or representations, either oral or written, relating to the subject matter of the foregoing documents, not expressly set forth herein or therein, are terminated and of no force and effect.

9.8 **Conflict Between Agreement, PCS Manual or On-Line Info**. Except in the case of a provision that expressly states that it is to supersede a conflicting provision in a PCS Document, (i) if there is a conflict between any of the PCS Documents and this Agreement, the terms of the Agreement shall govern; and (ii) if there is a conflict between the PCS Manual and On-Line Info, the terms of the PCS Manual shall govern.

9.9 **Headings**. The heading of articles and sections contained in this agreement are for convenience only, and do not affect in any way the meaning or interpretations of this Agreement.

**Schedule of Terms**

AWP or Average Wholesale Price means the current wholesale cost of a given drug as defined in the latest edition of the First DataBank Blue Book (with supplements) or any other similar nationally recognized reference which PCS may reasonably select from time to time.

Copay means the amount an Eligible Person must pay to Provider at the time a Covered Item is dispensed as indicated by the RECAP® System.

Covered Item means any drug or device covered, in whole or in part, in accordance with and subject to the terms of a Plan covering an Eligible Person.

DAW Code means the NCPDP product selection codes for transmitting drug claims.

Eligible Person means a person entitled to a Covered Item pursuant to a Plan.

Law means any federal, state, local or other constitution, charter, act, statute, law, ordinance, code, rule, regulation, order, specified standards or objective criteria contained in any applicable permit or approval, or other legislative or administrative action of the United States of America, or any state or any agency, department, authority, political subdivision or other instrumentality thereof or a decree or judgment or order of a court.

MAC or Maximum Allowable Cost means the maximum allowable cost of a drug pursuant to a Plan's list that establishes an upper limit reimbursement price for certain multiple-source drugs dispensed under the Plan without regard to the specific manufacturer whose drug is dispensed.

National Directory means a listing of the providers that have entered into an agreement with PCS substantially similar to this Agreement that are located in the United States and Puerto Rico, listing the names, addresses and certain services provided by such other providers.

NCPDP means the National Council of Prescription Drug Programs.

Networks means the PCS National Networks, the Plan Sponsor Networks, and the RECAP® Network.

On-Line Info means PCS' booklet entitled "On-Line Info," which is published and distributed semiannually to Provider, that contains information regarding certain PCS and RECAP® policies and procedures.

PCS Documents means this Agreement, including schedules, the PCS Manual, On-Line Info and information transmitted by PCS to Provider through the RECAP® System.

PCS Manual means the manual containing claims processing and program guidelines provided by PCS to Provider, as amended from time to time at PCS' sole discretion.

PCS National Networks means a network of providers that have contracted with PCS to provide Pharmacy Services to Eligible Persons, which Pharmacy Services are reimbursed by the Plan Sponsor as provided for in Section 4.3.1. The PCS National Networks presently include the Client Based Network, the Managed Care Program Network, the Performance Based Network 10 and the Performance Based Network 13.

Pharmacy Services means all services usually and customarily rendered by a provider licensed to provide pharmacy services in the normal course of business, including services mandated by applicable Law.

Plan means that portion of Plan Sponsor's drug benefit plan that relates to Covered Items with respect to a group of Eligible Persons.

Plan Sponsor means the entity that contracts with PCS for prescription benefit management services, which entity could be, among other things, an insurance company, self-insured group, health maintenance organization, preferred provider organization, multi-employer trust or third party administrator.

Plan Sponsor AWP Discount shall have the meaning used in Section 4.3.2.

Plan Sponsor Dispensing Fee shall have the meaning used in Section 4.3.2.

CONFIDENTIAL & PROPRIETARY- FOIA EXEMPT - DO NOT DISCLOSE

Plan Sponsor Network shall have the meaning used in Section 4.1

Prescriber means a person who is licensed to prescribe drugs in accordance with applicable Law.

Prior Agreements shall have the meaning used in Section 4.1.

QUANTUM Alert ® means PCS' automated, nondiscretionary drug utilization review system designed to provide to the Provider at the time of dispensing, certain information in the RECAP® System that may help manage the costs of prescription drug programs and improve the quality of drug therapy provided to patients.

RECAP® Network means a network of providers that have contracted with PCS to provide Pharmacy Services to Eligible Persons of certain Plans, which Pharmacy Services are reimbursed by the Plan Sponsor as provided for in Section 4.3.3.

RECAP® System means PCS' proprietary remote electronic claim adjudication process system that provides Provider with, among other things, eligibility and drug pricing information.

