# EXHIBIT 1

# EXHIBIT 23

**American Arbitration Association**
Commercial Arbitration Tribunal

Case Number: 01-21-0016-4612

New York Cancer & Blood Specialists,
  Claimant

-vs-

Caremark, LLC, Caremark PCS, LLC, SilverScript
Insurance Company and Aetna, Inc.
  Respondents.

_____/


# FINAL AWARD

WE, THE UNDERSIGNED ARBITRATORS, were appointed by the American Arbitration Association ("AAA") in accordance with an arbitration provision contained in the Provider Manual of Respondent Caremark, LLC, and Caremark PCS, LLC (collectively, "Caremark"). Having been duly sworn and having conducted an evidentiary hearing as set forth below ("Hearing"), and having heard, reviewed, and considered the allegations and proofs of the parties, we issue this Final Award to resolve disputes between New York Cancer & Blood Specialists ("NYCBS"), and Respondents, Caremark, SilverScript Insurance Company ("SilverScript") and Aetna, Inc. ("Aetna") in this arbitration proceeding ("Arbitration").

1

The hearing took place from April 3, 2023, through April 7, 2023, in New York, New York. New York Cancer & Blood Specialists was represented in these proceedings by Frier Levitt, LLC. Caremark, LLC, Caremark PCS, LLC, SilverScript Insurance Company and Aetna, Inc. were represented in these proceedings by Nixon Peabody, LLP.

Following the hearing and subsequent argument, the Panel issued an Interim Award on Liability and Damages on June 28, 2023 ("Interim Award", which is fully incorporated herein), to resolve disputes between NYCBS and Caremark, Aetna, and SilverScript in this arbitration proceeding ("Arbitration"). That Interim Award specified in pertinent part as follows:

1. No later than August 5, 2023, and in accordance with Section 15.09.02 of the Caremark Provider Manual, as amended, NYCBS may file an Application for all expenses of arbitration, including reasonable attorney fees. The Application must be accompanied by an affidavit from a billing attorney and contemporaneous billing records, redacted to protect the attorney-client privilege. The affidavit shall detail the time and expenses spent providing the service, the nature of the service provided, and the date the service was provided. The Arbitrators shall award applicable pre-judgement interest. NYCBS must establish such amount through August 4, 2023, with a *per diem* rate thereafter. The Arbitrators shall also award post-judgment interest.

2.  No later than August 25, 2023, Respondents may oppose an application for costs, fees, expenses, and interest. If Respondents challenge the amount of claimed costs, fees, or expenses they must give the Panel documentation establishing their own costs, fees, or expenses. In accordance with Rule 40 of the Commercial Rules of the American Arbitration Association, and subject to paragraph 13 below, the hearing shall thereafter be declared closed.

The parties timely filed briefs as specified above, and Claimant also filed an Application to Reopen Hearing Pursuant to Rule 41 and to Amend Fee Application Based on Change to Prime Interest Rate. Before considering Claimant's request for an award of costs, fees, expenses, and interest, the Panel will address the application to reopen the hearing and amend the fee application.

<u>Application to Reopen Hearing Pursuant to Rule 41 and Amend Fee Application Based on Change to Prime Interest Rate.</u>

Claimant alleges that a new document, specifically the Trimester 1 of the 2023 Reports issued by Caremark, has been delivered to them. This report is represented to contain the precise amount of PNR fees Caremark charged Claimant for the first trimester of 2023, which differs from the amount calculated by Claimant's expert witness. Further, Claimant submits that the prime interest rate under Arizona law has increased following the issuance of the Interim Award. Claimant therefore seeks

an increase in the damage amount determined in the Interim Award, as well as an adjustment to the pre-judgment and post-judgment interest calculations set forth in its Application to Reopen Hearing. In its Response to Claimant's Application, Respondents requested that the Panel reject the request to reopen the hearing. (Respondents' Brief at p. 1).

Upon consideration, the Panel denies the request to reopen the hearing and to amend the fee application. Based upon the interaction between the parties, as established by the record in this case, Claimant knew or should have known that a Trimester report would be issued by Caremark, yet Claimant did not ask for any delay in the presentation of damages, a bifurcation of the proceeding, or any other process which would have enabled the Panel to receive the Trimester Report into evidence as part of the scheduled proceeding. With respect to the interest rate, such matters are always subject to the whim of legislative bodies. The arbitration process demands finality and cannot be subject to a moving target. This Panel will rule based upon the evidence presented at hearing and will not reopen, revise, or recalculate based upon any subsequent developments.

Accordingly, the Tribunal declares this hearing closed as of August 25, 2023, pursuant to Rule 40 of the Commercial Rules of the American Arbitration Association. This is the Final Award.

4

Application for Attorneys' Fees and Expenses

In addition to the amount of $17,082,162 awarded to Claimant against the Respondents, jointly and severally, Claimant now seeks additional sums as follows:

$2,183,893.81 for attorney fees and expenses;

$1,652,315.90 for pre-judgment interest;

$5,157.95 as a *per diem* rate for post-judgment interest.

Each category will be discussed by the Panel in Order.


Attorney Fees and Costs

Per the parties' contractual agreement in Caremark's Provider Manual, Section 15.09.02, and the Joint Statement of Law filed in this matter, "the party against whom **the final award of the arbitrator(s) is rendered**" shall pay the other parties' reasonable expenses including attorneys' fees, except as otherwise required by Law." [emphasis original].  Claimant is entitled to an award of reasonable attorneys' fees and costs as the party in whose favor the Panel ruled and against Respondents. Respondents do not contest Claimant's entitlement to reasonable attorneys' fees and costs or the respective hourly charges.  However, Respondents do contest Claimant's requested amount on the grounds that Claimant does not qualify for a lodestar method calculation.  Also, Respondents argue certain of Claimant's billing entries are unreasonable because Claimant's attorneys used block billing, spent an

inordinate amount of time in internal office conferences, had vague billing entries, billed for clerical tasks and billed for unrelated tasks.  Further, Respondents argue certain costs are not reasonable.  (Respondents' Response, pp. 14-19).  Claimant has requested an award for 3,510.70 hours totaling $1,368,879.50 in fees and $428,543.81 in costs, for a grand total of $1,797,423.31 (interest not included), or in the alternative, application of a lodestar to calculate attorney's fees (plus the same total expenses of $428,543.81) of $2,183,893.81 for a grand total of $2,612,442.62 (interest not included).  (Mizeski Affidavit; Exhs. A-C).

The Panel has reviewed all the Parties' and their Counsels' respective submitted evidence and legal authorities under Arizona and New York law, including but not limited to, the background and experience of the respective attorneys, billing records, cost expenditures, cost receipts, attorneys' affidavits and the hourly rates charged respectively.  For the reasons discussed below the Panel awards Claimant **$1,356,916.00** in reasonable attorneys' fees and **$428,543.81** in reasonable costs, totaling **$1,785,460.31.**

In using its discretion to determine whether Claimant's requested attorneys' fees are reasonable, the Panel considered the following factors:

> (1) the qualities of the advocate: the advocate's ability, training, education, experience, professional standing and skill;
> (2) the character of the work to be done: its difficulty, its intricacy, its importance, time and skill required, the responsibility imposed and the prominence and character

6

of the Parties where they affect the importance of the
litigation;
(3) the work actually performed by the lawyer: the skill,
time and attention given to the work; and
(4) the result: whether the attorney was successful and
what benefits were derived.

Schweiger v. China Doll Rest., Inc., 138 Ariz. 183, 187 (1983) (*citing to* Schwartz

vs. Schwerin, 85 Ariz. 242, 336 P. 2d 144 (1959); Daiwa Special Asset Corp. vs.

Desnick, 2002 WL 31767817, at *1 (S.D.N.Y. Dec. 3, 2002).  No one factor

should be given undue weight or be prominent and Schwartz is a useful starting

point.  However, as the Schweiger court observed, "…[Schwartz] fails to give

specific guidance in how the enumerated factors are to be used in calculating a

reasonable fee." Schweiger, 138 Ariz. At 187 (citations omitted).  Likewise, under

New York law, the United States Second Circuit Court of Appeal has not provided

a hard and fast rule a judge should follow in deciding a contractual claim for

attorneys' fees.  Daiwa, at *1. Courts are not required to detail item by item

findings on what may be "countless objections to individual billing items"

particularly when the billing records are voluminous, as they are in this matter.  Id.

(citations omitted.)

The Panel also considered the overall circumstances of the exquisite

complexity of many issues, including discovery, for this claim and the legal

acumen, writing skills and resource demands on Claimant's counsel, including

each of the Schweiger factors. The Panel was guided as well by applicable law to

the extent it provided such, including that a reasonable hourly rate is the amount a client is willing to pay.  *See also* <u>Fountainhead Investments, Inc. vs. DePalo,</u> 2009 WL 3458985, at *2, 3, n. 6, *citing to,* <u>Johnson vs. Ga. Highway Exp. Inc.,</u> 488 F. 2d 714, 171-719 (5th Circuit 1974) (the twelve factors called the "Johnson factors.")  If Claimant's requested attorneys' fees were facially reasonable, the burden to prove they were clearly excessive fell on Respondents.  If Respondents did not so prove, then Claimant is entitled to recover its full attorneys' fees. <u>McDowell Mountain Ranch Community Ass'n, Inc. vs. Simons,</u> 216 Ariz. 266, 271165 P.3d 667, 672 (App. 2007) ("a trial court has discretion to award the reasonable amount of attorneys' fees to award when awarding fees pursuant to a contractual provision providing for reasonable attorneys' fees.")  Similarly, under New York law, courts have "… considerable discretion to determine the reasonableness of attorneys' fees."  <u>Fontana vs. Bowls and Salads Mexican Grill, Inc.,</u> 2022 WL 16549132, at *1 (E.D.N.Y. oct. 31, 2022) (citation omitted.)  In the end, the sound discretion of the court will not be overturned in the absence of an abuse of discretion, such as a mistake of law or clearly erroneous finding of fact. Because the trial court has presided over the bulk of the litigation, it is in the best position to assess the attorneys' skills and amount of time reasonably required to litigate the case.  <u>Fontana</u>, at *2 (citations omitted.)

