# EXHIBIT 6

**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mission Wellness Pharmacy LLC, | No. CV-22-00967-PHX-GMS |
| Petitioner, | **ORDER** |
| v. | |
| Caremark LLC, et al., | |
| Respondents. | |

Pending before the Court are Petitioner Mission Wellness Pharmacy LLC's ("Mission Wellness") Motion to Confirm Arbitration Award (Doc. 15) and Respondent Caremark LLC's ("Caremark") Cross-Motion to Vacate or Correct the Arbitration Award (Doc. 45).[1] For the following reasons, Mission Wellness's Motion to Confirm is granted, and Caremark's Motion to Vacate is denied.

## BACKGROUND

These motions arise from a commercial arbitration between Mission Wellness (a specialty pharmacy) and Caremark (a Pharmacy Benefit Manager). The parties apparently agree that their relationship was governed by an agreement stated across multiple documents, including, but not necessarily limited to, (1) a Provider Agreement, (2) a Provider Manual, and (3) network enrollment forms ("NEFs") for the years in question (together, "Agreement"). The Agreement provided for the arbitration of any dispute

---

[1] Caremark's Unopposed Motion for Leave to File Excess Pages (Doc. 25) and Mission Wellness's First Motion for Leave to File Excess Pages (Doc. 33) are granted.

between the parties, not just disputes arising out of contract. (*See* Doc. 30-1 at 10.)

Mission Wellness initiated arbitration proceedings to challenge Caremark's recoupment of $2,127,466.00 in Performance Network Rebate fees ("PNR fees") by raising six causes of action under federal and state law. The federal claims included violations of the Any Willing Provider Law ("AWPL") and the Federal Prompt Pay Law. The state claims included two breach of contract theories, breach of the implied covenant of good faith and fair dealing, and conversion.

On May 17, 2022, the Arbitrator found that Mission Wellness prevailed on each of these theories and awarded Mission Wellness the total amount of PNR fees it paid Caremark between 2016 and 2021 ($2,127,466.00), pre-judgment interest ($247,279.29), and attorneys' fees, costs, and expenses, which the Arbitrator calculated using a lodestar method with a 25% enhancement ($1,287,354.18), hereinafter "the Award." However, to date, Caremark has neither paid the Award nor provided Mission Wellness with assurances that it will do so. On June 20, 2022, Mission Wellness asked the Court to confirm the Award. On July 29, 2022, Caremark asked the Court to vacate it.

## DISCUSSION

### I. Motion to Confirm and Cross-Motion to Vacate

Under Section 9 of the Federal Arbitration Act ("FAA"), an arbitration award must be confirmed: "unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." 9 U.S.C. § 9; *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 998 (9th Cir. 2003). For the reasons below, the Award cannot be vacated, modified, or corrected as prescribed in these sections. Thus, Mission Wellness's motion is granted pursuant to Section 9, and Caremark's motion is denied.

**A. Section 10(a)(4)**

Caremark asserts that vacatur is appropriate under Section 10(a)(4) of the FAA because the Arbitrator exceeded his authority by (1) adopting an irrational damages computation, (2) awarding pre-judgment interest, (3) awarding 125% of attorneys' fees, and (4) disregarding the American Arbitration Association's ("AAA") procedural rules.

However, for the reasons below, these are insufficient grounds for vacatur under Section 10(a)(4), and Caremark's motion is denied.

### 1. Legal Standard

Section 10(a) of the FAA permits a district court to vacate an arbitration award in four circumstances, including "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). The party seeking vacatur bears the "heavy burden" of proving an arbitrator exceeded his authority within the meaning of Section 10(a)(4). *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 564 (2013). The Ninth Circuit has held that arbitrators exceed their authority within the meaning of Section 10(a)(4) "not when they merely interpret or apply the governing law incorrectly, but when the award is completely irrational, or exhibits a manifest disregard of law." *Kyocera*, 341 F.3d at 997 (internal citations and punctuation omitted) (emphasis added).

