# EXHIBIT 7

**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Caremark LLC, et al., | No. CV-21-01913-PHX-DJH |
| Petitioners, | **ORDER** |
| v. | |
| AIDS Healthcare Foundation, | |
| Respondent. | |

At issue before the Court is whether to confirm or vacate the arbitration award issued on November 12, 2021, against Petitioners Caremark LLC and Caremark PCS LLC (collectively, "Caremark"). On November 12, 2021, Caremark filed an Amended Motion to Vacate or Correct the Arbitration Award ("Motion to Vacate") on the ground that the arbitrator exceeded his authority (Doc. 12). In addition to responding to the Motion to Vacate, Respondent AIDS Healthcare Foundation ("AHF") filed a cross Motion to Confirm the Final Award and Entry of Judgment ("Motion to Confirm") (Doc. 72).[1] Both motions are fully briefed. (*See* Docs. 58, 59, 75, 76).

In its initial filing, Caremark also sought to seal this entire action, which the Court subsequently denied. (Doc. 49). The Court did, however, allow Caremark to file redacted versions of documents describing Caremark's "incentive-fee formulas" because it found Caremark had made an initial showing that its competitors could obtain an advantage if the

---

[1] Caremark requested oral argument on the matter. The Court finds that the issues have been fully briefed and oral argument will not aid the Court's decision. Therefore, the Court will deny Caremark's request for oral argument. *See* Fed. R. Civ. P. 78(b) (court may decide motions without oral hearings); LRCiv 7.2(f) (same).

formulas were released to the public. (Doc. 49 at 5) (stating that "at least for now, the incentive-fee formulas and the reimbursement rates should be shielded from public view"). The Court then issued an Order that permitted the following docket numbers to remain under seal, without prejudice to later move to unseal: 6, 12, 22, 24, 28, 31, 33, 34, 36, 37, 40, and 46. (Doc. 66).

Caremark now brings a Motion for Protective Order, which seeks to retain the redactions to those documents. (Doc. 67). As discussed below, the Court finds that any sealing of documents relating to this case is no longer justified and will order the documents listed above to be unsealed.

## I.    Background[2]

### A. The Parties

#### a. AIDS Healthcare Foundation

AHF owns and operates retail pharmacies that serve HIV/AIDS patients, including patients enrolled in Medicare Part D prescription drug program.[3] (Doc. 12-9 at 16). Each AHF-affiliated pharmacy submits claims to Caremark for reimbursement. (*Id.*)

#### b. Caremark

Caremark contracts with prescription drug plan sponsors to provide pharmacy benefit management services to the plan's members. (*Id.*) Caremark is a pharmacy benefit manager ("PBM"). In this role, it manages the prescription drug benefits of its clients, which includes, as relevant here, government prescription drug plan sponsors. (*Id.*)

Caremark offers several services to its clients, including the administration and maintenance of nation-wide pharmacy networks to provide pharmacy access to its clients' members. (*Id.* at 17). Caremark has over 68,000 pharmacies enrolled in its various networks, including AHF-affiliated pharmacies. (*Id.*)

---

[2] The Court will adopt portions of the background section from the arbitrator's Final Award Stipulated Facts section. (Doc. 12-9 at 16–25). Unless noted otherwise, all facts contained herein are stipulated.

[3] Medicare Part D provides outpatient prescription drug coverage to Medicare beneficiaries enrolled in private plans. *See* 42 U.S.C. §1395, *et seq.* A Part D plan, which is an insurance plan for prescription drugs, is also a contract that a plan sponsor enters with the Department of Health and Human Services. (Doc. 72 at 9).

### c. Reimbursement Claims

Under the various contract documents, pharmacies agree to provide services in accordance with the terms of those agreements. (*Id.*) When a customer fills a prescription at a Caremark network pharmacy, (e.g., an AHF-affiliated pharmacy), the pharmacy submits a reimbursement claim to the customer's prescriptions insurance plan via Caremark, and Caremark adjudicates the claim on behalf of its client—the plan sponsor. (*Id.*)

This process confirms the prescribed product is covered by the customer's health plan and advises the pharmacy the reimbursement rate at the point of service for the drug in addition to the amount of co-pay the pharmacy should collect from the customer based on its plan coverage. (*Id.*)

### B. AHF's Dispute

This case arises from an arbitration between the parties involving a breach of contract claim. (*Id.*)

At issue was Caremark's operation of the Performance Network Program ("PNP"). Under the PNP, Caremark was authorized to take back from pharmacies like AHF public Medicare Part D monies earmarked to pay for prescriptions for people of limited financial means. (*Id.*) Caremark then paid that money back to the Part D plan sponsors. The result was that pharmacies like AHF received less money than the Part D plan sponsors, who received the negotiated reimbursement rates for public Part D monies. (*Id.*)

AHF alleged the manner in which Caremark applied the PNP breached the agreement between AHF and Caremark and the covenant of good faith and fair dealing. (*Id.*) AHF also sought a permanent injunction prohibiting Caremark from operating the PNPs and sought damages arising out of Caremark's performance network fees ("PNR Fees") assessed to the pharmacies from January 1, 2016, to 2020. (*Id.*)

### A. Provider Agreements

Beginning in 2007 and prior to November of 2019, each AHF-affiliated pharmacy entered a separate "Provider Agreement" with Caremark to participate in Caremark's

1 Networks. (*Id.* at 18). On or about November 4, 2019, the AHF pharmacies became a
2 pharmacy chain in Caremark's Networks, and Caremark and AHF executed four provider
3 chain agreements ("Chain Provider Agreements"). (*Id.*)

4       The contract between AHF and Caremark included four documents:

5       (1) the Provider Agreements—used to sign up service providers, like AHF, so those
6            providers can participate in Caremark's pharmacy networks (prior to November
7            4, 2019);

8       (2) the Chain Provider Agreements (after November 4, 2019);

9       (3) the Caremark Provider Manuals; and

10       (4) the Caremark Network Enrollment Forms ("NEFs") used by Caremark to enroll
11            providers, like AHF, in specific Medicare Part D networks.

12 (*Id.* at 18–19).[4]

13       The Provider Manual contains various arbitration provisions, which state, "the
14 award of the arbitrator(s) will be final and binding on the parties, and judgment upon such
15 award may be entered in any court having jurisdiction thereof." (Doc. 12-6 at 118).