Usual and Customary Price means the lowest price the Provider would charge to a particular customer if such customer were paying cash for an identical prescription on that particular day.  This price must include any applicable discounts offered to attract customers.

**Schedule of Provisions Applicable to Providers in Certain States**

If Provider is located in or providing Pharmacy Services to Eligible Persons in any of the following states, the provisions set forth below with respect to that state are a part of the Provider Agreement and shall be binding on Provider. Such provisions shall be interpreted in accordance and consistent with, and in a manner that is not broader than that required by, applicable Law. Provider agrees that it will be bound by any amendments to such provisions that may be required by applicable Law and any additional provisions which are required by applicable Law that are not set forth herein.

**California (Knox-Keene Health Care Service Plan Act)**

1. Provider agrees to maintain reasonable hours of operation to ensure that Eligible Persons have access to Pharmacy Services at all reasonable times. Provider shall monitor waiting times and access and provide PCS, upon request, with information regarding Eligible Person's access to services.

2. Provider agrees to comply with the requirements of the Knox-Keene Health Care Service Plan Act (and the Medi-Cal program) and all other applicable laws and regulations to the extent they bear, directly or indirectly, upon the subject matter of the PCS Documents and/or operation of Provider's business.

3. Upon the request of PCS, a health care service plan contracting with PCS, the Department of Corporations, the California Department of Health Services, the United States Department of Health and Human Services and any other applicable governmental agencies, Provider shall provide access at all reasonable times to its books and records relating to the PCS Documents and to records demonstrating the financial solvency of Provider. These requirements shall survive the termination of this Agreement.

4. Provider shall cooperate with PCS' or a given Plan Sponsor's quality management and drug utilization management programs in effect from time to time. PCS shall be promptly notified of any unresolved dispute with an Eligible Person.

**Missouri (Missouri Code of State Regulations Section 20 CSR 400-7.080)**

1. If Provider provides Pharmacy Services to Eligible Persons whose Plan Sponsor is a health maintenance organization ("HMO") pursuant to a provider contract between itself and the HMO or the PCS Documents, under no circumstances (including, but not limited to, nonpayment by the HMO for Pharmacy Services rendered to Eligible Persons by Provider, insolvency of an HMO or an HMO's breach of any term or condition of its agreement with Provider, if any, or the PCS Documents), shall it bill, charge, collect a deposit, seek compensation, remuneration or reimbursement from or have any recourse against an Eligible Person or person acting on behalf of an Eligible Person for fees, charges or expenses relating to Pharmacy Services which the HMO is obligated to provide and pay for under the terms of the Eligible Person's subscriber agreement with the HMO.

2. The foregoing section (1) will survive the termination of the Agreement and the agreement between Provider and the HMO, if any, regardless of the cause of the termination and such section (1) shall be applicable to, and binding on, all individuals and entities with whom Provider may subcontract to provide Pharmacy Services to Eligible Persons. Nothing in this provision, however, shall in any way affect or limit Provider's right or obligation to collect from Eligible Persons copayments, deductibles or fees assessed for noncovered services in accordance with the agreement governing the Eligible Person's enrollment with the HMO.

**Nevada (Nevada Administrative Code Section 695C.190)**

Provider shall (i) release the Eligible Person from liability for the cost of Pharmacy Services rendered pursuant to a Plan Sponsor's health care plan except for any nominal payment made by the Eligible Person or for a Pharmacy Service not covered under the evidence of coverage, (ii) participate in such programs required by Nevada Law to assure the quality of Pharmacy Services provided to Eligible Persons by the Plan Sponsor through its providers, (iii) provide all medically necessary services, if any, required by the evidence of coverage and the agreement to each Eligible Person for the period for which a premium has been paid to the Plan Sponsor, (iv) give evidence of a contract of insurance against loss resulting from injuries resulting to third persons from the practice of the pharmacy profession or a reasonable substitute for it as determined by the Plan Sponsor, (v) if required by a Plan Sponsor, indemnify the Plan Sponsor for any liability resulting from the Pharmacy Services rendered by Provider and (vi) for Providers that are physicians, to transfer or otherwise arrange for the maintenance of the records of Eligible Persons who are his or her patients if Provider leaves the panel of physicians associated with the Plan Sponsor.

**Washington (Washington Administrative Code 284-46-575)**

10

284-46-575. Participating provider contracts.