## REASONABLE BILLING RATES

As recommended by the <u>Schweiger</u> court, the Panel started its analysis with determining a reasonable billing rate in this particular matter.  Mr. Mizeski's affidavit and its attachments, which included the chronological billing records, indicated the rates to which the Claimant agreed to compensate its attorneys.  Notably, Respondents did not challenge the Claimant's attorneys' or other hourly rates.  After reviewing Claimant's supporting affidavit on the background, education, ability, training, experience, professional standing and skill detailed, the Panel finds Claimants' attorneys and support personnel's hourly rates are reasonable. For example, Mr. Levitt, lead Counsel and Partner, charged $650/hour; Mr. Mizeski, managing and supervising Partner, charged $575/hour; Mr. Bennett, Partner and supervising Partner, charged $525/hour; Mr. Barbarito, Associate, $340/hour and Mr. Ferguson, Associate, $270/hour.  These hourly rates are less than Mr. Shea, Respondents' lead counsel, who charged $695/hour.  The additional associates and paralegal rates charged are also reasonable, which Respondents have not challenged.

## HOURS REASONABLY EXPENDED

Although Claimant is entitled to an award of reasonable attorneys' fees for time expended, Claimant is required to provide billing entries which have sufficient detail to determine the type of legal services provided, the date the

9

service was provided, the attorney's identity and the time expended in providing the service. Broad summaries are not acceptable and entries should be contemporaneously made in relation to the service. <u>Schweiger</u>, 138 Ariz. at 188; <u>RCS Capital Development, LLC vs. A.B.C. Learning Centers (U.S.A.), Inc.</u>, 2012 WL 2115377, at *9 (App. 2012).

Respondents do not object or question the majority of the <u>Schweiger</u> factors for the Panel's consideration regarding Claimant's application for attorneys' fees. Respondents do not challenge: (1) the character of the work done, such as its difficulty, intricacy, importance, skill, responsibility imposed on the attorneys, (2) the work actually performed and the attention devoted by Claimant's attorneys; (3) that the Panel ruled in favor of the Claimant and that Claimant's attorneys were successful in obtaining the Panel's interim award, (4) Claimant's evidence supporting its attorneys' skills and expertise, the complexity of the litigation or the attorneys' respective responsibilities in contemporaneously entered billings. (*See* Mizeski Affidavit, Exh. A). The Panel finds that Claimant met the requirements for each of those specific <u>Schweiger</u> factors to support the reasonableness of its attorneys' hourly billing rates. Therefore, the Panel addresses those areas in which the parties disagree. *See also* <u>Daiwa.</u>

## APPLICATION OF THE LODESTAR

Claimant's Mizeski affidavit and attached exhibits, i.e., its evidence, show that Claimant's agreement with its attorneys was an hourly billing rate. Claimant argues that the lodestar factor of 1.25 or 125% of its attorneys' average hourly rate of $400/hour should be applied. However, the lodestar applies only to contingency or hybrid cases under both Arizona and New York law. Schweiger, 138 Ariz. At 186, n. 5; R.C.S., 2012 WL 2115377, at *10, ¶51-52; 11, ¶55; Fountainhead, 2009 WL 3458985, at *3. Claimant did not cite any supporting law that the lodestar method applies to an hourly rate contract for special circumstances for the opposing party's discovery tactics.

Claimant did not submit evidence it has a contingency or hybrid fee agreement and relied in part on Johnson. Importantly, in discussing factor 6 on whether the fee was fixed or contingent, the Johnson court specifically held: "In no event, should the litigant be awarded a fee greater than he is contractually bound to pay, if indeed the attorneys have contracted as to amount." Id. Absent any evidence to the contrary, the Panel is awarding Claimant its attorneys' fees and costs based on that presumably hourly agreement, which the Panel finds is reasonable. (Mizeski Affidavit, Exh. A).

Claimant's request for a lodestar relies also on Perdue vs. Kenny A. ex rel. Winn, 559 U.S. 542 (2010). However, Perdue's holding regarding application of

11

the lodestar modifier in civil rights actions stated that the lodestar should be awarded only in "rare and exceptional circumstances." Perdue, 559 U.S. at 543. As explained above in this opinion, Claimant's submitted evidence does not demonstrate it has a contingency or hybrid contingency agreement. Therefore, Perdue is not persuasive either.

## BILLING ENTRIES

The Panel observes that this health care payor claim from its inception has been determinedly and strongly advocated by both sides. That level of advocacy continued throughout the five (5) day final hearing in early April, 2023 and continues to this day. The claim is highly complicated, being interwoven with complex with sophisticated mathematical formulas and analogs throughout, requiring actuarial expert witness testimony at the final hearing by both sides. Discovery involved hundreds of pages of written materials and unknown amounts of megabytes of data. *See* Respondents' Response, Exh. 8-A, 3/15/22 and 3/16/22 entries by Jeffrey Jarrett, "Staging, filtering, deduplication, metadata, text and extraction, exception handling, data conversion, and load file creation of client data to be loaded..." as one example. The agreement between the parties showed that Arizona and New York state laws, in addition to federal regulations and Centers for Medicare & Medicaid Services ("CMS") guidelines and contracts, applied to the dispute. Each parties' advocacy demanded sophisticated legal analysis of the

12

issues.  This litigation was not for the faint of heart advocate and the Panel approached its analysis of Claimant's application for attorneys' fees and costs with that background in mind.

## REASONABLENESS OF BILLING ENTRIES

Respondents argue that certain of Claimant's attorneys' billing entries are unreasonable because Claimant's attorneys (1) used block billing, (2) spent an inordinate amount of time for internal office conferences, (3) had vague billing entries, (4) billed for clerical tasks and (5) billed for unrelated tasks.  Further, Respondents argue certain costs are not reasonable.  Respondents' Response, pp. 14-19.  The Panel addresses each argument as follows.

## BLOCK BILLING

Block billing under Arizona law is that which contains "multiple individual and unrelated tasks.  Moshir vs. Automobili Lamborghini America, LLC, 927 F. Supp. 2d 789, 799 (D. Ariz. 2013).  New York law defines block billing as "grouping multiple tasks into a single billing entry."  Charles vs. City of New York, 2014 WL 4384155, at *5 (S.D.N.Y. Sept. 4, 2014).  Block billings are disfavored because they make it "nearly impossible for the Court to determine the reasonableness of the hours spent on each task."  Moshir, 927 F. Supp. 2d at 799; Charles, 2014 WL 4384155, at *5.  However, block billing is not inappropriate *per se.  Moshir,* 927 F. Supp. 2d at 799; Charles, 2014 WL 4384155, at *5.

Respondents argue that Claimant's attorneys block billed $641,206 for 1,549.20 hours, including multiple entries for Claimant's attorneys attending the five days of final hearing.  (Respondents' Response, Exh. 2, Blocked Billed Entries).  The Panel disagrees for the most part that Claimant's attorneys' entries were block billed.  A close reading of Claimant's attorneys' billing entries provides enough information to discern that the time spent on a particular project was reasonable and related, even if it involved several different time expenditures on the related tasks.

Several examples are as follows: (1) on April 25, 2022, Mr. Barbarito billed 7.60 hours related to the particular project on submission of a brief to the Panel. Having reviewed Claimant's respective briefs during this matter, the Panel is aware of the detailed analyses required and those which Claimant subsequently submitted; (2) on May 26, 2022, Mr. Bennett billed 6.50 hours for the particular project regarding oral argument for a hearing before the Panel.  The Panel can determine that Mr. Bennett's time was reasonable and related to prepare for and attend oral argument, including review of applicable case law, and addressing post hearing matters internally; (3) is Mr. Barbarito's March 8, 2023, billing entry for 11.10 hours for preparing for an expert witnesses' deposition, including reviewing the expert's reports.  The Panel can determine that this billed time was reasonable and related without knowing the length of time Mr. Barbarito separately spent

reviewing the expert's reports, as that review is part of preparing for the expert's deposition.  Further, the testimony and reports of the expert witnesses in this matter were very complicated, involving complex analyses of hundreds of documents and reports, including mathematical calculations; (4) Mr. Levitt's April 6, 2023, billing entry for 11.0 hours regarding preparing for cross examining Respondent's witness and expert witness' testimony at the final hearing and traveling to and from the hearing location.  The Panel knows first-hand that the hearing days were long.  The Panel does not find it necessary to separately determine the reasonableness of the amount of time it took Mr. Levitt and his firm's attendees to arrive and depart the final hearing site in New York City, as such would be nominal but essential, necessary, and related time. It is clear from Claimant's billing records that attorneys traveled and incurred expenses in doing so. (Mizeski Affidavit, p. 127). Further, the Panel finds it is not unusual for an attorney to work while traveling, whether in a car or otherwise.  As such, the Panel finds the billed time to which Respondents object is reasonable and related.

As a comparison and contrasting Respondents' argument with their attorneys' billing records, Respondents' attorneys' billing records show that their attorneys at times provided minimal details, if any.  For example, Mr. Shea has thirteen (13) entries for "Review claims" from September 9, 2021, to October 27,

2021, totaling thirty-eight (38) hours at $695 per hour for $26,410.  (Respondents' Response, Exh. 8-A).  Those entries are not supportive of Respondents' position.