"An award is completely irrational if it ignores controlling terms of the parties' contract." *HayDay Farms, Inc. v. FeeDx Holdings, Inc*, 55 F.4th 1232, 1242 (9th Cir. 2022). "This standard is extremely narrow and is satisfied only where the arbitration decision fails to draw its essence from the agreement." *Bosack v. Soward*, 586 F.3d 1096, 1106 (9th Cir. 2009) (internal punctuation omitted). An award "draws its essence from the agreement if the award is derived from the agreement, viewed in light of the agreement's language and context, as well as other indications of the parties' intentions." *Id.* Further, "[a]n arbitrator does not exceed its authority if the decision is a plausible interpretation of the arbitration contract." *U.S. Life Ins. Co. v. Superior Nat. Ins. Co.*, 591 F.3d 1167, 1177 (9th Cir. 2010) (citations and internal quotations omitted). "Accordingly, the court must defer to the arbitrator's decision as long as the arbitrator even arguably construed or applied the contract." *Id.* (cleaned up). *But see Pac. Motor Trucking Co. v. Auto. Machinists Union*, 702 F.2d 176, 177 (9th Cir. 1983) (noting that an "award that conflicts directly with the contract cannot be a 'plausible interpretation.'") (internal punctuation omitted).

Manifest disregard, on the other hand, "requires something beyond and different

from a mere error in the law or failure on the part of the arbitrators to understand and apply the law." *HayDay*, 55 F.4th at 1240–41 (citing *Bosack*, 586 F.3d at 1104) (citations and internal quotations omitted). "To demonstrate manifest disregard, the moving party must show that the arbitrator understood and correctly stated the law, but proceeded to disregard the same." *Id.* "There must be some evidence in the record, other than the result, that the arbitrators were aware of the law and intentionally disregarded it." *Id.*

**2. Analysis**

*i.  Elimination of PNR Fees*

Both parties acknowledge that the NEFs for the years in question included express provisions outlining the PNR fee structure. Both parties also acknowledge that, despite these provisions, the Arbitrator awarded Mission Wellness every dollar it paid Caremark in PNR fees ($2,127,466) between 2016 and 2021. Mission Wellness argues that this outcome was within the Arbitrator's authority, but Caremark suggests that it is completely irrational and reflects a manifest disregard for Arizona law.

*a. Completely Irrational*

One of Caremark's arguments is that "the parties' contracts [] provided that if CMS [the Centers for Medicare and Medicaid Services] were to issue guidance eliminating the PNR-fee component of the parties' contracts then the point-of-sale AWP rates would change to default rates that were less favorable to Claimant to reflect the elimination of the fee component."[2] (Doc. 39 at 6.) That is, Caremark claims that Mission Wellness would have paid more fees under the alternate default rate than it paid under the variable PNR structure. This argument fails, however, because Caremark neither asserts that CMS issued guidance eliminating the PNR fee component of the parties' contracts nor that there were any relevant material changes to the Part D rules. Thus, any provisions concerning the alternative default rate do not come into play here.

Caremark's other argument is that the Arbitrator "fundamentally rewrote the terms and conditions of the parties' contract to delete the contractual provision requiring Mission

---

[2] Presumably, this sort of guidance would come after relevant changes in Part D rules.

- 4 -

Wellness to pay PNR fees to Caremark." (Doc. 45 at 16.)  More specifically, according to Caremark, even "if Mission Wellness was the very top-performing pharmacy in Caremark's networks utilizing the PNP, then the minimum amount of PNR fees collectible for 2016 through 2020 from these pharmacies was $1,775,483.84, leaving Claimant with maximum contract damages of $341,381." (Doc. 45 at 18.)

While the Arbitrator's analysis is hardly capacious, it enumerates several bases for awarding the PNR fees.  For example, the Arbitrator indicated that Mission Wellness met its burden of proof on all six of its claims, and he granted its requested adverse inferences, which arose from "discovery disputes from the early stages of the case through [the] conclusion of the evidentiary hearing." (Doc. 15-1 at 14.)  The Arbitrator explained that the adverse inferences led him to reject various measurements for the years 2016 to 2021, including Caremark's (1) measurements of Mission Wellness's performance; (2) "the conversion of the FOPS" to the variable rate; (3) measurement of "statistically insignificant (non-credible) volumes of patients for medication adherence performance"; (4) "calculation of mean imputation", and; (5) "calculation of the five patients whose adherence was measured for the HIV therapeutic class for the specialty component" on the first-trimester report from 2020. (Doc. 15-1 at 14.)  The accompanying analysis explains that Caremark failed to support these measurements in discovery, and thus, they were presumed to be "incorrect," and "neither reasonable and relevant." (*Id.*)  The Arbitrator did not explicitly connect these conclusions to any of the six claims raised by Mission Wellness.  Ultimately, he concluded his analysis by noting that he found Mission Wellness's expert witness, Laura Coe's, testimony and report "far more persuasive" than testimony from Caremark's competing expert, Stephen Kacmarek. (*Id.*)