16 **B. Caremark's Performance Network Program and Network Enrollment Forms
17 ("NEF")**

18       On July 1, 2016, select Caremark Medicare Part D pharmacy networks became part
19 of Caremark's PNP. (Doc. 12-9 at 24). To join the PNP, Caremark provided AHF with a
20 NEF, which set forth the rates that Caremark used to reimburse AHF's pharmacies for the
21 filling of prescriptions for a particular year. (*Id.* at 69). Under the PNP, Caremark
22 reimbursed pharmacies with a point-of-sale rate in conjunction with a set network fee,
23 which was assessed at the point of sale. (*Id.* at 24).

24       On January 1, 2016, instead of assessing a flat network fee, pharmacies were
25 assessed a variable network fee range, contingent on their performance metrics, with the
26 higher performing pharmacies paying the lower fee. (*Id.*) Under this scheme, Caremark
27 calculated the participating pharmacies scores per the PNP's criteria and used those scores

28     

---

[4] The Caremark Documents, which are defined in the Provider Manual, are also included
in the contract documents. (*Id.*)

to determine the applicable variable rate fee, called Performance Network Rebate fees ("PNR fees"). (*Id.*) Caremark provided the participating pharmacies with "Trimester Reports" three times a year and then recouped the PNP fees from those pharmacies. (*Id.* at 25). After November 2019, Caremark scored the AHF pharmacies in the aggregate, using one Trimester Report for the entire chain instead of an individual Trimester Report. (*Id.* at 42).

### C. AHF's Claims and Arbitration Proceedings

On November 12, 2019, AHF filed suit with the American Arbitration Association, alleging Caremark's operation of the PNPs breached the agreements between AHF and Caremark and the covenant of good faith and fair dealing. (Doc. 58 at 13). AHF also sought a permanent injunction prohibiting Caremark from operating the PNPs. (*Id.*)

#### i. Caremark's Motion to Sever and Dismiss

On May 4, 2020, Caremark filed a Motion to Sever, arguing AHF's claims constituted a class action that the Provider Manual prohibited. (Doc. 12-6 at 98–109). On August 1, 2020, the arbitrator, William "Zak" Taylor ("arbitrator"), denied Caremark's Motion, finding "in a chain pharmacy agreement, which necessarily contemplates a number of pharmacy locations, the plain language of the Arbitration clause from the Provider Manual, permits aggregation of claims the chain has from any contracts and agreements arising from "participation in one or more Caremark networks." (Doc. 12-6 at 122–25).

#### ii. Arbitration Hearings, Interim Award, and Final Award

On April 12, 2021, the arbitrator held a five-day evidentiary hearing, where nine witnesses testified and over 690 exhibits were entered into evidence. (Doc. 12-9 at 14). After the arbitrator received testimonial evidence, the parties submitted two rounds of post-hearing briefing. (*Id.*)

The arbitrator considered the following issues:
(1) Whether Caremark breached the contract with its application of the PNP resulting in AHF being paid less than the contract required;
(2) Whether Caremark breached the contract by violating the covenant of good faith and fair dealing by implementing the PNP;
(3) Whether Caremark's imposition of the PNP was procedurally unconscionable;

(4) Whether the terms of the PNP were substantively unconscionable;

(5) Whether the PNP was an unenforceable contract of adhesion;

(6) Whether the PNP should be enjoined;

(7) What, if any, damages AHF sustained; and

(8) Who was the prevailing party.

(Doc. 12-9 at 15). The arbitrator found for AHF on all the claims. (*Id.* at 69–75).

The arbitrator then issued a binding Interim Award dated August 3, 2021, followed by issuance of the 62-page Final Award on November 12, 2021. (*Id.* at 14–75). The arbitrator awarded AHF $22.6 million in damages, an additional $365,799.44 in arbitration expenses, including reasonable attorney's fees, and held that Caremark was responsible for the entire sum. (*Id.* at 75).

The arbitrator held the PNPs and the NEFs that implemented them were "adhesive," and that Caremark had "unchecked economic power." (*Id.* at 70). He thus found the contracts were "substantively unconscionable as a matter of law" and therefore unenforceable. (*Id.* at 72). Accordingly, the arbitrator "limit[ed] the application of the variable [PNR] provisions" and awarded damages to AHF during the years the PNRs applied. The damages included: $2,164,775 for 2016; $2,503,514 for 2017; $4,090,475 for 2018; $4,704,095 for 2019; $8,696,289.44 for 2020, for a total of $22,159,148.44. (*Id.*) The arbitrator also granted a permanent injunction prohibiting Caremark from operating the PNPs using the methodologies at issue in the arbitration claims because "the calculations to determine the variable [PNRs] were not actuarially based." (*Id.* at 71).

### iii. Caremark's Motion to Recalculate Damages Computation

On August 29, 2021, Caremark filed a Motion to Recalculate Damages Computation, arguing the arbitrator should have based the damages award calculation "on the contractual floor of [PNR] fees under the contracts at issue for 2016 through 2020 . . . [awarding] AHF the lowest available [PNR] fees, rather than award[ing] AHF damages based on a return of all [PNR] fees." (Doc. 12-7 at 2–12).

On September 11, 2021, the arbitrator denied Caremark's Motion, finding Caremark "made a tactical decision not to attack the damages amount sought based on the view that presenting an alternative theory of damages would undercut and detract from its position

that no damages at all should be awarded." (*Id.* at 46). On November 12, 2021, the arbitrator issued the Final Award. (Doc. 12-9).

### D. Caremark's Motion to Vacate and AHF's Motion to Confirm

On December 1, 2021, Caremark filed its Amended Motion to Vacate or Correct the Arbitration Award ("Motion to Vacate"), arguing the arbitrator exceeded his authority by an improper consolidation of claims, adopting an irrational damages computation, and increasing the amount of the damages award after the deadline for doing so had passed. (Doc. 12). On June 24, 2022, AHF filed its Motion to Confirm the Final Award and for Entry of Judgment, in which AHF essentially argues the same points it does in its Response to the Amended Motion to Vacate in addition to requesting attorneys' fees and costs.[5] (Doc. 72).