1.  Provider hereby agrees that in no event, including, but not limited to nonpayment by a Plan Sponsor or Plan Sponsor's insolvency or breach of the PCS Documents (if applicable) shall Provider bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against Eligible Persons of such Plan Sponsor, other than such Plan Sponsor, acting on their behalf, for Pharmacy Services provided pursuant to the PCS Documents. This provision shall not prohibit collection of deductibles, copayments, co-insurance, and/or payments for noncovered services, which have not otherwise been paid by a primary or secondary carrier in accordance with regulatory standards for coordination of benefits or from Eligible Persons in accordance with the terms of the Eligible Person's subscriber agreement with such Plan Sponsor.

2.  Provider agrees, in the event of a Plan Sponsor's insolvency, to continue to provide the Pharmacy Services promised in this Agreement to Eligible Persons of the insolvent Plan Sponsor for the duration of the period for which premiums on behalf of the Eligible Persons were paid to Plan Sponsor or until an Eligible Person's discharge from inpatient facilities, whichever time is greater.

3.  Notwithstanding any other provision of this Agreement, nothing in this Agreement shall be construed to modify the rights and benefits contained in the Eligible Person's subscriber agreement.

4.  Provider may not bill the Eligible Person for Covered Services (except for deductibles, copayments or co-insurance) where Plan Sponsor denies payments to PCS because Provider has failed to comply with the terms of the Agreement.

5.  Provider further agrees that the above sections (1) - (4) shall survive termination of this Agreement regardless of the cause giving rise to termination and shall be construed to be for the benefit of the affected Plan Sponsor's Eligible Persons and that this provision supersedes any oral or written contrary agreement now existing or hereafter entered into between Provider and Eligible Persons or persons acting on their behalf.

6.  If Provider contracts with other health care providers who agree to provide Pharmacy Services to Eligible Persons of a given Plan Sponsor with the expectation of receiving payments directly or indirectly from such Plan Sponsor, such providers must agree to abide by the above sections (1) through (5).

11

CONFIDENTIAL AND PROPRIETARY – FOIA EXEMPT –
DO NOT DISCLOSE

Schedule of Transmission and Maintenance Fees

      PCS offers Provider three ways to telecommunicate claims: direct dial, a Provider-supplied line (*i.e.*, a leased line that is provided by and paid for by Provider) or through the PCS RECAP® Terminal. The transmission fee charged for each claim verified as a Covered Item (whether submitted on-line via the RECAP® System, on paper, tape or electronically in a batch format) is as follows:

|  | **Provider Supplied Line** | **PCS Communication Network** |
|---|---|---|
| **Provider using its own computer system** | $.03 | $.12 |
| **Provider using leased RECAP® Terminal:** | | |
| **Option One** | N/A | $.20 ($4.50 minimum transmission charge per cycle) |
| **Option Two*** | N/A | $.12 ($10.00 maintenance fee per cycle) |

* Not available for new Providers

**Provider using purchased RECAP® Terminal:**

|  |  |  |
|---|---|---|
|  | N/A | $.12 ($5.00 maintenance fee per cycle or $100 per occurrence if no cycle fee is deducted) |

**SIGNATURE REQUIRED**

kwiktag® 021 867 077

## PCS Health Systems, Inc.
## Network and Plan Enrollment Form
(Page 1 of 2)

The undersigned hereby enrolls as a Provider in one or more of PCS' Networks. The attached Provider Agreement, all Schedule thereto, and the PCS Documents (as defined in the Provider Agreement) each as in force from time to time constitute Provider's agreement with PCS Health Systems, Inc.

IN WITNESS WHEREOF, the parties hereto have caused this Provider Agreement to be executed by their respective officers or representatives duly authorized so to do effective as of the date PCS Health Systems, Inc. accepts this Provider Agreement. By signing below, the undersigned Provider represents and warrants to PCS Health Systems, Inc. that (i) it has read the PCS Provider Agreement, the Schedules thereto and the other PCS Documents, and (ii) agrees to be bound by such agreements (as such agreements may be amended from time to time in accordance with the terms of the Provider Agreement) without any modifications, deletions or additions to any of such agreements.

**Provider**

Name: OSTERHAUS PHARMACY
Address: 124 SOUTH MAIN
MAQUOKETA, IOWA 52060

NABP: 16-01904

Telephone: 319-652-5611

Fax: 319-652-6242

By: [signature]
Signature

MATT. C. OSTERHAUS RPh
Printed Name and Title

**PCS Health Systems, Inc.**

By: [signature] V. P.

Printed Name and Title

Date of Acceptance by PCS:

RECEIVED
JAN 1 8 1996
PROVIDER