Overall, the Panel finds that Claimant's billing records were not block billing, which is not inappropriate *per se*.  Based on the billing entries showing that the tasks described were reasonably related to the project, the Panel could and did determine the reasonableness of the hours spent on each task and project for the 1,549.20 hours to which Respondents' object.  Moshir, 927 F. Supp. 2d at 799; Charles, 2014 WL 4384155, at *5.  Therefore, the Panel denies Respondents' request to reduce Claimant's attorneys' hours based on block billing.

AMOUNT OF TIME FOR INTERNAL OFFICE CONFERENCES

Respondent argues that Claimant included a "staggering" amount of interoffice conference billing time, totaling $43,894.50 comprised of 106.90 hours. (Respondents' Response, p. 16 and Exh. 3).  No evidence was provided that Claimant was unwilling to compensate its attorneys for this billed time.  *Cf* Mogck vs. Unum Life Ins. Co. of Am., 289 F. supp. 2d, 1181, 1195 (S.D. Cal. 2003) ("This Court doubts that Miller, Monson would have charged Plaintiff for all of Monson's and Horner's consultations with one another…")

A close review of Claimant's attorneys billing records reveals that at times they billed for conferences involving multiple attorneys and sometimes support paralegals.  For example, those billing entries include 3/9/2021, 3/11/2021,

6/15/2021, 8/10/2021, 8/24/2021, 8/31/2021, 9/2/2021, 3/23/2022, 3/29/2022, 4/5/2022 and 4/7/2023.  At other times they billed for a managing partner's conference with an associate.  The Panel finds those entries are reasonable as being part and parcel of managing partners' responsibilities to the client.

Further, it is important to keep the interoffice conferences in perspective. Claimant's attorneys billed a total of 3,510.70 hours of which about three (3) percent, i.e., 106.90 hours using Respondents' calculations, are comprised of interoffice conferences, a small percentage of the total billing.  Bringing a claim as complex as the instant one requires considerable skill and coordination to efficiently follow all the discovery, if nothing else, and a large number of legal professionals.  In this particular matter, Claimant and its attorneys faced formidable opponents in which each of the three Respondents is a very large company with significant financial and legal resources.  Claimant faced considerable, persistent resistance from Respondents throughout the litigation, including discovery.  (*See* Claimant's Application for Attorneys' Fees and Expenses, pp. 16-19). Meeting as a team, such as the "DIR fee team," was not only prudent but reasonably necessary to ensure completeness and efficiency in keeping all team members abreast and directing their efforts.  In turn, managing partners or lead counsel will require that the associates and office personnel to whom they have delegated report back to them.  (*See* Mizeski Affidavit, references to "team.")

17

The Panel finds that due to the complexity of this claim and Respondents'

persistent resistance to discovery, including the Panel's Order on such, the

interoffice conferences were necessary and essential to properly pursue Claimant's

claims. *Cf* In re Poseidon Pools of America, Inc., 180 B.R. 718, 731 (E.D.N.Y

1995) (noting that not more than two attorneys should bill for the same

conference.) With the added complicating factor of digital data and metadata,

sometimes in native format, in discovery, legal theories and presentation of one's

case during a final hearing/trial, an attorney's use of a team of personnel with

concomitant interoffice conferences is reasonable, essential and necessary on a

practical basis in this claim. The Panel finds that Claimant's attorneys' billings for

interoffice conferences are reasonable and necessary to properly prosecute this

claim and awards those billing entries to Claimant.

## VAGUE BILLING ENTRIES

Respondents argue that Claimant's attorneys' billings were vague for 98.10

hours, totaling $36,019. (Respondents' Response, p. 16-17, Respondents' Exh. 4).

Having reviewed the specific entries Respondents characterized as vague, the

Panel finds that 2.5 hours totaling $1,557 are too vague to be reasonable. Examples

include "review file," "legal research and discovery" (2), no description (2) and

"prepare for call." The Panel finds that "trial preparation," "final hearing

preparation," "discuss briefing strategy re applicability of 2020 Manual" and other

entries are not too vague to describe the general subject matter of the work,

particularly considering the attorneys' obligation to protect privileged information.

Tucker vs. Mukasey, 2008 WL 2544504, at *2 (S.D.N.Y. June 20, 2008).  For

example, in Mr. Barbarito's 2/14/23 entry, "Prepare trial strategy," it is not

reasonable to demand that Mr. Barbarito must detail trial strategy to the opposing

side to be paid for Claimant's legal work.  Accordingly, the Panel reduces

Claimant's attorneys' fees claim for $1,557 for being too vague to determine

whether they are reasonable.

CLERICAL TASKS

Respondents argue that Claimant's attorneys improperly billed 67.20 hours

for a total of $10,633 for clerical tasks.  Tasks of reviewing court-generated

notices, scheduling, notifying clients of hearings, filing documents with the court

and document organizing are clerical or secretarial, regardless of who performs the

task.  Rindlisbacher vs. Steinway & Sons, Inc., 2021 WL 2434207, at *12 (D. Ariz.

May 26, 2021); Dancy vs. McGinley, 141 F. Supp. 3d 231, 245 (S.D.N.Y. 2015).

After reviewing Claimant's attorneys' billing records, the Panel finds that

1.1 hours for $263.00 are clerical tasks.  Some of those clerical tasks include "Bate

stamped documents and marked as confidential," "Review and analyze emails,",

and "Call with Kim Haduck at Veritext re Invoices." The Panel specifically finds

that the remainder of the billings Respondent challenges are not clerical tasks.  For

example, preparing trial or hearing binders and exhibits require the skill level of a

paralegal to understand the significance and presentation for a hearing or trial and,

often include reading and understanding the related briefs.  Those types of tasks

are not merely administerial and can have deleterious consequences if not properly

accomplished.  *Cf* Respondents' Response, Exh. 8-A, 3/2/22, Guillaume Poudrier,

"Review and organize Respondent's Expedited Discovery Requests to Claimant,"

which are not clerical tasks. Therefore, the Panel will reduce Claimant's attorneys'

fees request as clerical tasks for 1.1 hours for $263.00.

## UNRELATED TASKS

Respondents allege that Claimant's attorneys billed for 20.30 hours, which

total $10,143.50 for unrelated tasks to this claim.  Respondents' Response, p. 18,

Exh. 6.  In reviewing each entry, the Panel finds that the entries are unrelated for

20.30 hours billed totaling $10,143.50.  The Panel will reduce Claimant's

attorneys' fees award accordingly.

## COSTS

Claimant maintains that the expenses incurred for $428,543.81, which

consists of $359,005.82 which Claimant directly paid and $69,537.99 incurred by

its attorneys, are the usual and customary kind of charges to Frier Levitt clients in

similar arbitrations and were reasonably necessary to prosecute this claim.

(Claimant's Application, p. 12; Mizeski Affidavit, ¶¶7, 8 and Exhs. B and C).

Respondents do not challenge any of Claimant's costs and expenses except for $8,667.25 billed for Westlaw and PACER (federal court computer system). Respondent's Response, p. 18; Exh 7.  Respondents rely upon certain New York and Arizona cases that hold that computerized research, such as Westlaw fees, are part of overhead and, thereby, not recoverable separately from attorney's fees as an unbundled cost.  BD vs. DeBuono, 177 F. Supp. 2d 201, 209 (S.D.N.Y. 2001) (computerized research does not save attorney's time because many attorneys still use West's Keynote Digest, the Federal Reporter and Federal Supplement); BBQ Hut, Inc. vs. Maelin Enterprises, LLC, 2008 WL 2687685, at *4 (D. Ariz. July 3, 2008) (Arizona courts have not awarded computerized research costs when they had no way of knowing how those fees were incurred.)

Yet, the BD Court acknowledged that courts in the same circuit feel to the contrary and have awarded computerized research expenses as taxable costs.  Id. One such case is Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 369 F.3d 91, 98 (2d Cir. 2004).  Courts in the Ninth Circuit as well permit such recovery as reasonable attorney's fees.  Trustees of Const. v. Redland Ins. Co., 460 F. 3d 1253, 1258 (9th Cir. 2006).

The Panel finds that the cases awarding computerized research as part of an attorney's fees application are persuasive.  The legal research software has dramatically and exponentially improved, particularly over the last several years.

21

For example, artificial intelligence in the form of gpt has created quite a challenge, including for courts, in its ability to imitate human thinking. Further, long gone are the days of attorneys using the physical books to conduct research, if, indeed, they can even be found. Claimant's evidence supports that these computer research charges are the usual and customary kind of charges to Frier Levitt clients in similar arbitrations. Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 369 F.3d 91, 98 (2d Cir. 2004) ("If GD C normally bills its paying clients for the cost of online research services, that expense should be included in the fee award.")

As such, the Panel finds that Claimant's Westlaw and PACER expenses are reasonable and compensable as part of its application for attorneys' fees for $8,667.25. Trustees of Const. v. Redland Ins. Co., 460 F. 3d 1253, 1258 (9th Cir. 2006); Anderson vs. City of New York, 132 F. Supp. 2d 239, 247 (S.D.N.Y. 2001); Gonzalez v. Bratton, 147 F. Supp. 2d 180, 212-213 (S.D.N.Y. 2001).

The $428,543.81 in costs includes the sum of $214,017.72 for arbitration fees and expenses. (Claimant's Application at p. 12). The Panel has reviewed this amount with the American Arbitration Association. The administrative fees and expenses of the American Arbitration Association totaling $25,458.22 shall be borne by the Respondents, and the compensation and expenses of the arbitrators totaling $378,709.22 shall be borne by the Respondents. Therefore, Respondent

shall reimburse Claimant the sum of $214,812.83 ($25,458.22 + $189,354.61), representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by the parties. This adjustment increases the total costs awarded to Claimant from $428,543.81 to $429,338.93.