When taken together, these inferences support the conclusion that Caremark failed to comply with the AWPL, which was arguably incorporated into the Agreement by reference.[3]  Under the AWPL provisions cited in the Award, Plan D participants like

---

[3] Although the law does not contain a private right of action, its terms were apparently incorporated into the parties' contract. Even if, for some reason, failure to comply with the provisions would not have presented a cause of action for breach, the Court cannot vacate the Award merely because the Arbitrator made errors in applying governing law. *See*

- 5 -

Caremark must offer pharmacies "reasonable and relevant" reimbursement rates. *See* 42 C.F.R. § 423.505 (b)(18) ("The Part D plan sponsor agrees to . . . have a standard contract with reasonable and relevant terms and conditions of participation whereby any willing pharmacy may access the standard contract and participate as a network pharmacy."). And "[t]he contract between the Part D plan sponsor and CMS must contain the provisions specified in paragraph (b) of this section." 42 C.F.R. § 423.505(a). Thus, Mission Wellness claims that, during the course of arbitration, it argued that the PNR assessments for 2016–2021 were unreasonable because they relied on metrics that were not "relevant to … a specialty pharmacy." (*See* Doc. 15-1 at 12.)

This argument would provide a potentially plausible basis for the Award, which Defendants do not refute. For example, the Award notes Ms. Coe testified that the PNR fee structure was "not actuarily sound" and "flawed" because of Caremark's "use of retail metrics that do not apply to specialty pharmacies; mean amputation; lack of statistical significance; the misleading use of uniform distribution to rank pharmacies; misleading language; lack of predictability; and lack of opportunity to improve performance scores." (*Id*.) Further, the Award appears to note that Caremark failed to produce evidence related to these (and possibly other) metrics it used to calculate Mission Wellness's PNR fees. (*Id*. ("Ms. Coe emphasized that she was greatly hampered in her work by the lack of documentation and information that had been requested from [Caremark] but not provided to [Mission Wellness].").) It seems likely, then, that these are the "discovery disputes" that gave rise to the adverse inferences. And, according to Mission Wellness, those inferences could have plausibly produced the Arbitrator's finding that Caremark should not recoup its 2016–2021 PNR fee assessments because they violated the AWPL.

Caremark fails to explain how this does not constitute a plausible interpretation of the Agreement. Thus, it has not carried its burden of establishing that the Award "fails to

*Bosack*, 586 F.3d at 1104; *see also Kyocera*, 341 F.3d at 1003 ("The risk that arbitrators may construe the governing law imperfectly in the course of delivering a decision that attempts in good faith to interpret the relevant law, or that may make errors with respect to the evidence on which they base their rulings, is a risk that every party to arbitration assumes, and such legal and factual errors lie far outside the category of conduct embraced by [the FAA].").

- 6 -

1  draw its essence from the Agreement." Caremark's argument that Mission Wellness
2  always owed at least a minimum amount of PNR fees does not change this analysis—
3  Caremark has not established that the minimum amount of PNR fees would not be based
4  on the same metrics that the Arbitrator rejected as irrelevant and unreasonable.

5  Further, even if the Arbitrator's interpretation of the Agreement was not "plausible,"
6  Caremark has still not established that the Award was "irrational." The Ninth Circuit
7  considered a similar award in *HayDay Farms, Inc. v. FeeDx Holdings, Inc.*, where an
8  arbitration panel found that an agricultural company's breach excused another party from
9  paying a $7 million fee that was expressly required by a settlement agreement, which was
10 subject to arbitration. 55 F.4th at 1242. As Caremark asserts in this case, the agriculture
11 company argued that allowing the other party to circumvent the $7 million fee contravened
12 the express terms of the parties' agreement and resulted in the other party receiving a
13 windfall because it recovered a "greater amount in damages for the breach of an obligation,
14 than he could have gained by the full performance thereof on both sides." *Id.* at 1243;
15 (Doc. 45 at 4 ("[T]he Award gifted Mission Wellness a windfall that placed it in an
16 economic position better than if Caremark had never allegedly breached the parties'
17 performance-based agreement at all.").)