## II.    Legal Standard

Under the Federal Arbitration Act ("FAA"), a party to an arbitration may apply to the Court for an order confirming the arbitration award, and the Court "must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of [the FAA]." 9 U.S.C. § 9.

An arbitration award review is "both limited and highly deferential." *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1288 (9th Cir. 2009); *Kyocera Corp. v. Prudential–Bache Trade Servs., Inc.*, 341 F.3d 987, 994 (9th Cir. 2003) (en banc) ("The Federal Arbitration Act, 9 U.S.C. §§ 1–16, enumerates limited grounds on which a federal court may vacate, modify, or correct an arbitral award"). "Neither erroneous legal conclusions nor unsubstantiated factual findings justify federal court review of an arbitral award." *Bosack v. Soward*, 586 F.3d 1096, 1102 (9th Cir. 2009). Nonetheless, the Ninth Circuit has held that "[a]lthough an arbitrator has great freedom in determining an award, he may not dispense his own brand of industrial justice." *Garvey v. Roberts*, 203 F.3d 580, 588–89 (9th Cir. 2000) (quoting *Pac. Motor Trucking Co. v. Auto. Machinists Union*, 702

---

[5] AHF originally filed their Petition to Confirm in California and the case was transferred here, and subsequently dismissed upon stipulation of the parties. *See AIDS Healthcare Foundation v. Caremark LLC*, No. 2:22–cv–00925–DJH (D. Ariz.) at Doc. 57.

F.2d 176, 177 (9th Cir. 1983)).  The FAA authorizes a court to vacate an arbitration award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."  9 U.S.C. § 10(a)(4).  "The burden of establishing grounds for vacating an arbitration award is on the party seeking it."  *U.S. Life Ins. Co. v. Superior Nat. Ins. Co.*, 591 F.3d 1167, 1173 (9th Cir. 2010).

Arbitrators "exceed their powers" when the award is "completely irrational" or in "manifest disregard of the law."  *See Comedy Club*, 553 F.3d at 1288; *Biller v. Toyota Motor Corp.*, 668 F.3d 655, 665 (9th Cir. 2012).  "Completely irrational" means an award "fails to draw its essence from the agreement." *Id.*  In other words, an "arbitration award draws its essence from the agreement if the award is derived from the agreement, viewed in light of the agreement's language and context, as well as other indications of the parties' intentions."  *Lagstein v. Certain Underwriters at Lloyd's, London*, 607 F.3d 634, 642 (9th Cir. 2010) (quoting *Bosack*, 586 F.3d at 1106).  Manifest disregard of the law means that "the arbitrators recognized the applicable law and then ignored it."  *Luong v. Circuit City Stores, Inc.*, 368 F.3d 1109, 1112 (9th Cir. 2004).  "These grounds afford an extremely limited review authority, a limitation that is designed to preserve due process but not to permit unnecessary public intrusion into private arbitration procedures."  *Kyocera Corp.*, 341 F.3d at 997.

Arbitration awards should be confirmed if the "arbitrators' interpretation was 'plausible.'"  *Employers Ins. of Wausau v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 933 F.2d 1481, 1486 (9th Cir. 1991).  A reviewing court has "no authority to vacate an award solely because of an alleged error in contract interpretation."  *Id.*  However, an "award that conflicts directly with the contract cannot be a 'plausible interpretation.'"  *Pac. Motor Trucking*, 702 F.2d at 177 (quoting *Federated Employers of Nevada, Inc. v. Teamsters Local No. 631*, 600 F.2d 1263, 1265 (9th Cir. 1979)).

## III.  Discussion

As noted, Caremark seeks to vacate the arbitrator's award and AHF seeks to confirm

it.  The parties have filed extensive briefing on the issues.  A ruling in favor of one motion necessarily means denial of the other.  The Court will also consider Caremark's Motion for Protective Order.

### 1. AHF's Motion to Confirm and Caremark's Motion to Vacate

Caremark argues that the arbitration award should be vacated for three reasons: (1) the arbitrator improperly consolidated the claims of fifty-one separate pharmacies into a single proceeding, (2) the arbitrator adopted an irrational damages computation, and (3) the arbitrator increased the damages award amount after the deadline for doing so had passed.  (Doc. 12 at 18–29).

### A. Whether the arbitrator exceeded his authority by consolidating the pharmacies' claims into a single proceeding

The Provider Manual states, in relevant part:

> Any and all disputes between Provider and Caremark . . . including but not limited to, disputes in connection with, arising out of, or relating in any way to, the Provider Agreement or to Provider's participation in one or more Caremark networks or exclusion from any Caremark networks, will be exclusively settled by arbitration. This arbitration provision applies to any dispute arising from events that occurred before, on or after the effective date of this Provider Manual.

(Doc. 12-6 at 118).

In the arbitrator's ruling on Caremark's Motion to Sever and to Dismiss, he found the operative contract to be the Chain Provider Agreement of November 4, 2019.  (Doc. 12-6 at 123).  The arbitrator notes "the claims at issue arose from events occurring almost exclusively before then."  (*Id.*)  "Per the Provider Manual provisions incorporated in the agreement on the subject of Arbitration . . . those claims nonetheless are at issue in this Arbitration pursuant to the written provisions of the November 2019 agreement."  (*Id.*)

The arbitrator further found:

> The "Arbitration" section of the [Provider] Manual states that "**any and all disputes** . . . including but not limited to, disputes in connection with, arising out of, or relating in any way to, the Provider Agreement **or to Provider's participation in one or more Caremark networks** . . . ," are to be

arbitrated. The Arbitrator interprets this language to mean that the range of issues to be arbitrated need not arise explicitly from the chain pharmacy agreement, but includes any claims not barred by the statute of limitations that the chain has arising from "participation in one or more Caremark networks." This is application of the plain meaning of the arbitration clause. It does not involve retroactivity but merely allows all cognizable claims existing at the time of the contract that are not precluded by the statute of limitations to be brought in a single arbitration.