In conclusion, in applying the Panel's above findings, the Panel awards Claimant as follows:

### SUMMARY OF AWARD OF ATTORNEYS' FEES AND COSTS

|  | Attorneys' Fees | Costs | Total Awarded |
|---|---|---|---|
| Requested amount w/o lodestar | $1,368,879.50 | $428,543.81 |  |
| Vague billing | - 1,557.00 |  |  |
| Clerical Tasks | - 263.00 |  |  |
| Unrelated Tasks | - 10,143.50 |  |  |
| **TOTAL AWARDED** | **$1,356,916.00** | **$429,338.92** | **$1,786,254.92** |

Pre-judgment interest

As noted in the Interim Award, Claimant did not object to Respondents' position that Arizona law governs the relationship with certain of Claimant's affiliates for claims before October 7, 2022 (J-32, J-35), and that New York law governs claims for all other affiliates for claims after October 7, 2022 (J-39, 42, 45, and 51) (see Respondents' Response at 4). Accordingly, Claimant based its calculation of pre-judgment interest on both states' applicable law.

In Arizona, pre-judgment interest may be awarded if the sum claimed is

liquidated. Although Respondents argue that the sum is not liquidated, the Panel disagrees, based upon its review of applicable law and the evidence in this case. With respect to New York, Claimant cites CPLR Section 5002 in support of the argument that they are entitled to pre-judgment interest from the date that liability was established. (Claimant's Application at 22). Respondents argue that the Interim Award was premised on a finding of unjust enrichment and, therefore, any award of pre-judgment interest is discretionary with the Panel. (Respondents' Response at 21-22). The Panel finds, based upon a review of applicable law and the evidence in this case, that even if it were to accept Respondents' argument, it would exercise its discretion and award pre-judgment interest to Claimant.

The calculations performed by Claimant, with respect to the relevant entities based in Arizona and New York, are set forth in the Application for Attorneys' Fees and Expenses, pp. 21-23. The parties concur that the parties' relationship during the 2016–2022-time frame is the period for which pre-judgment interest should be calculated. (Claimant's Application at 22-23, Respondents' Response at 22-23). Respondents argue that the calculation should be based upon a lesser amount than was awarded to Claimant in the Interim Award. In that Interim Award, the Panel already rejected Respondents' argument regarding damages.

Accordingly, the Panel finds that pre-judgment interest is properly based upon the $17,082,162 awarded to Claimant, and that the pre-judgment interest calculation

24

performed by Claimant is appropriate. Accordingly, pre-judgment interest in the amount of $1,652,315.90 is awarded to Claimant.

### Post-judgment interest

Claimant submits that both applicable New York and Arizona law authorize an award of post-judgment interest, and ask the Panel to apply the slightly lower New York rate of 9% to the award. This position is not contested by Respondents and is supported by the authority cited by Claimant. (Claimant's Application at p. 23). Accordingly, post-judgment interest is awarded and calculated by totaling the damages, costs and fees, and pre-judgment interest to arrive at the amount of $20,520,732.80. That figure multiplied by 9% equals $1,846,865.95 which, divided by 365, equals the per diem amount of $5,059.90.

**Upon careful consideration of the entire evidentiary record, the Tribunal FINDS, DETERMINES and AWARDS as follows:**

1. Claimant is AWARDED the sum of $1,786,254.92 for attorney fees, expert witness fees, costs, arbitration fees and expenses, and $1,652,315.90 for pre-judgment interest. When added to the damages determined in the Interim Award on Liability and Damages of $17,082,162, the total Final Award to NYCBS is **$20,520,732.80.**

2. Respondents are ordered to pay said sum to Claimant within thirty (30) days of the entry of this Final Award. Post-Award interest shall thereafter accrue

pursuant to this Final Award.

3. We make this Final Award based upon the evidence, the law, the arguments of the parties, and our assessment of the credibility of the witnesses. We do hereby affirm upon our oaths as Arbitrators that we are the individuals described in and who executed this instrument which is our Final Award.

4. All claims and requests for relief made by the parties but not expressly granted in this Final Award are hereby denied and this Final Award represents the complete and final resolution of all claims and counterclaims in this matter.

5. This Final Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.


SO ORDERED ON September 19, 2023

By:

_____
Michael Jordan, Arbitrator

_____
Brendan Hare, Arbitrator

_____
Louise Zeuli, Arbitrator

pursuant to this Final Award.

3. We make this Final Award based upon the evidence, the law, the arguments of the parties, and our assessment of the credibility of the witnesses. We do hereby affirm upon our oaths as Arbitrators that we are the individuals described in and who executed this instrument which is our Final Award.

4. All claims and requests for relief made by the parties but not expressly granted in this Final Award are hereby denied and this Final Award represents the complete and final resolution of all claims and counterclaims in this matter.

5. This Final Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

SO ORDERED ON September 19, 2023

By:

_____
Michael Jordan, Arbitrator

_____
Brendan Hare, Arbitrator

_____
Louise Zeuli, Arbitrator

pursuant to this Final Award.

3. We make this Final Award based upon the evidence, the law, the arguments of the parties, and our assessment of the credibility of the witnesses. We do hereby affirm upon our oaths as Arbitrators that we are the individuals described in and who executed this instrument which is our Final Award.

4. All claims and requests for relief made by the parties but not expressly granted in this Final Award are hereby denied and this Final Award represents the complete and final resolution of all claims and counterclaims in this matter.

5. This Final Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.


SO ORDERED ON September 19, 2023

By:


_____
Michael Jordan, Arbitrator

*Brendan M. Hare*
Brendan Hare, Arbitrator


_____
Louise Zeuli, Arbitrator


26

pursuant to this Final Award.

3. We make this Final Award based upon the evidence, the law, the arguments of the parties, and our assessment of the credibility of the witnesses. We do hereby affirm upon our oaths as Arbitrators that we are the individuals described in and who executed this instrument which is our Final Award.

4. All claims and requests for relief made by the parties but not expressly granted in this Final Award are hereby denied and this Final Award represents the complete and final resolution of all claims and counterclaims in this matter.

5. This Final Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

SO ORDERED ON September 19, 2023

By:

_____
Michael Jordan, Arbitrator

_____
Brendan Hare, Arbitrator

_____9/19/2023
Louise Zeuli, Arbitrator

26

**American Arbitration Association**
Commercial Arbitration Tribunal

Case Number: 01-21-0016-4612

New York Cancer & Blood Specialists,
    Claimant

-vs-

Caremark, LLC, Caremark PCS, LLC, SilverScript
Insurance Company and Aetna, Inc.
    Respondents.

_____/

**INTERIM AWARD**

    WE, THE UNDERSIGNED ARBITRATORS, were appointed by the American

Arbitration Association ("AAA") in accordance with an arbitration provision

contained in the Provider Manual of Respondent Caremark, LLC, and Caremark

PCS, LLC (collectively, "Caremark"). Having been duly sworn and having

conducted an evidentiary hearing as set forth below ("Hearing"), and having heard,

reviewed and considered the allegations and proofs of the parties, we issue this

Interim Award on Liability and Damages to resolve disputes between New York

Cancer & Blood Specialists ("NYCBS"), and Respondents, Caremark, SilverScript

Insurance Company ("SilverScript") and Aetna, Inc. ("Aetna") in this arbitration

proceeding ("Arbitration").

1

Background

New York Cancer & Blood Specialists was represented in these proceedings by Frier Levitt, LLC. Caremark, LLC, Caremark PCS, LLC, SilverScript Insurance Company and Aetna, Inc. were represented in these proceedings by Nixon Peabody, LLP.

NYCBS is a community cancer center with locations on Long Island and New York City. Six locations operate as physician dispensaries through which patients may receive oncology medications. Respondent, Caremark, is a Pharmacy Benefit Manager ("PBM"), which creates and manages pharmacy networks and prescription drug benefits on behalf of Medicare Part D ("Part D") Plan Sponsors, including Respondents, Aetna and SilverScript. Part D provides prescription drug coverage for the elderly and disabled. To distribute oncology medication to its Medicare patients, NYCBS must participate in Medicare Part D networks and, to that end, NYCBS executed a Provider Agreement with Caremark for each of its dispensaries. (J-362 at 22:24-23:3).

Each Provider Agreement incorporates by reference the Provider Manual. See, e.g., J-32 at ¶11; see also J-54 to J-60 (Provider Manuals). Signing the Provider Agreement does not give a provider access to all of Caremark's networks. To join specific networks, providers agree to Network Enrollment Forms ("NEFs"), which contain the reimbursement terms and conditions for each

2

network. Here, NYCBS retained a pharmacy services administration organization ("PSAO"), Amerisource Bergen Drug Corporation ("Elevate"), to enroll it in the Caremark Part D networks and represent it in interactions with Caremark regarding the NEFs at issue. (J-99, 100, 102).

In 2016, Caremark established a Performance Network Rebate Program ("PNP") pursuant to which reimbursement to providers for Medicare Part D drugs was contingent on a provider's performance. (J-1).  In 2018, Caremark introduced a specialty medication adherence component to the PNP, utilizing a medication possession ratio ("MPR") to measure patients' adherence in taking the medications as prescribed for them. (J-205). The Plans here incorporate direct or indirect remuneration ("DIR," a/k/a "PNR" fees) components in their plan design.

The calculation of the PNP is complex. In summary, a third-party vendor, Pharmacy Quality Solutions ("PQS"), measures providers' performance under the medication adherence and gap therapy metrics. (T-3, 925, 1262; see, e.g., J-111). Likewise, another third-party, Outcomes MTM (previously Mirixa), evaluates pharmacies on their MTM (Medication Therapy Management) scores. (T-3, 925, 1262-1263; see, e.g., J-205). For plan years 2016-2017 of the PNP, Caremark scored formulary compliance itself. (See, e.g., J-111 at 5290).