18 After finding the award did not manifestly disregard California law, the Ninth
19 Circuit held that it was not irrational because it was "not based on its interpretation of the
20 parties' contracts, but on [the arbitration panel's] application of legal principles to fashion
21 a remedy for the contracts' breach." *Id.* at 1244. Caremark admits this is precisely what
22 happened in this case: "[the Arbitrator] deleted that portion of the PNR-fee component
23 from the contracts" in order to "fashion[] a remedy" for Mission Wellness's six causes of
24 action. (Doc. 39 at 4.) Accordingly, the Court "lack[s] the power to vacate this portion of
25 the award." *Id.* at 1243.

26 *b. Manifest Disregard*

27 Alternatively, Caremark claims that the Arbitrator manifestly disregarded Arizona
28 law by awarding Mission Wellness all of the PNR fees it paid to Caremark pursuant to the

- 7 -

Provider Manual. According to Caremark, this portion of the Award violates Arizona law, which limits damages in a breach-of-contract dispute to the actual losses sustained. *See Tech. Const., Inc. v. City of Kingman*, 229 Ariz. 564, 569 (Ct. App. 2012).

Here again, *HayDay* is instructive. Like Caremark, the agricultural company claimed that the arbitrator's decision not to award the $7 million fee amounted to an improper windfall under state law concerning the proper computation of damages for breach-of-contract claims. *Id.* The Ninth Circuit agreed with the company's legal argument. But, "[e]ven so," it found that "the tribunal did not manifestly disregard" the relevant state law because the arbitrator did not expressly recognize that its award was an improper windfall. *Id.* This was true, even though the agricultural company raised the relevant law during arbitration proceedings. *Id.*

Caremark fails to show that the Arbitrator acknowledged Arizona law and chose to disregard it, which is what the FAA requires. *Lagstein v. Certain Underwriters at Lloyd's, London*, 607 F.3d 634, 641 (9th Cir. 2010) ("It must be clear from the record that the arbitrators recognized the applicable law and then ignored it."). Thus, the Court's power to vacate the Award on this basis is "plainly, limited." *HayDay*, 55 F.4th at 1244.

### ii. Pre-Judgement Interest

There is no assertion that any contractual provision dealt with pre-judgment interest. Yet, Caremark argues that, based on the requirements of Arizona law, the Arbitrator acted irrationally when he awarded pre-judgment interest on the basis of an expert's opinion.

In arguing this point, Caremark appears to confuse the "completely irrational" and "manifest disregard" inquiries. The "completely irrational" standard is, for the most part, inapplicable in the absence of contractual provisions governing a particular question. Although Caremark alleges the Arbitrator acted irrationally in awarding pre-judgment interest, in substance, it argues the Arbitrator acted in manifest disregard of Arizona law that contains the requirements for awarding pre-judgment interest. Nevertheless, Caremark has not met the "manifest disregard" standard because it fails to show that the Arbitrator knew that pre-judgment interest was inappropriate to award in this instance and chose to

- 8 -

award it anyway. *Lagstein*, 607 F.3d at 641. Accordingly, even accepting that the Arbitrator's award of pre-judgment interest was improper under Arizona law, "such legal . . . errors lie far outside the category of conduct embraced by § 10(a)(4)." *Kyocera*, 341 F.3d at 1003.

### iii. Attorneys' Fees

Caremark also suggests that the Arbitrator exceeded his authority by awarding attorneys' fees plus an additional 25% "lodestar" fee. Specifically, Caremark explains that this portion of the Award: (1) was unreasonable under applicable state law, (2) not supported by adequate reasoning, and (3) the Arbitrator awarded the lodestar fee as a punishment. However, none of these arguments justify vacatur under Section 10(a)(4).

To start, misapplication of state law is not an independent ground for vacatur. *Collins v. D.R. Horton, Inc.*, 505 F.3d 874, 879 (9th Cir. 2007) ("[M]anifest disregard . . . requires 'something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand and apply the law.'"). Further, "[a]rbitrators are not required to set forth their reasoning supporting an award." *Bosack*, 586 F.3d at 1104. And finally, although the parties' Agreement explicitly precluded punitive damages, the lodestar calculation is not a form of punitive damages. *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010) (noting that the lodestar amount is adjusted based on attorney performance); *Van Gerwen v. Guarantee Mut. Life Co.*, 214 F.3d 1041, 1046 (9th Cir. 2000) (finding that an upward adjustment of a lodestar amount is appropriate "in the rare case where there is specific evidence that the quality of service was superior in light of the hourly rates charged and the success was exceptional.").