To the extent it is argued that this violates the anti-class action provisions of the arbitration provision, the Arbitrator finds that, in a chain pharmacy agreement, which necessarily contemplates a number of pharmacy locations, the plain language of the Arbitration clause from the Provider Manual, permits aggregation of claims the chain has from any contracts and agreements arising from "participation in one or more Caremark networks." The "one or more" language is instructive that claims arising under multiple subcontracts, such as the four individual state Medicaid agreements here, are within the scope of the arbitration clause. Thus, claims arising prior to the agreement at issue pursuant to prior contracts between the parties are cognizable in this Arbitration even if such contracts were terminated by the November 4, 2019 Agreement.

(Doc. 12-6 at 123) (emphasis in original).

Like in its Motion to Sever, Caremark again argues the consolidation of the claims violates the anti-class action provisions of the Provider Manual. (Doc. 12 at 18). To support this argument, Caremark cites to a provision in the Provider Manual that prevents "representative[s] actions or proceeding[s]":

All disputes are subject to arbitration on an individual basis, not on a class or representative basis, or through any form of consolidated proceedings, and the arbitrator(s) will not resolve Class Action disputes and will not consolidate arbitration proceedings without the express written permission of all parties to the Provider Agreement.

(Doc. 12-6 at 119).

Caremark contends this contractual requirement precluded AHF from consolidating the claims into one arbitration proceeding. (Doc. 12 at 18). Specifically, Caremark argues the arbitrator's interpretation of the Provider Manual exceeded his authority because he

ignored "the Provider Manual's anticonsolidation clauses and [relied] on the Chain Provider Agreements." (Doc. 59 at 9). Caremark argues AHF's claims "predated the Chain Provider Agreements" and thus those "disputes arose under AHF's individual Provider Agreement with Caremark, not under the Chain Provider Agreements." (*Id.* at 10).

The Court rejects Caremark's arguments because the arbitrator's interpretation was not "completely irrational" or in "manifest disregard of the law." *See Comedy Club*, 553 F.3d at 1288. The arbitrator plainly found, under the arbitration section of the Provider Manual, that the plain language from the parties' Provider Manual permitted consolidation of claims from *any contracts and agreements* which arose from "participation in one or more of Caremark networks." (Doc. 12-6 at 123) (emphasis added). The arbitrator found this to be "the plain meaning of the arbitration clause" and noted "[i]t does involve retroactivity but merely allows all cognizable claims existing at the time of the contract that are not precluded by the statute of limitations to be brought in a single arbitration." (*Id.*) He then interpreted the Chain Provider Agreements to mean that "the range of issues to be arbitrated need not arise explicitly from the chain pharmacy agreement, but includes any claims not barred by the statute of limitations that the chain has arising from 'participation in one or more Caremark networks." (*Id.*) On this basis, the arbitrator ruled that the "'one or more' language is instructive that claims arising under multiple subcontracts, such as the four individual state Medicaid agreements here, are within the scope of the arbitration clause." (*Id.*) He therefore concluded that "claims arising prior to the agreement at issue pursuant to prior contracts between the parties are cognizable in this Arbitration even if such contracts were terminated by the November 4, 2019 Agreement." (*Id.*)

This outcome finds support in the case law. The arbitrator interpreted the Provider Agreement, the Provider Manual, and the Chain Provider Agreements, and his ruling "drew its essence" from the operative agreements, considered "the agreement's language and context," and thus cannot be deemed "completely irrational." *See Lagstein*, 607 F.3d at

642.

Caremark further argues the arbitrator's decision was in manifest disregard for the law because he ignored both *Lamps Plus, Inc. v. Varela,* 139 S. Ct. 1407, 1416 (2019) and *Weyerhaeuser Co. v. W. Seas Shipping Co.*, 743 F.2d 635, 637 (9th Cir. 1984)—the two cases Caremark cited in its Motion to Sever.  (Doc. 59 at 11).  But manifest disregard of the law "means something more than just an error in the law or a failure on the part of the arbitrators to understand or apply the law." *Collins v. D.R. Horton, Inc.*, 505 F.3d 874, 879 (9th Cir. 2007).  "It must be clear from the record that the arbitrators recognized the applicable law and then ignored it."  *Id.*  Here, Caremark has not proffered any evidence that the arbitrator identified an applicable law and then ignored it.  Caremark argues *Lamps Plus* and *Weyerhaeuser* stand for the proposition that consolidated arbitrations must be based on express contract authority.  The arbitrator, however, found such authority under the arbitration section of the Provider Manual.  He then interpreted the plain language of the Provider Manual to permit the consolidation of claims from any contracts and agreements which arose from "participation in one or more of Caremark networks."  (Doc. 12-6 at 123).  He further explains that "[a]bsent a court order or agreement of the parties, the Arbitrator does not have authority to sever claims or to create multiple arbitrations."  (Doc. 12-6 at 123).  It is Caremark's burden to provide such evidence, and they have failed to do so.  *Bosack*, 586 F.3d at 1104–05.  The Court therefore rejects Caremark's argument that the arbitrator manifestly disregarded the law when he resolved the AHF's claims in a single proceeding.

## B. Whether the arbitrator adopted an irrational damages computation

The Court similarly finds the arbitrator did not adopt an irrational damage computation.  His conclusions that that Caremark's NEFs were adhesive, substantively unconscionable, and unenforceable were plausible interpretations of the contract.  Accordingly, his finding that Caremark must pay back to AHF all the monies Caremark took pursuant to the NEFs was not irrational.

In the Final Award, the arbitrator found that Caremark's NEFs "attempt to disclose

the rates and [performance] network rebates ("PNR") . . . ." (Doc. 12-9 at 69). The variable PNRs began in 2016. He notes the movement from fixed rebates to variable range rebates "was [the] result of some pharmacies' efforts to differentiate themselves based on superior performance." (*Id.*)

From 2006 to 2015, the arbitrator found the fixed rate PNRs were enforceable and not unconscionable. (*Id.*) But, starting in 2016, the arbitrator found the PNR rates were variable and unconscionable as implemented because they "were unknowable when the NEF was entered into and at the Point of Sale." (*Id.*) The arbitrator found Caremark's calculation of the variable PNR fees contained several flaws, including that the PNR fees "were not actuarially based" or "based on sound statistical methodologies." (*Id.* at 71).