After a provider receives a score for each metric, Caremark provides a weighted final overall performance score ("FOPS") for each plan. (See, e.g., J-

3

111). After calculations were complete, including a variable rate score, Caremark

collected through claw back/ set-off the PNR fees from participating providers'

reimbursements over the subsequent eight weeks. (See, e.g., J-205).

   In 2018, Caremark introduced a specialty medication adherence component

to the PNP (T-4, 1264:21-1265:4; J-391 at 54). Caremark utilizes two lists as part

of the specialty component, the Specialty Drug Universe List ("Universe List") and

the List of Therapeutic Classes. (T-1265-1267). At the time Caremark developed

the specialty component, PQS did not have a multiple-therapeutic specialty

medication measure. (T-3, 925, 926; J-391 at 57). Thus, Caremark informed

providers in the contract documents that it would measure the specialty medication

component. (J-205 at 313).

   On March 10, 2021, NYCBS delivered a "Dispute Notice" to Caremark

pursuant to the 2020 Provider Manual, disputing Caremark's implementation of the

PNR program (J-1). The parties were unable to resolve the dispute and this

arbitration followed.

Procedural History

   The arbitration proceeding commenced with the filing of a Demand for

Arbitration on October 10, 2019. (J-2). Amended Statement of Claims were filed

on January 6, 2022, November 23, 2022, and January 12, 2023. (J-4, 5, 6). To

resolve several preliminary issues, the parties agreed to file Omnibus Motions and

presented several issues to the Panel.  Toward that end, NYCBS sought a ruling

from the Panel declaring that:

1.  the federal Any Willing Provider Law ("AWPL", 42 U.S.C. Sec. 1395w-

    104(b)(1)(A)), applies to Respondents and that NYCBS can maintain its

    breach of contract claim based on a claimed violation of the AWPL;

2.  the Agreement between the parties, which consists of the documents

    referenced above, constitute a contract of adhesion; and

3.  certain provisions in the documents are unconscionable and, accordingly,

    unenforceable. Specifically, NYCBS focused on the waiver of laws

    provision, the limitation on claims provision, the escrow provision, the

    severance provision, and a confidentiality provision.

Respondents requested the Panel to:

1.  sever Claimant's claims into five individual ones, because Claimant was five

    separate pharmacies;

2.  strike the NYCBS' damage claims for the 2016-2020 period as untimely;

3.  dismiss Respondents, SilverScript and Aetna, as improperly named in this

    proceeding; and

4.  require NYCBS to escrow funds pending the Final Award.

Following briefing and oral argument, the Panel ruled on these motions on June 24,

2022. (J-19). In summary, the Panel held that:

1. the AWPL does apply to all Respondents, and NYCBS may maintain a cause of action for a claimed violation of the statute;

2. the contractual relationship between the parties is one of adhesion and NYCBS had no choice but to enter into the agreement to ensure the continuity of patient care;

3. an escrow provision in the documents between the parties was vague in several aspects and would not be enforced;

4. the parties did not agree on a Limitation on Claims Provision, and Respondents' unilateral insertion of the provision into the Provider Manual rendered it unconscionable, and therefore, the Panel did not strike damage claims for the 2016-2020 period as requested by Respondents;

5. NYCBS would not be required to identify a single pharmacy to continue this arbitration, nor would the Panel sever and dismiss all other pharmacy claims as impermissibly consolidated.  Claimant is one dispensing pharmacy with different dispensing provider locations;

6. given that this proceeding is subject to the stringent confidentiality provisions of any AAA proceeding, a confidentiality provision in the documents between the parties would not be enforced as the issue was deemed substantially moot; and

7.  Respondents would be allowed to renew a request to Dismiss

Respondents, SilverScript and Aetna, following the close of discovery.

Subsequently, Respondents did move to dismiss Respondents, SilverScript

and Aetna. In Order No. 12, the Panel denied the Motion and reserved for hearing

the question of whether SilverScript and Aetna were proper Respondents in this

case.

The hearing took place from April 3, 2023, through April 7, 2023, in New

York, New York, and the Panel heard evidence on the following counts asserted

against all Respondents (except for Count 6, asserted against Caremark alone) in

the Third Amended Statement of Claims:

1.  Whether Respondents violated the federal Any Willing Provider Law

("AWPL");

2.  Whether Respondents failed to provide reimbursement information in

violation of N.Y. Pub. Health Law § 4406-c;

3.  Whether Respondents improperly assessed PNR fees on inapplicable claims;

4.  Whether Respondents' application of the PNR fees was a breach of contract;

5.  Whether Respondents violated the federal Prompt Pay Law ("PPL");

6.  Whether Caremark failed to properly measure NYCBS' performance scores;

7.  Whether Respondents breached an implied covenant of good faith and fair

dealing;

8.  Whether Respondents are liable for conversion; and

9.  Whether Respondents are liable for unjust enrichment.

In the Scheduling Order in the case (J-16), the parties stipulated that Arizona law would be applied substantively to this arbitration. If NYCBS asserted additional claims, it could assert that such claims are governed by New York substantive law, although Respondents could object to the application of New York law. It is Respondents' position that Arizona law governs the relationship with certain of NYCBS' affiliates for claims before October 7, 2022 (J-32, J-35), and that New York law governs claims for all other affiliates for claims after October 7, 2022 (J-39, 42, 45, and 51) (see Respondents' Post-Hearing Brief at 4). NYCBS did not object to this position, although neither party argued that the substantive law of the respective states was materially different.

Pursuant to an April 17, 2023, Post-hearing Scheduling Order, the parties timely filed briefs and responsive briefs. This Interim Award follows.

Analysis

As a threshold matter, the Panel will not dismiss Respondents, SilverScript and Aetna, from this proceeding. In reaching this conclusion, the Panel considered the documents which govern the relationship among Respondents, as well as the testimony adduced at hearing.

8

Mr. Glenn Amnott, Vice President of Medicare Part D for Aetna and President of SilverScript Insurance Company, testified that both Aetna and SilverScript are subsidiaries of CVS Health, which is the parent corporation of Caremark (T-3, 683, 698). SilverScript is also under the "Aetna umbrella". (T-3, 678-683). When Caremark contracts with a pharmacy network, Mr. Amnott admitted that it does so on behalf of Aetna or SilverScript (the pharmacy agreements are the same) (T-3, 721). There is little doubt that this testimony alone establishes an agency relationship between the Respondents.

This conclusion is bolstered by a review of the documents introduced in this case. The Arbitration provision in the Provider Manual specifies that it applies to "…any and all disputes between Provider and Caremark (including…parents, affiliates, agents, and assigns…)" This broad language would clearly encompass Aetna and SilverScript.

Further, the Panel has reviewed exhibits J-284-293, a series of identical contracts between Respondents, SilverScript or Aetna, and the Centers for Medicare & Medicaid services ("CMS). These contracts impose many obligations upon SilverScript and Aetna which pertain to related entities performing functions on their behalf. (See, e.g. J-291).  Also germane are J-265-283, the Agreements or Amendments to Agreements between SilverScript or Aetna and Caremark, which detail multiple obligations between the parties regarding Caremark's role as a

9

PBM. Mr. Amnott testified to some services that Caremark provides to the Plan Sponsors per those agreements, including but not limited to, "… pay prescription drug claims for us, they negotiate with pharmacies on our behalf to set rates and build a pharmacy network, they look at our PA, prior auths, they approve prior auths." T-3, 700.

Taken together, the testimony and documents inarguably establish an agency relationship between Caremark and SilverScript and Caremark and Aetna. Both SilverScript and Aetna are proper Respondents to the claims asserted against them.

Those claims will be considered in the order in which they were asserted by NYCBS.

Count I—Did Respondents violate the federal Any Willing Provider Law ("AWPL")?

Preliminarily, the Panel notes that it held in its June 24, 2022, ruling (J-19) that the AWPL does apply to all Respondents, and NYCBS may maintain a cause of action for a claimed violation of the statute. In post-hearing briefing, Respondents renew the argument, already rejected in the June 24 ruling, that AWPL does not apply to NYCBS because it is a "dispensing physician" and not a pharmacy. (Respondents' Post-Hearing Brief at 7). The Panel sees no reason to reconsider its earlier determination.

Accordingly, the remaining issue is whether the terms and conditions in the Caremark documents complied with the requirements of the AWPL. Specifically,

10

CMS requires that plans offer "…standard terms and conditions to all pharmacies for purposes of ensuring that any pharmacy, and any type of pharmacy, willing to accept the standard terms and conditions can join the pharmacy network." (70 Fed. Reg. 4194, at 4440). Further, with respect to specialty pharmacies, a Part D plan sponsor must:

> …offer specialty pharmacies standard terms and conditions that are reasonable and relevant to the specialty pharmacy's pharmacy practice business or service delivery model. 83 FR 16440, at 16596.
>
> …
>
> *We reiterate that while the Part D Program does not define "specialty pharmacy" or "specialty network," any* such requirements in Part D Plan sponsors' standard terms and conditions must be reasonable and relevant to the pharmacy practice functions performed by the specific pharmacy's business and service delivery model, *and particularly in regard to standard terms and conditions held out to promote quality, which as the "floor," must be applied consistently.* 83 FR 16440, at 16598. (Emphasis in original).

NYCBS contends that Respondents violated the "reasonable and relevant" standard in two key respects and, therefore, breached the contract between the parties.