### iv. AAA Rules.

Finally, Caremark claims, without citing any binding authority, that the Arbitrator exceeded his authority because he failed to comply with applicable AAA Rules. The reason Caremark failed to cite binding authority is simple: none exists. Other courts in this circuit have declined to vacate awards in similar circumstances, particularly where the party moving for vacatur "received adequate notice of [the opposing parties'] claims and

damage theories." *See Interbill, Inc. v. Atl.-Pac. Processing Sys. NV Corp.*, No. 222CV00827JADVCF, 2022 WL 17833429, at *4 (D. Nev. Dec. 21, 2022) ("APPS fails to point to any authority stating that an arbitrator's failure to precisely follow internal AAA rules merits the harsh remedy of vacatur.").

Accordingly, Caremark has not met the high burden required for vacatur under Section 10(a)(4).

### B. Section 11

In the alternative, Caremark asks the Court to correct the Award under Section 11 of the FAA. If a district court finds that vacatur is inappropriate under Section 10, it may modify or correct an arbitrator's award under Section 11, which allows courts to correct technical errors like "evident material miscalculations of figures" and "strike all or a portion of an award pertaining to an issue not at all subject to arbitration." 9 U.S.C. § 11(a); *Kyocera*, 341 F.3d at 997–98.

In its motion, Caremark asks the Court to modify or correct the Award because the Provider Manual required Mission Wellness to pay PNR fees. The Court has rejected this argument for the reasons stated above. And, on a miscalculation inquiry, "the issue to be resolved by the Court is not whether the arbitration panel reached what the Court believes is the correct decision . . . but solely whether the panel's alleged mathematical miscalculation is plainly evident." *In re Arbitration Proceeding Btwn 12 Scottsdale Ins. Co. v. John Deere Ins. Co.*, No. CV-15-00671-PHX-PGR, 2016 WL 627759, *3 (D. Az. Feb. 17, 2016). Caremark has not identified any qualifying miscalculation. Thus, the Court cannot correct the Award as Caremark requests.

### CONCLUSION

Because vacatur is inappropriate under Section 10 and correction is inappropriate under Section 11, the Court must confirm the Award under Section 9. Additionally, post-judgment interest is appropriate from the date of this judgment until the date of payment. *Barnard v. Theobald*, 721 F.3d 1069, 1078 (9th Cir. 2013). "[O]nce an arbitration award is confirmed in federal court, the rate specified in § 1961 applies." *Fid. Fed. Bank, FSB v.*

*Durga Ma Corp.*, 387 F.3d 1021, 1024 (9th Cir. 2004). The rate prescribed by 28 U.S.C. § 1961 is "equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the judgment." Here, that amount is 4.72%.[4]

Accordingly,

**IT IS THEREFORE ORDERED** that Caremark's Motion to Exceed Page Limit (Doc. 25) is **GRANTED.**

**IT IS FURTHER ORDERED** that Mission Wellness's Motion to Exceed Page Limit (Doc. 33) is **GRANTED.**

**IT IS FURTHER ORDERED** that Mission Wellness's Motion to Confirm Arbitration Award (Doc. 15) is **GRANTED.** As a result, Caremark is ordered to pay:

1. The entire $3,662,099.47 Award, and
2. Post-judgment interest at a rate of 4.72% from the date of this judgment.

**IT IS FURTHER ORDERED** that Caremark's Cross-Motion to Vacate or Correct the Arbitration Award (Doc. 45) is **DENIED**.

**IT IS FURTHER ORDERED** that Caremark's Cross-Motion to Vacate or Correct the Arbitration Award (Doc. 48) is **DENIED.**

**IT IS FURTHER ORDERED** that Caremark's Cross-Motion to Vacate or Correct the Arbitration Award (Doc. 23) is **DENIED** as moot.

Dated this 22nd day of June, 2023.

_____
G. Murray Snow
Chief United States District Judge

---

[4] Selected Interest Rates, Fed. Rsrv., https://www.federalreserve.gov/releases/h15/.

- 11 -