Based on these findings, the arbitrator found Caremark "breached the contract with its application of the PNP resulting in AHF being paid less than the contract required in the variable PNR years." (Doc. 12-9 at 74). He further found "[t]he provisions of, and application of variable [PNRs] was contrary to the covenant of good faith and fair dealing inherent in the NEF's." (*Id.* at 72). The arbitrator held the "variable [PNRs] as implemented were substantively unconscionable as a matter of law." (*Id.*) As a result, he chose to "limit the application of the variable [PNRs] provisions" and award damages to AHF for the years the variable PNRs applied. (*Id.*) The damages included: $2,164,775 for 2016; $2,503,514 for 2017; $4,090,475 for 2018; $4,704,095 for 2019; $8,696,289.44 for 2020, for a total of $22,159,148.44. (*Id.*)

Thereafter, Caremark filed a Motion to Recalculate Damages, arguing that the arbitrator's award provided a windfall to AHF "by eliminating the contractual floor PNR fees that AHF knew was the minimum it would pay when it agreed to participate in Caremark's Medicare part D performance networks" and thus requested the arbitrator "to modify the damages calculation to award AHF damages based on the contractual floor of [PNR] fees under the NEFs, not based on a full refund of those fees." (Doc. 12-7 at 2–12; 80). Caremark claimed that when AHF joined Caremark's PNP, AHF knew there was a minimum (3%) fee for pharmacies with perfect performance and knew it would never pay

0% in PNR fees because that could not occur under the PNP. (*Id.*) Thus, Caremark contends the damages should be measured based on the lowest available contractual rate rather than on a rate of 0%. (*Id.*) This computation, Caremark argues, results in a damages award of $2,710,305, not $19,276,611. (*Id.*) The arbitrator rejected this argument, finding:

> Caremark's Motion is an attempt to raise an after-the-fact argument on damages for the first time. It is not a motion to correct a mathematical error or a calculation error in the sense contemplated by the AAA Rules. [AHF] has been consistent throughout that it seeks to invalidate the entire network rebate amount as the product of an unconscionable contract term. The Interim Award so found and held. [Caremark's] argument seeks to substantially reduce the damages awarded and is not a recalculation but an argument as to an alternative theory of damages. [Caremark] did not raise its alternative damages theory in its prehearing brief; it did not raise the argument during the hearing; it did not raise the argument in its initial post-hearing brief; and it did not raise the argument in its responsive post-hearing brief. Rather, it "sandbagged" the issue and raised it as a "gotcha" motion.
>
> The Arbitrator concludes that [Caremark] made a tactical decision not to attack the damages amount sought based on the view that presenting an alternative theory of damages would undercut and detract from its position that no damages at all should be awarded. This is a common decision faced by trial counsel. [Caremark] made the decision to hold off on presenting this alternative theory of damages. This ruling holds [Caremark] to the choice it voluntarily made.

(Doc. 12-7 at 45–46).

Like in its Motion to Recalculate Damages, Caremark contends the arbitrator should have awarded no damages at all because, "as high-performing pharmacies, AHF paid less in PNR fees than they would have paid in a fixed-rate network with a midpoint rate, thus making their damages $0." (*Id.*) Alternatively, Caremark argues AHF's maximum contract damages are $2,987,474.38, which "represents the difference between the PNR fees AHF knew they would have to pay under any circumstances ($19,171,674.06) and the PNR fees Caremark charged AHF after the alleged improper scoring ($22,159,148.44)." (*Id.*)

After reviewing the record, the Court agrees with the arbitrator that Caremark failed

to raise its alternative damages theory in its prehearing brief, during the hearing, in its initial post-hearing brief, or in its responsive post-hearing brief. (Doc. 12-7 at 45–46). The first time Caremark advanced this theory was in its Motion to Recalculate. (*Id.*) Caremark was on notice of the measurement the arbitrator used to calculate AHF's damages. Indeed, the arbitrator expressly adopted damages according to AHF's calculations, citing to AHF's Exhibit 71 in the Final Award. (Doc. 12-9 at 72). As noted, Caremark "made a tactical decision not to attack the damages amount sought based on the view that presenting an alternative theory of damages would undercut and detract from its position that no damages at all should be awarded." (Doc. 12-7 at 45–46). Thus, the arbitrator's conclusion that Caremark forfeited this argument when it failed to raise it during the proceedings was not irrational or in manifest disregard of the law. The arbitrator clearly stated Caremark's Motion was "not a motion to correct a mathematical error or a calculation error in the sense contemplated by the AAA Rules." (*Id.*) This interpretation was plausible, and it is "not the province of the district court . . . to determine whether the arbitrator committed an error, even a serious error, in [his] interpretation [of the rules]." *Sanchez v. Elizondo*, 878 F.3d 1216, 1223 (9th Cir. 2018) (internal citation omitted). The Court "need only determine that the arbitrator confined himself to the interpretation and application of the parties' agreement," which stated that AAA Rules applied. *Id.* Because the Court finds the arbitrator did so here, he did not exceed his authority in adopting AHF's damages computation for the years the variable PNR fees applied.

### C. Whether the arbitrator increased the damages award amount after the deadline for doing so had passed

Last, the Court finds the arbitrator plausibly interpreted the American Arbitration Association ("AAA") Commercial Rule 50 as inapplicable to AHF's Motion to Correct the Damages Award. Rule 50 states:

> Within 20 calendar days after the transmittal of an award, any party, upon notice to the other parties, may request the arbitrator, through the AAA, to correct any clerical, typographical, or computational errors in the award. The arbitrator is not empowered to redetermine the merits of any claim already

decided.

AAA Commercial R-50.

The arbitrator issued his Interim Award on August 3, 2021. (Doc. 12-9 at 14). AHF filed a Motion to Correct the Interim Award on September 14, 2021, arguing the arbitrator did not include the damages for the third trimester of 2020, which Caremark took after the Interim Award was issued. (Doc. 12-7 at 48). On October 27, 2021, the arbitrator found

> [t]he Motion correctly points out a mistake regarding correction in the original damages and also, as this is an Interim Award, establishes that the amounts recouped after the Interim Award for the plan year 2020 should be added to the damages. As the Award was interim in nature, it is subject to revision at any time before the Final Award and the time limits of AAA Rule 50 do not apply. Thus, the damages to be awarded are $22,159,148.44.

(Doc. 12-8 at 5–6).