First, it argues that Respondents' application of the MPR was not reasonable and relevant. Specifically, NYCBS notes that MPR was calculated by a fraction, the denominator of which measured specialty medication adherence from the first date of fill to the end of an arbitrary measurement period (Hutchins at T-4, 1128). The particular data are not given to pharmacies (Id. at 1131, 1142-1144), and Caremark corporate representative and Vice President of Network Services, Steven

11

McCall, referred to the MPR formula in deposition as a "secret sauce." (J-382, 189-190; *see also* T-4, 1319-1320, testimony of Gina Redner, Caremark's Director of PNP). Mr. Amnott testified that the program overview and MPR definition could be deemed ambiguous, as "…It doesn't say what the time period is, how the time period is defined." (T-3, 824-825). Regarding the PNR program overall, he testified that parts of the program were "a black box…as to all those terms and conditions." (T-3, 843-844).

The impropriety of measuring from the first fill date to the end of a pre-determined measurement period is that it disregarded the inherent nature of oncology medications. (*See* 83 FR 16440, at 16596). As testified by NYCBS' corporate representative, Dr. Jeffrey Vacirca, it cannot be assumed that cancer patients will remain on drugs for a full calendar year, as the high toxicity associated with such drugs may require a pause or discontinuance to avoid serious adverse effects (T-1, 116-117). In those circumstances, Caremark would deem the clinical decision to hold or discontinue the drugs to protect the patient's safety and quality of life/care as non-compliant and collect PNR fees.

In essence, Caremark measured adherence for specialty medications the same way as it measured adherence for non-specialty maintenance medications, i.e., ACE inhibitors, statins and diabetic medication (T-3, 1004-1009, 1017-1018, testimony of David Hutchins). Caremark's scoring fails to account for the clinical

12

realities of patient safety and quality of life and care, i.e., the "floor," which are attendant to oral oncolytics.

The testimony of Mr. Hutchins, Director of Network Strategy of Caremark and who helped with the development of measures for the PNP program (T-3, 923), is telling. He discussed the drugs that would measure performance for individual pharmacies like NYCBS, reviewing J-212, the universal list of all oncology drugs that Caremark says are specialty drugs, and J-225, the smaller list of drugs comprising the therapeutic classes. (T-3, 1094):

Q: But you do agree, as you sit here today, that many of the drugs on the oncology shorter list that is measured are drugs that are subject to drug holidays?
A: I now understand that may be the case for some, yes. (T-4, 1103).

****
Q: But you do acknowledge, as you sit here today, that many of the drugs on this shorter oncology list are subject to drug holidays…but you've done nothing as the head of this MPR methodology to figure that out using any data; right?
A: I don't recall.
Q: And you've done nothing to figure out whether any of these drugs are subject to serious adverse events?
A: I have done nothing, no.
Q: And no one else at Caremark has done that?
A: I can't say that.
Q: You're not aware of anyone else that has?
A: My understanding is there are clinicians who look at things like that, but I can't speak for them.
Q: But no clinician has ever said to you, Dave, I've been looking at the little shorter list, J225. I think we should think about striking it off the list because there's so many serious adverse events or drug holidays?"
A: To my knowledge, no one has told us, internal or external that any of these drugs need to come off the list. (T-4, 1105-1106).

13

****
Q: But nowhere in the contract does it say, hey, we're going to measure you in the denominator from the date you first give the medication until the end of the evaluation period which is the end of the year for the trimester three?"
A: Not in the contract. (T-4, 1128).

Mr. Hutchins also concurred that the denominator definition is not in the contract, nor is he aware of any network bulletin that defines it. (T-4, 1148).

Based on the facts in this case, the Panel concludes by a preponderance of the evidence the Respondents' application of the MPR was not "reasonable and relevant" within the context of the AWPL and was a breach of the parties' contractual obligations.

The second argument advanced by NYCBS in support of its argument that Respondents failed to comply with the "reasonable and relevant" provision of the AWPL relates to the application of "mean imputation." Mean imputation occurs when Caremark assigned pharmacies without any claims in non-specialty categories an average performance score of other network pharmacies which had non-specialty claims. (T-4, 1291 (Redner); T-4, 1430 (McCall)).

Respondents agree that NYCBS was limited, pursuant to New York law, to the dispensation of oncology medications. (T-5, 1550 McCall). NYCBS argues that it was disadvantaged when Caremark imputed to it the scores of pharmacies in the non-specialty categories that were part of the PNP calculation. Indeed, Ms. Redner admitted that there was nothing that NYCBS could do to improve its performance

14

scores in the non-specialty category. (T-4, 1334-1335). The imputation of scores in the non-specialty category strikes the Panel as directly contradictory to documentation which assures pharmacies that "[b]lank cells mean your pharmacy had zero or negligible volume. Your pharmacy is neither advantaged nor disadvantaged by this scenario." (J-140 at 14).

NYCBS's expert, Laura Coe, explained that mean imputation may be appropriate when a data set is missing relatively few observations, but when there are no observations the use of mean imputation will result in a score that is not reasonable or relevant to NYCBS's actual clinical experience. Further, Caremark's scoring method results in bias toward the mean. (T-2, 515-517; C-1035 at 18 (Coe revised report)). The Panel agrees. Caremark's utilization of data from pharmacies markedly different than NYCBS cannot have fairly measured its performance.

Also troubling to the Panel is the fact that the PNP was supposedly intended to allow individual providers to receive financial benefits tied to their individual performance. (J-101 (NEFs) and J-144 (Trimester Reports)). In fact, and as noted above, Ms. Redner agreed that there was nothing NYCBS could do to increase its adherence scores in the non-specialty category. (T-4, 1334-1335). As noted by Claimant's expert, Laura Coe:

"To use the word that Caremark uses, you're advantaging or disadvantaging New York Cancer in giving them the scores of other people…Eighty percent of the time you're evaluating them based on the average for pharmacies that have nothing to do with what they do, essentially." (T-2, 526).

15

Based on the preponderance of the evidence, the Panel concludes that Respondents' use of "mean imputation" violated the AWPL and was a breach of the parties' contract.

As an aside, Respondents now protest the Panel's earlier conclusion, in response to the Omnibus Motions, that the contract here is one of adhesion. The new argument presented by Respondents relates to the role that Elevate played in the parties' contractual interactions vis-à-vis the NEF's. Specifically, Respondents argue that Elevate negotiated some terms for NYCBS and, therefore, used its bargaining power to negotiate PNP's reimbursement terms.

Respondents further argue that Elevate or NYCBS could have argued that the PNP was not reasonable or relevant. (Respondents' Post-Hearing Brief, ft. 21; Response to NYCBS's Post-Hearing Brief, 6). Respondents point to Exhibits J-61-64, letters which Respondents required NYCBS to sign as a condition precedent of adding an additional location to the network, stating that "… any networks in which it enrolls contain relevant and reasonable measures for its practice."

However, as noted above, the way the PNP was calculated was not clearly disclosed in the Agreements and no one can be expected to protest or agree to terms and conditions of which they are not aware. Further, NYCBS's corporate representative testified that NYCBS had one week to sign the agreements referenced in Exhibits J-61-64, that there was no choice but to sign to ensure

16

continuity of patient care, and that failure to sign would have resulted in a denial of enrollment. (T-1, 181-186). Therefore, the Panel affirms its earlier decision that the contract is one of adhesion.

The Panel notes that the evaluation of whether the contract offered "reasonable and relevant" terms was determined by Respondents in a manner that the Panel finds astonishingly cavalier and without any regard for quality. Mr. Amnott testified as follows:

> A: "The best thing we can do is sort of look at what the market will bear … So if essentially every pharmacy agrees to the terms and conditions, I would argue that they are reasonable and relevant. Again, our pharmacies' networks meet the convenient access standard stipulated in this document by CMS. So again, if we're building a network that meets the access requirements stipulated by CMS, I would say that our terms—under that are obviously reasonable and relevant. (T-3, 740-741).

This approach ignores the fact that the contract at issue is one of adhesion and quality is the floor. These facts and testimony demonstrate by a preponderance of the evidence a surprising failure of Respondents to adequately assess whether the contract complied with their statutory and contractual obligations and implement standard terms and conditions which did.

<u>Count II—Did Respondents breach the contract by failing to provide reimbursement information in violation of N.Y. Pub. Health Law § 4406-c?</u>

NYCBS does not separately brief this issue but submits that the argument it presents in favor of its position on Count I also warrants a finding that

17

Respondents violated N.Y. Pub. Health Law Sec. 4406-c. (NYCBS's Post-Hearing Brief, ft. 17). Respondents counter that the state statute does not, by its terms, apply to Plan Sponsors and that the statute is preempted by the Medicare legislation. Upon review of the facts, the statutes at issue, and the cited cases, the Panel concludes that there was not an actionable violation of Sec. 4406-c and this breach of contract claim is denied.

<u>Count III-- Whether Respondents breached the contract by improperly assessing PNR fees on inapplicable claims</u>?

Again, NYCBS argues that the argument presented in favor of Count I justifies a finding in its favor on Count III. In its Reply to Respondents' Post-Hearing Brief, NYCBS states that the contract term "applicable claims" implies that only drugs actually measured for adherence would be assessed PNR Fees. (Id. at 5). Respondents submit, to the contrary, that the plain language of the contract mandates a finding that this cause of action fails.

While the Panel understands NYCBS's argument, it is not supported by the contract language. As Respondents point out, "applicable claims" is a defined term, and language in the NEFs specify that all drugs will be assessed PNR fees. (Respondents Post-Hearing Brief at 19-20, citing J-75, J-95). This was not a failure to disclose, as was the case with the PNP as discussed above. Accordingly, this breach of contract claim is denied.

Count IV-- Whether Respondents' application of the PNR fees was a breach of contract?