Caremark contends the arbitrator exceeded his authority by increasing the damages award amount after the deadline for doing so had passed. (Doc. 12 at 27–29). But the Ninth Circuit is clear that "the arbitrator's interpretation of the scope of his powers is entitled to the same level of deference as his determination on the merits." *Schoenduve Corp. v. Lucent Techs., Inc.*, 442 F.3d 727, 733 (9th Cir. 2006). Here, the arbitrator found Rule 50, including its time restrictions, did not apply because it was an Interim Award. Caremark correctly notes Rule 50 states the arbitrator "is not empowered to redetermine the merits of any claim already decided." AAA Commercial R-50. But the arbitrator did not redetermine the merits; he acknowledged "a mistake regarding correction in the original damages . . . [and] that the amounts recouped after the Interim Award . . . should be added to the damages." (Doc. 12-8 at 5). Thus, the Court finds the arbitrator plausibly interpreted the time limits of Rule 50 as inapplicable to the Interim Award. Caremark may take issue with this interpretation, but such alleged errors are insufficient to vacate, in whole or in part, an arbitration award. *See Collins*, 505 F.3d at 879.

Because Caremark has not raised any meritorious argument in favor of vacatur, the Court "must grant" AHF's application for confirmation of the award and enter judgment. 9 U.S.C. § 9.

1

**D. AHF's Attorneys' Fees, Prejudgment Interest, Postjudgment Interest**

AHF has requested an award of its reasonable attorneys' fees and costs incurred in seeking confirmation of the arbitration award, which Caremark opposes. (Doc. 72 at 13–18). AHF also seeks prejudgment interest and postjudgment interest. (*Id.*)

**i. Post-Arbitration Attorneys' Fees**

Although the FAA is silent as to attorney's fees to a party who is successful in obtaining confirmation of an arbitration award, *Menke v. Monchecourt*, 17 F.3d 1007, 1009 (7th Cir. 1994), AHF notes the Provider Manual provides that "[t]he expenses of arbitration, including reasonable attorney's fees, will be paid for by the party against whom the final award of the arbitrator(s) is rendered, except as otherwise required by Law." (Doc. 75-1 at 4). The Court is not persuaded this language extends beyond the arbitration proceedings to confirmation of the final award by the district court. In *In re Arb. Proceeding Between: Scottsdale Ins. Co. v. John Deere Ins. Co.*, this court granted respondent's request for attorneys' fees because the parties' agreement provided "the attorneys' fees of the party so applying and court costs will be paid by the party against whom confirmation is sought." 2016 WL 627759, at *4 (D. Ariz. Feb. 17, 2016). This contractual language is specific to the final award's confirmation process. The language in the Provider Manual at issue here, however, appears to be limited to the arbitration itself, not the subsequent confirmation proceedings in the district court.

Nonetheless, AHF contends A.R.S. § 12-1514, a provision of the Arizona Uniform Arbitration Act, provides express statutory authority for an award of attorneys' fees and costs. (Doc. 72 at 14). A.R.S. § 12-1514 states, "[u]pon the granting of an order confirming, modifying or correcting an award, judgment or decree shall be entered in confirmity [sic] therewith and be enforced as any other judgment or decree. Costs of the application and of the proceedings subsequent thereto, and disbursements may be awarded by the court." The Arizona Supreme Court has interpreted the statute's use of "costs" to include attorneys' fees. *See Canon Sch. Dist. No. 50 v. W.E.S. Const. Co.*, 882 P.2d 1274, 1280 (Ariz. 1994) ("Therefore, we conclude that, under A.R.S. § 12-1514, the trial court

- 17 -

may make an award for attorney's fees incurred in the confirmation proceedings themselves."). Caremark argues the FAA governs this matter, not A.R.S. § 12-1514. (Doc. 75 at 5). But under the Provider Manual, the "Law" that encompasses the expenses of arbitration is defined to include "any federal, state, [or] local . . . . law." (Doc. 76 at 48). The Court therefore finds the agreement between the parties incorporates A.R.S. § 12-1514, which authorizes an award of attorney's fees upon confirmation of an arbitration award. AHF is accordingly entitled to attorneys' fees and costs under A.R.S. § 12-1514.

In the alternative, Caremark argues that AHF's proposed fee award should be reduced because of improper block billing, arguing AHF's billing entries contain $67,488.75 in block-billed entries and any fees awarded to them should be reduced by this amount. (Doc. 75-2 at 2–6).

In Arizona, block-billed entries contain multiple individual and unrelated tasks. *Moshir v. Automobili Lamborghini Am. LLC*, 927 F. Supp. 2d 789, 799 (D. Ariz. 2013). "[B]lock-billing makes it nearly impossible for the Court to determine the reasonableness of the hours spent on each task. *Id.* Accordingly, "[w]here the Court cannot distinguish between the time claimed for the various tasks, the Court will reduce the award . . . ." *Id.* The Ninth Circuit has stated it is permissible "to reduce block-billed hours by ten to thirty percent based upon a report that block billing inflated billed hours by that percentage range." *Moon v. Am. Fam. Mut. Ins. Co. SI*, 2018 WL 3729762, at *3 (D. Ariz. Aug. 6, 2018) (citing to *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007)).

Arizona District Court Local Rule 54.2 provides, in part, that a litigant seeking an award of attorney's fees must provide: "(A) The date on which the service was performed; (B) the time devoted to each individual unrelated task performed on such day; (C) a description of the service provided; and (D) the identity of the attorney, paralegal, or other person performing such service." LRCiv 54.2 (e)(1)(A)–(D).

Caremark contends that AHF's billing entries are "block-billed" because they contain "multiple individual and unrelated tasks." (Doc. 75 at 7). Upon review, the Court finds the entries do not describe the time spent on each individual task and therefore do not

comply with Rule 54.2 and thus make it impossible for the Court to ascertain whether the time spent on each task was reasonable. The Court therefore finds it appropriate to reduce the hours expended on these block-billed activities by 15%, calculated as follows:

$67,488.75[6] * 0.15% = $10,123.31

$124,456.40 – 10,123.31 = $114,333.09.

Under these adjustments, the Court will award attorneys' fees and costs in the sum of $114,333.09.

## ii.     Prejudgment Interest

AHF also seeks prejudgment interest from the date the arbitrator issued his final arbitration award, November 12, 2021, through the date their Motion to Confirm was filed, June 24, 2022.   (Doc. 72 at 15).