NYCBS argues that Respondents breached the contract by "disadvantaging" it when mean imputation was applied in a manner that prevented NYCBS from influencing its performance score. As noted above in Count I, when NYCBS had no claim volume for a particular metric, Caremark assigned it an average score of pharmacies participating in the network (T-3, 1041, Hutchins). In addition to the discussion above, this further disadvantaged NYCBS because it resulted in what its expert, Laura Coe, testified was "bias toward the mean." This effect prevented NYCBS of any realistic opportunity to influence its own score and benefit from good performance (C-1035, Coe Revised Expert Report).

Respondents argue that NYCBS was not disadvantaged because it was treated the same as was any other provider (Post-Hearing Brief at 22). However, Coe credibly explained that ranking specialty pharmacies alongside retail pharmacies produces unreasonable results, and they cannot be treated the same. (C-1035).

Respondents also contend that the case of *AIDS Healthcare Foundation v. Express Scripts, Inc.,* 2023 WL 2263183 (E.D. Mo. Feb. 28, 2023), undercuts the position of NYCBS by holding that a pharmacy's concerns about its particular patient base should be address by CMS. NYCBS effectively shows, however, that

*AIDS Healthcare Foundation* is distinguishable, as plaintiff in that case failed to establish a breach of contract (Reply to Respondents' Post-Hearing Brief, ft. 13).

Based on a preponderance of the evidence, the Panel concludes that NYCBS was disadvantaged by Respondents in a manner that breached the parties' agreement.

Count V-- Whether Respondents violated the federal Prompt Pay Law ("PPL")
and, therefore, breached the contract?

Again, NYCBS does not separately brief this issue but submits that the argument it presents in favor of its position on Count I also warrants a finding in its favor on Count V. (NYCBS's Post-Hearing Brief, ft. 17). In its Response to Caremark's Post Hearing Brief, NYCBS further summarily contends that the unilateral claw back effected by withholding payment on clean claims violates the Prompt Pay Law. Respondents, however, point out that the provisions allowing a "retroactive assessment" of PNR fees have been utilized since 2016, as NYCBS's representative, Dr. Vacirca, was aware. (T-1, 308-309). The documents did provide for a claw back (Respondents' Post-Hearing Brief at 23, citing *inter alia* J-205), and Dr. Bai, an NYCBS expert, agreed that DIR fees "claw back" are common in the industry. Dr. Bai had no opinion on the reasonableness of Caremark's PNP. (T-2; 389, 404-405).

NYCBS argues that, because the contract is one of adhesion, provisions that violate the law are unenforceable. (Response to Respondents' Post-Hearing Brief

20

at 8). However, NYCBS does not establish by a preponderance of the evidence that the provisions at issue violate the law. Accordingly, even though the contract is one of adhesion, the claw back provisions are not unenforceable. This breach of contract claim is denied.

<u>Count VI--Whether Caremark breached the contract by failing to properly measure NYCBS's performance scores?</u>

NYCBS submits that the arguments it presents in favor of its position on Count I also warrant a finding in its favor on Count VI. (NYCBS's Post-Hearing Brief, ft. 17). In its Third Amended Statement of Claim, NYCBS alleges that Respondents failed to properly score its performance, including its FOPS, as Respondents used mean imputation when NYCBS does not have measurable volume or has negligible volume, all of which resulted in increased PNR fees against it. Further, NYCBS alleges that Respondents consistently refused to produce any data to prove the accuracy of their calculations for NYCBS' adherence, FOPS, mean imputation, or their methodology to determine its rank against other pharmacies in the network. (J-6, ¶¶139-147).

Caremark, however, argues that Dr. Vacirca lacks the expertise to evaluate whether the performance scores were adequately measured and, further, that his review of medical records was inadequate. (Respondents' Post-Hearing Brief at 25, citing J-366 at 104, 116, 122, 125, 131-132, and 139).

Caremark justifies its MPR methodology, using retrospective database analysis, by citing the testimony of Mr. Hutchins and one of its experts, Dr. Peterson. Mr. Hutchins testified that a review of patient medical records is not part of the retrospective database analysis. (T-3, 949-950). Dr. Peterson testified that, in conducting retrospective database analysis, researchers do not know if a patient is "…truly non-adherent or whether the prescriber told the patient to stop using the drug and that it is common to err on the side of caution and assume the patient is not adherent." (Respondents' Post-Hearing Brief at 25, citing T-1184, 1188, 1192, 1217-1218).

NYCBS contends that specific information regarding patients at issue was readily available through a review of medical records (often requested by Caremark via prior authorizations), or information available through the National Council for Prescription Drug Programs' ("NCPDP"). It argues, as noted above, that Caremark's use of MPR was based on the mistaken assumption that oncology medications should be measured for adherence in the same manner as maintenance medications (T-3, 1004-1009: T-4, 1120-1222, testimony of Hutchins).

The Panel agrees with the position of NYCBS, which has proven this claim by the preponderance of the evidence. For Caremark to suggest that it was appropriate to "err on the side of caution" and assume that a patient was "non-adherent" makes no sense. Keeping in mind that the purpose of the PNP program is

to promote quality, erroring on the "side of caution" would consider the patient's quality of care/life and the actual adherence behavior of the Medicare Part D plan beneficiaries. Respondents did not so consider.

The Panel agrees with Dr. Vacirca's testimony that "…patients are amazingly compliant. … [W]hen it's your life you are fighting for, people tend to want to really work hard and work with you.  In our office our no-show rate is like one percent.  … People don't miss their oncology appointments…. Patients [take] their medications [and] … [stop them] or [hold them]" when told to do so." (T-1, 219). There may have been many ways to develop an MPR methodology, but to make assumptions that ignore the very purpose of oncology medications was not one of them. Caremark provided no rationale or credible evidence that its methodology considered quality for patients to support its assumption against NYCBS' performance scores instead of in its favor.  The manner in which Caremark evaluated NYCBS's performance scores breached the contract.

Count VII--Whether Respondents breached an implied covenant of good faith and fair dealing?

NYCBS argues that its inability to financially benefit from positively performing was a breach of the implied covenant of good faith and fair dealing (NYCBS's Post-Hearing Brief at 20), citing the arguments reviewed above regarding the MPR assessments and mean imputation. NYCBS submits that it was

deprived of the benefit of its bargain, and that Respondents accordingly breached

the implied covenant. (Id. at 23).

Respondents' main defenses to this claim are that NYCBS is attempting to

negate the express terms of the contract between the parties (Respondents' Post-

Hearing Brief at 27-30; Response to NYCBS's Post-Hearing Brief at 10-13), and

that Medicare law preempts the implied covenant claim in any event (Respondents'

Post-Hearing Brief at 30).

After reviewing the facts and law cited by the parties, the Panel finds that the

breach of implied covenant cause of action is properly asserted and is not

preempted. As noted above, the contract here consists of multiple documents

which the Panel finds are vague, and NYCBS' implied covenant claim does not

contradict the contract. Indeed, the term 'mean imputation' did not even appear in

any of Respondents' documents until 2021 (T-4, Redner testimony at 1379), and

how mean imputation was calculated was not disclosed to NYCBS until Order of

this Panel, (J-21).

An analysis of the case law cited by the parties regarding Medicare

preemption supports NYCBS' position that this Count is not preempted (NYCBS'

Reply to Respondents' Post-Hearing Brief at 11-12, and ft. 30).

Respondents argue that a claim for breach of implied covenant claim will

not lie absent a showing of "…fraud, malice, bad faith, intentional wrongdoing, or

24

reckless indifference" (Respondents' Response to NYCBS's Post Hearing Brief at 12, 13). On the totality of facts and evidence presented to the Panel in the final hearing and arguments, Claimant proved by a preponderance of the evidence that Respondents knew their metrics and calculations intentionally ignored the potential deleterious consequences to Medicare part D beneficiaries. (*See also* the Panel's findings in Counts I, IV, VI, IX.) Therefore, Claimant proved Caremark's bad faith or reckless indifference that their methodologies and actions with respect to oncology medications were not tenable. (T-3. 1004-1009; 1017-1018; J 308 at 9). Respondents breached the implied covenant of good faith and fair dealing.

Count VIII and Count IX--Whether Respondents are liable for conversion and unjust enrichment?

The Panel does not find that Claimant proved its claim for conversion in Count VIII by a preponderance of the evidence based on the facts and that Count is denied.

However, Claimant proved Count IX by a preponderance of the evidence that Caremark was unjustly enriched.

All parties agree that the stated purpose of the PNP is to improve the quality of care for beneficiaries of the program by incentivizing providers to improve their individual performances. Simply stated, the fundamental premise of the PNP program is that individual providers will receive a financial benefit or a detriment

commensurate with their individual performance. Indeed, the theme of individual

performance and responsibility runs through the parties' arguments, briefs, expert

reports, and crucially, the contracting documents. See, e.g., the Network

Enrollment Forms (Network Variable Rate "based on provider's performance." J

101 at 2).

The PNP program operates through a combination of both negative and

positive incentives. Thus, the best performing providers would: (1) pay the lowest

network variable rate fee, and (2) potentially be paid an "annual performance

payment." The latter would be based on the amount of network variable rate

collections remaining after Caremark paid the plan sponsors and recovered its own

administrative costs.

However, from the program's inception, Caremark knew that it could not

"…develop criteria that will consistently and fairly measure..." adherence (J 308 at

9). Further, Caremark understood that there was nothing NYCBS could do to

improve its adherence score. (Gina Redner T-4: 1334: 25-1335:8). Caremark did

not ever inform NYCBS of these facts, starting from 2016.          -

Caremark also did not disclose until 2021 that it relied on the flawed

technique of mean imputation. (Gina Redner T-4: 1379: 14-19). And, although

Caremark's chosen methodology created a "bias towards the mean," it repeatedly

assured program participants that they would be "neither advantaged nor

disadvantaged" by its methodology. (J-140 at 14). Similarly, Caremark has not, to this day, provided NYCBS full details of the MPR calculation. (T-4, 1124-1128, Hutchins; T-5, 1526, McCall).