In diversity cases such as this one, the Court reviews state law to determine the rate of prejudgment interest, while federal law determines the rate of post judgment interest. *Northrop Corp. v. Triad Int'l Mktg., S.A.*, 842 F.2d 1154, 1155 (9th Cir. 1988). In Arizona, an award of prejudgment interest is allowed as a matter of right on a liquidated claim. *See Creative Builders, Inc. v. Ave. Devs., Inc.*, 715 P.2d 308, 313 (Ariz. Ct. App. 1986) (internal citation omitted). "Interest that accumulates from the time an arbitration award is issued until the time a judgment from the district court affirming the arbitration award is entered is considered pre-judgment interest." *TSYS Acquiring Sols., LLC v. Elec. Payment Sys., LLC*, 2010 WL 1781015, at *4 (D. Ariz. May 4, 2010) (citing *Northrop*, 842 F.2d at 1155–56)). "Courts do not lack authority to award interest where an arbitration award is silent." *Lagstein*, 725 F.3d at 1055.

If awarded, "[i]nterest on any judgment shall be at the lesser of ten per cent per annum or at a rate per annum that is equal to one per cent plus the prime rate as published by the board of governors of the federal reserve system in statistical release H.15…." A.R.S. § 44-1201(B). The Federal Reserve's prime rate is 4.75%.[7] Thus, the prejudgment

---

[6] These entries contained herein include the entire list of objectionable entries raised by Caremark. (Doc. 75-2 at 2–6).

[7] H.15, Selected Interest Rates, is available on the Federal Reserve's website. *See* Board

interest here is 5.75%, which is the federal reserve's prime rate plus 1%.

Caremark argues AHF's request is untimely because it failed to make the request for prejudgment interest before the arbitrator. (Doc. 75 at 8). Caremark further argues prejudgment interest is only allowed as a matter of right on a liquidated claim and, because the damages the arbitrator awarded were not "capable of precise computation," the damages were not liquidated. (*Id.* at 9). The Court rejects Caremark's arguments. The Ninth Circuit is clear that "[w]hile the arbitrators' explicit award of interest on the contract damages should be respected, their failure to speak on interest otherwise does not constitute a denial of interest on other parts of the award." *Lagstein*, 725 F.3d at 1055. Although the arbitrator found AHF's request for prejudgment interest "came too late," the arbitrator did not make a determination of whether prejudgment interest should be awarded for the dates at issue here. (Doc. 12-8 at 5). Further, Caremark cites no authority to support its argument that, "the damages the arbitrator awarded were not capable of precise computation and thus were not liquidated." (Doc. 75 at 9). To the contrary, the arbitrator adopted the damages in accordance with the damages put forth by AHF. (Doc. 12-9 at 72). The Court therefore finds AHF is entitled to prejudgment interest at the rate of 5.75%.

Here, the arbitrator issued the Final Award on November 12, 2021. AHF filed this motion on June 24, 2022. The Court thus finds $815,608.64 in prejudgment interest has accrued, calculated as follows:

$23,113,158.57 * 5.75% = $1,329,006.62.

$1,329,006.62/365 days = $3,641.11 per day.

224 days from November 12, 2021, to June 24, 2022.

224 days * $3,641.11 = $815,608.64.[8]

### iii. Postjudgment Interest

AHF also seeks postjudgment interest from the date this Court enters judgment.

---

of Governors of Federal Reserve System, H. 15 https://www.federalreserve.gov/releases/h15/

[8] The Court notes Caremark does not object to AHF's calculations, only that AHF should not be awarded prejudgment interest. (Doc. 75 at 8).

(Doc. 72 at 17–18).

Even in diversity cases "[p]ost-judgment interest is determined by federal law." *Northrop Corp.*, 842 F.2d at 1155. "Post-judgment interest on a district court judgment is mandatory per 28 U.S.C. § 1961." *Lagstein*, 725 F.3d at 1056 (internal citation omitted). Under 28 U.S.C. § 1961(a), "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." Postjudgment interest ". . . shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961. The current weekly average 1-year constant maturity treasury yield is 2.92%. (Doc. 72-1 at ¶ 17). "Post-judgment interest should be awarded on the entire amount of the judgment, including any pre-judgment interest." *Lagstein*, 725 F.3d at 1056 (internal citation omitted).

Here again, Caremark argues AHF's request is untimely because it failed to make the request for postjudgment interest before the arbitrator. (Doc. 75 at 9). Caremark further argues postjudgment interest should only accrue from the date the Court enters its order confirming the arbitration award, not from the date on which AHF filed its Motion to Confirm. (*Id.*) First, the Court rejects Caremark's argument about untimeliness for the same reasons as described above. Second, the Ninth Circuit has stated "post-judgment interest is awarded from the date of judgment until the judgment is satisfied." *Lagstein*, 725 F.3d at 1056. On that basis, the Court will award postjudgment interest from the date of this opinion until the date of payment.

### 2. Motion for Protective Order

As noted above, in its initial filing, Caremark sought to seal this entire action, which the Court subsequently denied. (Doc. 49). The Court did, however, allow Caremark to file redacted versions of documents containing descriptions of Caremark's "incentive-fee formulas" because it found that, "at least for now, the incentive-fee formulas and the reimbursement rates should be shielded from public view." (Doc. 49 at 5). The Court then

1   issued an Order that permitted the following docket numbers to remain under seal, without

2   prejudice to later move to unseal: 6, 12, 22, 24, 28, 31, 33, 34, 36, 37, 40, and 46 ("Sealed

3   Documents"). (Doc. 66).

4       Caremark now brings a Motion for Protective Order, which seeks to retain the

5   redactions. (Doc. 67). AHF opposes Caremark's Motion, arguing Caremark failed to carry

6   its burden of showing that information subject to the motion is a trade secret. (Doc. 69 at

7   17).

8       The Court further stated that "[a]lthough [it] agrees with Respondent's argument

9   that unlawful business practices are not deserving of trade secret protection, it would be

10  premature at this juncture to find that the incentive-fee formula is not a trade secret because

11  the arbiter found the formulas to be unconscionable. Indeed, Petitioners initiated these

12  proceedings to challenge that very decision." (*Id.*) The Court concluded that "a wholesale

13  seal of all documents in this case is not appropriate; nor is the wholesale seal of the Award

14  or Provider Manual. The incentive-fee formulas should instead be redacted from the

15  record." (*Id.* at 7).