Further, and contrary to the stated purpose of the PNP to provide "quality outcomes," Caremark mechanically penalized the use of drugs not in its formulary without allowing room for a provider's informed judgment. It did this even in a field as complex as the patient ingestion and use of oral oncolytic medications, including FDA labeling. (T-1, 196-197, Dr. Vacirca). The evidence relating to Patient DL demonstrates how this approach was seriously and willfully misguided.

Patient DL was diagnosed with metastatic cancer and administered Stivarga. (J-426). NYCBS later instructed the patient to hold Stivarga and, ultimately, to discontinue its usage. (T-426). As NYCBS notes, even Respondents' expert testified that taking medication in accordance with agreed-upon guidelines with their prescriber is the definition of adherence. (T-4, 1202-1203, Dr. Andrew Peterson). Nevertheless, Respondents considered the termination of Stivarga as non-adherence, and assigned a low adherence score to Patient DL. (T-1, 198-200, Dr. Vacirca.)

Moreover, Caremark has not analyzed the myriad amounts of data it has gathered since 2018 to determine whether its use of MPR as an adherence score as opposed to PDC, which is used by PQS, disadvantages or advantages specialty

pharmacies. (T-3, 799, 1022-1023). No one at Aetna or SilverScript has ever audited Caremark's specialty adherence score, even though they have the right to do so per their agreements with Caremark. No one at Aetna or SilverScript has ever audited Caremark to "verify the statistical significance of specialty and retail pharmacy rankings "in one group from best to worst." (T-3, 800). No evidence was presented that Caremark engages in any reliability testing of its PNP/PNR fee program. (T-2, 529).

While unjust enrichment cannot be used to contradict the express terms of a contract, it can be used to provide restitution where there is a showing that the Respondent was enriched at NYCBS's expense through the operation of some unjust factor such as mistake, duress, misrepresentation, or failure of consideration. Given Caremark's conduct, two such unjust factors are operative on these facts: misrepresentation and failure of consideration.

Caremark misrepresented the contractual terms by repeatedly failing to disclose its measurement methodologies, which it combined with its repeated, misleading assurances from the inception of the program. Caremark touted the PNP program, knowing full well that it would not fulfill its contractual promises. It had superior knowledge, unfairly tying both of NYCBS' hands behind its back and taking advantage of NYCBS' (and other providers') ignorance regarding how performance would be measured.

There was a failure of consideration when NYCBS' intended to participate in a program focused on improving the quality of care for beneficiaries and its financial results were supposedly a function of its properly measured individual performance. Said another way, the consideration Caremark promised was financial reward tied to accurately measured individual performance, but the consideration it delivered was a financial reward based on flawed measurement criteria that, among other things: (1) were tied to the average performance of thousands of other providers, and (2) ignored the goal of promoting quality care for beneficiaries.

The bargained for consideration was material and substantial, but it was not delivered. The failure to deliver the consideration agreed upon eviscerates the very foundation of the contract, the basis for inducing NYCBS' agreement. Accordingly, the Panel rules in favor of NYCBS on Count IX, as NYCBS' has met its burden of proof by a preponderance of the evidence.

The Defenses of Waiver and Failure to Mitigate

Respondents also contend that the claims asserted by NYCBS are barred by waiver and failure to mitigate. They argue that NYCBS did not complain about the PNP for five years after it came into effect and, thereafter, did not question Caremark about the assessment of PNR fees. Respondents argue that NYCBS continued to sign up for the PNP, even after the documents referenced 'mean

29

imputation.' They further contend that, by continuing to participate in an arrangement which it now alleges caused damages, NYCBS failed to mitigate its damages. (Respondents' Post-Hearing Brief at 30-32).

NYCBS counters and proved by a preponderance of the evidence that it did not receive information regarding adherence scores until this Panel ordered the production of relevant documents (J-21), and that a party cannot waive its rights without actual knowledge of a breach. Fundamentally, and as discussed in greater detail above, NYCBS notes that the contract is one of adhesion and that it had no choice but to continue to participate in the PNP. (NYCBS's Reply to Respondents' Post-Hearing Brief, at 12-13).

Following a review of the facts and case law here, the Panel finds that Respondents have not met their burden of proof on these claims.  The Panel agrees with the position advanced by NYCBS and affirmatively finds that it did not waive any breach of contract or fail to mitigate its damages.

<u>Damages</u>

In light of the findings and conclusions above, the Panel awards restitution to NYCBS of the full amount of the PNR fees assessed by Respondents. By a preponderance of the evidence NYCBS met its burden of proof, having presented credible evidence that PNR fees of $17,082,162 were assessed between 2016 and the Final Hearing. (C-1039), of which $10,761,762 were PNR fees based on MPR

and $6,320,399.44 were based on mean imputation. (C-1037). As established by the facts and law in this case, the PNR fees were assessed in a manner that unjustly enriched Respondents.[1] The terms of the contract relating to the PNR program failed and will not be enforced. Where the nature of the contract is such that the consideration can be apportioned by objective analysis, the payments made with respect to the part of the contract may be recovered. Here, the failure of consideration relates directly to the PNP program and the amount of the unjust enrichment is easily quantified.

Only by requiring a full return of the wrongfully assessed PNR fees may the Panel grant "just and equitable" relief in accordance with AAA Rule 47. Despite Respondents' protestations, the Panel is not rewriting the contract by recalculating PNR fees in an alternative manner. (Respondents Post-Hearing Brief at 32). The conclusion of the Panel above, buttressed by the credible testimony of NYCBS' expert Laura Coe, establishes that the application of the PNR program to NYCBS was unreasonable and unreliable. (C-1035). This is remedied only by a full return of PNR fees.

---

[1] The Panel notes, as found above, that the Respondents also violated the contract in many respects (including compliance with the AWPL) and breached the implied covenant of good faith and fair dealing.

Nor does a full return constitute a windfall to NYCBS, as Respondents contend. (Respondents' Post-Hearing Brief at 34). NYCBS is correct in its rebuttal: "Caremark's…entire PNR program as applied to NYCBS violates the AWPL and the contract." (NYCBS' Reply to Respondents' Post-Hearing Brief at 14, ft. 32). While Respondents argue that any damages should be limited to the "…difference between what NYCBS bargained for and what Caremark provided…", (Respondents' Post-Hearing Brief at 33), Respondents miss the point.

Significantly, while what Caremark did provide breached the contract, violated the AWPL, and breached the implied covenant of good faith and fair dealing, it fundamentally unjustly enriched Respondents. This was a failure of consideration. (NYCBS' Post-Hearing Brief at 16). The measure of damages advocated by Respondents would reward it for exactly the conduct that this Panel has found unjustly enriched them. Respondents' position has no basis in the facts or law applicable to this case.

Subject to further proceedings in this matter as discussed below, NYCBS is awarded $17,082,162 against the Respondents, jointly and severally.

Further Proceedings

1. No later than August 5, 2023, and in accordance with Section 15.09.02 of the Caremark Provider Manual, as amended, NYCBS may file an Application for

32

all expenses of arbitration, including reasonable attorney fees. The Application must be accompanied by an affidavit from a billing attorney and contemporaneous billing records, redacted to protect the attorney-client privilege. The affidavit shall detail the time and expenses spent providing the service, the nature of the service provided, and the date the service was provided. The Arbitrators shall award applicable pre-judgement interest. NYCBS must establish such amount through August 4, 2023, with a *per diem* rate thereafter. The Arbitrators shall also award post-judgment interest.

2. No later than August 25, 2023, Respondents may oppose an application for costs, fees, expenses, and interest. If Respondents challenge the amount of claimed costs, fees, or expenses they must give the Panel documentation establishing their own costs, fees, or expenses. In accordance with Rule 40 of the Commercial Rules of the American Arbitration Association, and subject to paragraph 13 below, the hearing shall thereafter be declared closed.

3. A Final Award will be issued in accordance with Rule 47 of the Commercial Rules of the American Arbitration Association.

4. The Panel reserves the right to re-open the hearing pursuant to Rule 41.

Interim Award

Upon its careful consideration of the entire evidentiary record, the Panel FINDS, DETERMINES and AWARDS as follows:

1. The Panel finds in favor of NYCBS on all claims in Counts I, IV, VI, VII and IX.  The Panel finds in favor of Respondents on Counts II, III, V, and VIII.

2. All defenses asserted by Respondents are denied.

3.  NYCBS is awarded the amount of $17,082,162 against the Respondents, jointly and severally.

We make this Interim Award on Liability and Damages based upon the evidence, the law, the arguments of the parties, and our assessment of the credibility of the witnesses. We do hereby affirm upon our oaths as Arbitrators that we are the individuals described in and who executed this instrument, which is our Interim Award on Liability and Damages.

4.  Except for an award of attorneys' fees, expenses, costs, and interest, which will be addressed in the Final Award, all claims and requests for relief made by the parties but not expressly granted in this Interim Award are hereby denied and this Interim Award on Liability and Damages represents the complete and final resolution of all claims and counterclaims in this matter.

5.  This Interim Award on Liability and Damages may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

SO ORDERED ON June 28, 2023

By:

_____

Michael Jordan, Arbitrator, Chair


_____

Brendan Hare, Arbitrator


_____

Louise B.  Zeuli, Arbitrator

SO ORDERED ON June _28_, 2023

By:

_____

Michael Jordan, Arbitrator, Chair

_____

Brendan Hare, Arbitrator

_____

Louise B. Zeuli, Arbitrator

SO ORDERED ON June 2 8ᵗʰ, 2023

By:

_____

Michael Jordan, Arbitrator, Chair

_____

Brendan Hare, Arbitrator

_____

Louise B. Zeuli, Arbitrator

35