16      Thus, the only outstanding issue is whether the Sealed Documents, which

17  presumably contain descriptions of incentive fee formulas, should remain sealed.[9]

18  Caremark argues the Court should maintain redactions to the reimbursement information,

19  including the point-of-sale rates, network variable-fee rates, and dispensing fees that

20  participating pharmacies receive in Caremark's Medicare Part D networks. (Doc. 67 at 6–

21  10). AHF contends Caremark already publicly disclosed the variable-fee rates in *Senderra*,

22  another matter pending in this district. *Senderra Rx Partners, LLC v. CVS Health Corp.*,

23  No. 2:19–cv–05816–SPL (D. Ariz.).

24      The Court will apply the same standards to Caremark's most recent request as it did

25

26  ---
    [9] Although Caremark also seeks to maintain redactions to (i) information contained in a
    Specialty Drug Reimbursement Addendum and (ii) information concerning a separate
27  arbitration proceeding between Caremark and AHF (Doc. 67 at 2), the Court finds
    Caremark failed to show how these documents are related to the incentive fee formulas.
28  Caremark also fails to explain how these documents are not already covered by the Court's
    previous Order, which found no cause existed to seal or redact anything but those
    documents describing the incentive fee formulas. (Doc. 49).

to its initial Motion to Seal. Accordingly, the Court begins with a "strong presumption in favor of [public] access." *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006); *see also Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978) (The public has a general right of access "to inspect and copy . . . judicial records and documents"). "[A] party seeking to seal a judicial record then bears the burden of overcoming this strong presumption.'" *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1095 (9th Cir. 2016) (quoting *Kamakana*, 447 F.3d at 1178)). To meet its burden, a party seeking to file a document under seal must give compelling reasons supported by specific factual findings. *Id.* The moving party must specifically identify "where in the documents confidential financial information and trade secrets are to be found." *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1137 (9th Cir. 2003). General allegations of confidentiality, "without further elaboration or any specific linkage with the documents," do not satisfy the moving party's burden. *Kamakana*, 447 F.3d at 1184.

Caremark argues that although the *Senderra* court ordered the reimbursement-related information to be filed on the public docket, this does not mean that the information is no longer protectable. (Doc. 67 at 8). Specifically, Caremark argues trade secrets disclosed in prior court proceedings do not lose protection in subsequent proceedings. (*Id.*) As an initial matter, the Court notes the cases cited by Caremark to support this proposition are not binding on this Court because those cases are outside this Circuit.[10] Second, as to the variable-fee rates, the Court finds the reasoning from the *Senderra* court instructive. There, the court found Caremark failed to meet their burden of showing that the use of a variable-fee rebate was a trade secret because of a public article indicating variable fees and network rebates "are common with regards to pharmacy DIR fees" and its explicit mention "that CVS uses them." *Senderra Rx Partners, LLC*, No. 2:19–cv–05816–SPL (D. Ariz.). Because of this, the court found it "cannot conclude that [Caremark] receive[s] a

---

[10] *See Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 418 (4th Cir. 1999); *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 848–49 (10thCir. 1993); *Kittrich Corp. v. Chilewich Sultan LLC*, 2013 WL 12131376, at *4 (C.D. Cal. Feb. 20, 2013); *MicroStrategy Inc. v. Business Objects, S.A.*, 331 F. Supp. 2d 396, 418 (E.D. Va. 2004); *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 923 F. Supp. 1231, 1254–55 (N.D. Cal. 1995).

competitive advantage from the secret or proprietary nature of a variable network rebate . . . [and therefore] will not redact this information from the record." *Id.*  Finally, as to the point-of-sale rates and the dispensing fees, Caremark fails to "articulate compelling reasons supported by specific factual findings that outweigh the general history of access and the public policies favoring disclosure . . . ." *Kamakana*, 447 F.3d at 1178-79.  Nor has Caremark met its burden of showing that disclosure of those fees, which the arbitrator found substantively unconscionable, will work "a clearly defined and serious injury" to them.  *Oliner v. Kontrabecki*, 745 F.3d 1024, 1026 (9th Cir. 2014).  For these reasons, the Court will deny Caremark's Motion for Protective Order, and direct the Clerk of the Court to unseal the entire case.

Accordingly,

**IT IS ORDERED** that Petitioner Caremark, L.L.C. and Caremark PCS, L.L.C's Motion to Vacate or Correct the Arbitration Award (Doc. 12) is **denied** and Respondent AIDS Healthcare Foundation's Motion to Confirm Award and Enter Judgment (Doc. 72) is **granted**.  The Final Award of the Arbitration Panel, dated November 12, 2021, is confirmed by the Court pursuant to § 9 of the Federal Arbitration Act, 9 U.S.C. § 9.

**IT IS FURTHER ORDERED** that Respondent AIDS Healthcare Foundation is awarded its reasonable attorneys' fees and costs it incurred in seeking the confirmation of the final arbitration award in the sum of $114,333.09.

**IT IS ORDERED** that Petitioner Caremark, L.L.C. and Caremark PCS, L.L.C.'s Motion for Protective Order to Maintain Redactions to Documents Filed in Accordance with May 5, 2022, Order (Doc. 67) is **denied**.  Accordingly, the Clerk of the Court is directed to unseal all filings in this case.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter a judgment in favor of Respondent AIDS Healthcare Foundation confirming the Final Award of the Arbitration Panel, dated November 12, 2021.  (Doc. 12-9 at 14–75).

**IT IS FURTHER ORDERED** that AHF is awarded attorneys' fees and costs in the sum of $114,333.09, plus pre-judgment interest computed on the total amount of

$23,113,158.57 at the annual rate of 5.75% and at a daily rate of $3,641.11 running from November 12, 2021, to the date of entry of this Judgment, plus post-judgment interest on the foregoing sums at the rate of 2.92% until paid in full.

**IT IS FINALLY ORDERED** that this action is hereby terminated.

Dated this 14th day of September, 2022.

Honorable Diane J. Humetewa
United States District Judge