# EXHIBIT 9

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

Mission Wellnes Pharmacy, LLC,)
                              )
               Petitioner,    )   NO. 2:22-cv-00967-GMS
v.                            )
                              )   Phoenix, Arizona
Caremark, LLC; Caremark PCS,  )   June 9, 2023
LLC; SilverScript Insurance   )   3:01 p.m.
Company,                      )
                              )   AMENDED AS TO DATE
               Respondents.   )
_____)


**BEFORE:  THE HONORABLE G. MURRAY SNOW, CHIEF JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**MOTION HEARING**

Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251


Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2

 3    ON BEHALF OF PETITIONER:

 4         FRIER & LEVITT
           BY:  Jonathan E. Levitt, Esq.
 5         84 Bloomfield Avenue
           Pine Brook, New Jersey  07058
 6         jlevitt@frierlevitt.com

 7    ON BEHALF OF RESPONDENTS:

 8         ROSE LAW GROUP, PC
           BY:  Shelton L. Freeman, Esq.
 9         7144 E. Stetson rive
           Suite 300
10         Scottsdale, Arizona  85251
           filings@roselawgroup.com
11
           NIXON PEABODY, LLP
12         BY:  Kevin Patrick Shea, Esq.
                Aon S. Hussain, Esq.
13         70 W. Madison Street
           Suite 3500
14         Chicago, Illinois 60602
           kpshea@nixonpeabody.com
15         ahussain@nixonpeabody.com

16         Also appearing:  Heather Barber telephonically

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
 1                    P R O C E E D I N G S
 2   (Proceedings begin at 3:01 p.m.)
 3              COURTROOM DEPUTY:  This is CV22-967, Mission
 4   Wellness Pharmacy v. Caremark on for motion hearing.
 5              Counsel, please announce your appearances.
 6              MR. LEVITT:  For the plaintiff, Mission Wellness,
 7   Jonathan Levitt from the law firm of Frier Levitt.
 8              MR. SHEA:  Good afternoon, Judge.  For counsel for
 9   respondents, Kevin Shea from Nixon Peabody.
10              MR. HUSSAIN:  Good afternoon, Your Honor, Aon
11   Hussain from Nixon Peabody on behalf of respondents.
12              MR. FREEMAN:  Good afternoon, Your Honor, Shelton
13   Freeman from Rose Law Group as local counsel.
14              THE COURT:  Good afternoon to you all.
15              Mr. Levitt, it's your motion.
16              MR. LEVITT:  Thank you, Chief Judge.
17              My understanding is I have twenty minutes?
18              THE COURT:  Yeah.
19              MR. LEVITT:  Okay.  Well, thank you, Chief Judge.
20              I'm very honored here today to be on behalf of
21   Mission Wellness, Maria Lopez and Dan, her husband, behind me
22   there.  Maria is the owner of Mission Wellness.  They serve
23   HIV patients in San Francisco and they've dedicated their
24   lives professionally to doing so.
25              This case is only about Medicare Part D claims, has
```

1  nothing to do with commercial claims; and I mention that
2  because there's a federal law called the Any Willing Provider
3  Law that overlays everything that we're talking about today.
4          THE COURT:  Is there a private right of action under
5  that law?
6          MR. LEVITT:  There is no expressed private right of
7  action.  Doesn't say "yes" or "no," but we have a decision in
8  this case and many others saying that there is a breach of
9  contract claim.  So to answer the question more --
10          THE COURT:  Doesn't the Arbitrator in this case find
11  in favor on the statutory claim, the Arbitrator's finding that
12  there is a private right of action?
13          MR. LEVITT:  Well, in this case there's a federal
14  law called -- we call it the "flow-down provision" and it
15  essentially requires the -- one of the respondents, Aetna and
16  SilverScript, those are the prescription drug plans, to
17  incorporate into every contract that they write the Any
18  Willing Provider Law.  And so the flow-down provision is -- is
19  a federal statute and when --
20          THE COURT:  So you're saying it makes it a matter of
21  breach of contract?
22          MR. LEVITT:  That is exactly what I'm saying, Chief
23  Judge, thank you.
24          THE COURT:  Okay.
25          MR. LEVITT:  And so -- and in the contract there is

1    a provision.  They define the word "law" and they actually --

2    because of the flow-down provision under federal law, they are

3    required to incorporate that federal law into the contract;

4    and, in fact, in this case the Any Willing Provider Law and

5    the Medicare Part D Prescription Drug Manual are all actually

6    referenced in the contract.  So we don't have to --

7            THE COURT:  Does it make up the contract, the

8    agreement made up by the provider agreement, the provider

9    manual, the network enrollment forms?

10           MR. LEVITT:  The Caremark documents is a defined

11   term in the contract, and it includes all of the items that

12   you mentioned, including many, many others.  There are

13   thousands of pages.

14           THE COURT:  Okay.  Did the Arbitrator award Mission

15   Wellness all the recoupment fees assessed between 2016 and

16   2021?

17           MR. LEVITT:  Yes, sir, he did.

18           THE COURT:  Okay.  And that amount is $2,127,466.

19           MR. LEVITT:  Yes, Your Honor.

20           THE COURT:  Okay.

21           MR. LEVITT:  Yes, and there is precedent in other

22   cases for a full recoupment.

23           THE COURT:  Can you tell me where the alternative

24   amount asserted by Caremark comes from?  That's the

25   $1,775,483.

 1          MR. LEVITT:  Caremark has an alternative damage

 2    theory that they want the Court to believe that was rejected.

 3          THE COURT:  I understand --

 4          MR. LEVITT:  Okay.

 5          THE COURT:  -- but I'm asking how do they arrive at

 6    that figure, do you know?

 7          MR. LEVITT:  I think what they do, Chief Judge, is

 8    they look at the contract and in their view there's a minimum

 9    and a maximum percentage -- they call it a variable rate --

10    that can be applied.

11          So it's between -- in some of the years between

12    three and five percent.  So what they're saying is if we paid

13    you a dollar and we took back five dollars, which would be

14    five percent, the best you could do would be three percent;

15    and so, therefore, I believe that they are computing their

16    alternative -- I call it their alternative minimum damage

17    theory; and they're saying, really, the best you could do if

18    we didn't breach the contract in every possible way is you

19    would have had to pay the least amount of DIR fees.

20          And we -- we argued that in front of the Arbitrator.

21    We argued that with four witnesses on our count, five

22    witnesses on theirs, including Gina Redner and Steve McCall,

23    who are here for them, and my clients, who are here, and

24    expert witnesses.  These issues were all hashed out below.

25          THE COURT:  So -- well, I'll ask Caremark how they

UNITED STATES DISTRICT COURT

 1 | arrive at that figure, too, figure it out.  Go ahead.

 2 |          MR. LEVITT:  Okay.  And, Your Honor, maybe I could

 3 | just maybe riff on your question but one of the -- sort of the

 4 | essence -- well, first of all, under the Federal Arbitration

 5 | Act Your Honor clearly has the authority to issue an order

 6 | confirming the award.

 7 |          And I want to -- I'm going to get to, I think, riff

 8 | on -- on your exact questions about the damages in a moment

 9 | because I think it really kinda goes to the heart of all the

10 | issues but we started -- I filed this case in January 2019.

11 | So that's about four and a half years.

12 |          Obviously, arbitration was supposed to be, you know,

13 | quick -- a quicker process.  The Arbitrator in May 2022,

14 | Arbitrator Suarez, issued a final award in our favor, about

15 | 3.6 million dollars, which is the figure you mentioned, 2.1

16 | million dollars in damages, plus $247,000 in prejudgment

17 | interest and 1.28 million dollar in attorneys' fees.

18 |          The day after we received the award I wrote an

19 | e-mail to counsel saying, "What is your intention?  Do you

20 | intend to pay?  I'll give you, you know, a certain date,

21 | number of days to let me know."

22 |          They wrote back five days later saying that if you

23 | -- they threatened to terminate Maria and Dan and Mission

24 | Wellness from the Medicare Part D network if they chose to

25 | file this proceeding to confirm the award.

1        THE COURT:  So, Mr. Levitt, that's not part of the

2   claims here, though, is it?

3        MR. LEVITT:  It's not, Judge, but I think it gives a

4   flair.  I understand your point is not -- maybe not to

5   editorialize here but -- so I'll move on but the arbitration

6   award -- the arbitration agreement states, "...the award of

7   the arbitrator will be final and binding on the parties, and

8   judgment upon such award may be entered in any court having

9   jurisdiction thereof."

10       That's Exhibit A-1 in ours, and Your Honor asked a

11  question about the contract, what it encompasses; and there is

12  what they define as the contract documents and there are

13  literally thousands of pages, and I just wanted to make it

14  clear that Maria and Dan were able to negotiate zero words,

15  zero words on zero pages out of the thousands of pages of

16  documents.

17       They have zero bargaining power.  Caremark stacks

18  the deck, whatever they say, and the arbitration award says

19  it's "final and binding on the parties."  But, yet, here we

20  are four and a half years later and they don't want to pay the

21  award.  We had to make four motions for sanction to get

22  documents, and we never got the documents.

23       I want to just make it clear this DIR fee program --

24  they call it a Performance Network Rebate program, PNR

25  Performance.  Performance, they judged Mission Wellness'

1  performance based on medication adherence is the biggest

2  thing.

3          After four and a half years, three and a half years

4  after the arbitration, Caremark did not provide any support --

5  I want to make this clear -- any support for 2.7 million

6  dollars of DIR fees that they took from them and counsel -- a

7  lot of counsel's arguments, I think, are answered by

8  Arbitrator Suarez when he stated as follows on the final award

9  at Page 6 -- and I want to address a couple of the comments

10  there.

11          He's talking -- the Arbitrator's talking about the

12  adverse interest (sic) and he says claimants' adverse interest

13  (sic) -- I'm sorry, adverse inference is hereby granted and it

14  is found that Caremark's measurement of Mission Wellness

15  performance as shown on these trimester reports, which I'd

16  like to talk to you about, referenced at the hearing for years

17  2016 --

18          THE COURT:  So -- this is really getting to one of

19  my questions so I'm going to interrupt you.  I'm sorry, hold

20  your thought; but are those performance measures used in

21  calculating the alternative damage theory of 1,775,483?

22          MR. LEVITT:  No, they didn't measure any of our

23  performance, and they weren't able to show any proof of the

24  performance.

25          THE COURT:  I don't think that's my question.

1    So my question is:  When they arrive at the

2    1,775,483, where does that figure come from?

3    MR. LEVITT:  Again, I --

4    THE COURT:  Do you know?  Maybe you don't know.

5    MR. LEVITT:  No, I think I do know.  I think what

6    they're saying -- I think what they're saying is the smallest

7    amount of fees they could have paid is that number.

8    THE COURT:  Yes, but how would they have calculated

9    that figure?

10   MR. LEVITT:  They calculated that figure by saying

11   something like, "We charged you 4.2 percent on average, but if

12   you had been the best actor in the network we would have only

13   charged you three percent," and the difference in value

14   between the best you could have done, according to them, which

15   we don't agree with, and the amount they actually charged was

16   that damage figure.

17   THE COURT:  But would that not still have applied

18   the same performance measures in coming up with that?

19   MR. LEVITT:  No, they never performed -- they

20   never -- they never measured our performance, and that's the

21   key to this case.  That's the key to everything that happened

22   in the three and a half years --

23   THE COURT:  Did the Arbitrator find that they never

24   measured your performance?

25   MR. LEVITT:  That's exactly what he found, they

1    never measured.

2            THE COURT:  Well, what he found is -- maybe we're

3    arguing about potayto potahto, but didn't the Arbitrator find,

4    look, he's going to grant all these adverse inferences and

5    he's going to reject all of the measures that they offered,

6    right?

7            MR. LEVITT:  No.

8            THE COURT:  Well, let me read to you what I've got

9    here:  As a result, the Arbitrator granted the adverse

10   inferences that were requested by Mission Wellness, and then

11   applying any such inferences the Arbitrator rejected

12   Caremark's measurements of Mission Wellness' performance from

13   2016 to 2021.

14           Is that correct, as you understand it?

15           MR. LEVITT:  What happened was -- no, they didn't

16   measure the performance.  That's the problem with the

17   underlying case.

18           Caremark did not measure Mission Wellness.  They

19   just gave them average scores that were not related to them

20   and, again, under --

21           THE COURT:  You mean in the alternate damages?

22           MR. LEVITT:  No, no, no.  No, literally, Chief

23   Judge, in the five years between 2016 and 2021 they --

24   Caremark did not measure their performance of Mission

25   Wellness.

1            THE COURT:  Okay.  So take me back to Page 6 of the

2  Arbitrator's finding.  Did he not reject Caremark's

3  measurements of Mission Wellness' performance for the years

4  2016 to 2021 by rejecting the conversion of the FOPS to the

5  variable rate, whatever that is, for the years 2016 to 2021 by

6  -- as shown on Caremark's trimester reports?

7            Did he not reject Caremark's measurement of

8  statistically insignificant non-credible volumes of patients

9  for medication adherence performance for those years,

10  Caremark's means imputation for those years and Caremark's

11  calculation of the five patients measured for the HIV

12  therapeutic class for the specialty component?

13            Isn't that what the Arbitrator did?

14            MR. LEVITT:  Judge, they didn't produce any -- I'm

15  going to state it again.  They did not measure --

16            THE COURT:  But really, help me out.

17            MR. LEVITT:  I'm trying to.

18            THE COURT:  Educate me, okay?

19            MR. LEVITT:  Okay.

20            THE COURT:  So answer my question.

21            MR. LEVITT:  I am, I think.  I am.  See, what

22  happened is Caremark gives a piece of paper.  It's called a

23  trimester report --

24            THE COURT:  Right.

25            MR. LEVITT:  -- and on that report they say, "We're

 1  going to measure your adherence."  That's about 90 percent of
 2  what they're doing.
 3          THE COURT:  Measure adherence to what?
 4          MR. LEVITT:  They measure adherence to a
 5  patient's -- adherence is a patient taking a drug, and so what
 6  they did was -- they have a performance network retail
 7  program, but Mission Wellness is not a retail pharmacy.
 8  They're a specialty pharmacy.  So Caremark measures adherence
 9  based on two things.  One is a retail drug and two is
10  specialty drug.  So when Caremark measures a retail drug, they
11  measure diabetes, statins, and cholesterol drugs.
12          Dan and Maria do not dispense those drugs, and so
13  Caremark gave them a score that they say was the average score
14  for the network.  That's what the mean imputation is.  So I
15  see -- I see your potayto potahto because on the piece of
16  paper it says there's a score, but they didn't measure Dan and
17  Maria's score.  They say they measured everybody -- all 67,000
18  pharmacies besides Dan and Maria, and so now I hope it's
19  clarified a little bit, Judge.
20          The piece of paper says there's a measurement, but
21  they acknowledge in depositions, at the hearing, in briefs
22  that they didn't actually measure when it comes to these
23  chronic meds, these diabetes, cholesterol and statins, and so
24  they gave an average score.
25          So in the hearing we said, "Where's the evidence of

1  this average score?" and they wouldn't produce it.  So about

2  -- 60 percent of the score was this mean imputation.  That's a

3  rough figure, Judge.

4       The other percent of adherence in this performance

5  program is how well did Dan and Maria -- how well did they do

6  in keeping HIV patients taking their drug once a month.  Even

7  there, they didn't measure.  I believe they measured in five

8  years five claims.

9       So with those five claims out of five years we said,

10  "Okay, you have no backup for any adherence for the chronic

11  meds that you say" -- they didn't measure.  They acknowledge

12  they didn't measure for chronic meds because we didn't do any;

13  and then they said, "But we measured you for specialty."  We

14  said, "Okay.  How did you come up with your score?"

15       Indeed, there's a piece of paper that has a number,

16  Judge, but behind that number is where discovery happens and

17  we said there's a -- there's an Excel spreadsheet on this

18  trimester report with a fact and figure.  It's the adherence

19  measure.  "Where's your backup?"  They said, "We're not giving

20  it to you."

21       Arbitrator Suarez said give them the backup for

22  medication adherence.

23       THE COURT:  On specialty meds?

24       MR. LEVITT:  On specialty meds and, also, this mean

25  imputation for the chronic care meds, Judge, both.  Nothing.

1  Three and a half years.

2          We took depositions.  I asked Mr. McCall, I asked

3  Ms. Redner in this room, "How did you come up with these

4  scores?"  "I don't know."

5          "How did you convert that final overall performance

6  score to the aggregate?"  "I don't know."

7          "Can you give us the backup data?"  "No."

8          So to be clear from the very first question, "Did

9  Arbitrator Suarez say you measured but I'm rejecting your

10 measurements?"  No.  All the testimony at the hearing was they

11 didn't actually measure, and so the piece of paper that said a

12 number --

13         THE COURT:  What was the adverse inference you asked

14 for?

15         MR. LEVITT:  We said if they didn't -- if they don't

16 support their measurement, then -- then it doesn't -- then

17 reject the measurement.

18         THE COURT:  Which is what he did.

19         MR. LEVITT:  Which is exactly what he did, yes.

20         THE COURT:  Okay.

21         MR. LEVITT:  So it invalidated the entire program.

22         And just to be clear, I started off talking about

23 the federal Any Willing Provider law and there's a law --

24 there's a statute, there's a regulation under the CFR and

25 there's guidance by CMS.

 1          And, essentially, the law can be boiled down to the

 2   terms and conditions must be reasonable, which the Judge --

 3   the Arbitrator found they were not, and they also must be

 4   relevant; and so the relevance -- the Arbitrator thought to

 5   himself, "How could it possibly be that how well some other

 6   pharmacy that Dan and Maria don't own kept their patients

 7   adherent on chronic meds?  How can that be relevant to Dan and

 8   Maria?"  So he rejected that concept.  They just said, "No,

 9   we're giving you an average score."  It's not -- it's a

10   violation of federal law.

11          THE COURT:  Okay.  Did you want to reserve time?

12          MR. LEVITT:  Yes, Your Honor.

13          THE COURT:  Okay.  You're -- with reserving your

14   time, then, unless you got any final points you want to make

15   before you start reserving time?

16          MR. LEVITT:  I'd just like Your Honor to know that

17   the reimbursement rate must be reasonable as well, and that's

18   under the Medicare Part D Manual.

19          Dan and Maria literally lost money -- let me just be

20   clear.  Let's say they bought a pill for a dollar.  After DIR

21   fees Caremark reimbursed them about 95 cents.  Again, this is

22   in their Medic -- these are Medicare claims.  So they lost

23   money on every fill for five years.

24          What did they do?  Did they say to the HIV patient

25   that walked in the door, "I'm not going to serve you because

1   I'm losing money," no.  They borrowed money.  Two million

2   dollars they borrowed, home equity lines to keep their doors

3   open so they could serve these Caremark and Medicare Part D

4   patients.

5           THE COURT:  Again, I don't doubt that your clients

6   are good folks; but what relevance does their borrowing have

7   to do with what the contract said?

8           MR. LEVITT:  Because the contract incorporates

9   federal law.  Federal law says specifically the reimbursement

10   rate for a specialty drug must be reasonable.

11           THE COURT:  Right.

12           MR. LEVITT:  Judge, if you find -- well, the

13   Arbitrator found that that reimbursement rate was not

14   reasonable.

15           THE COURT:  Where did he find that?

16           MR. LEVITT:  He said they violated the Any Willing

17   Provider law.  The only thing it says is reasonable and

18   relevant terms and conditions.

19           THE COURT:  All right.

20           MR. LEVITT:  And he did find -- he said --

21           THE COURT:  Do you want more or do you want to

22   reserve three minutes?

23           MR. LEVITT:  I will, Judge, but the Arbitrator found

24   exactly what I just said, that they had to borrow money to

25   keep the doors open because they were losing money on every

 1 | fill.  He found that in his report.

 2 |             THE COURT:  Okay, thank you.

 3 |             Caremark.

 4 |             MR. SHEA:  Thank you, Judge.  And, obviously, if you

 5 | have any questions or you want me to start anywhere in

 6 | specific, please -- please let me know.

 7 |             THE COURT:  I certainly will.

 8 |             MR. SHEA:  And maybe I will start with the 1.7

 9 | million dollar number that you referenced.

10 |             So in this particular program the reimbursement

11 | structure is provided for in the network enrollment forms, in

12 | the NEFS, and the contractual construct of this program

13 | provides that there is a minimum level of fees that will be

14 | assessed and a maximum level of fees that will be assessed,

15 | and it's always within a two percent range.

16 |             So if -- in other words, if a -- if the pharmacies

17 | paid a hundred dollars at the point of sale and the network

18 | has a three to five percent fee range, the highest performing

19 | pharmacies in the network will pay three dollars, will pay the

20 | lower end of the rate, and the worst-performing pharmacies

21 | will pay five dollars.

22 |             There is no contractual scenario or right where a

23 | pharmacy is going to pay no dollars, zero dollars.  That is

24 | not part -- there is a contractual limitation and it provides

25 | a floor and a ceiling and here --

```
 1              THE COURT:  How is the floor and the ceiling
 2   calculated?
 3              MR. SHEA:  So -- so -- so those -- so the 1.7
 4   million is the floor of the fees that Mission Wellness would
 5   be subject to and how --
 6              THE COURT:  How is it calculated?
 7              MR. SHEA:  Okay.  So how that was calculated was it
 8   took the volume of claims for each network that they submitted
 9   and a Caremark witness, Dave Hutchins, recalculated their
10   scores using perfect performance.
11              So giving them a hundred percent performance scores,
12   the minimum level -- if they were the highest-performing
13   pharmacy in the entire network and they did the best they
14   could possibly do, they would have still been subject to fees
15   of 1.7 million dollars.  That was the floor.
16              THE COURT:  I get that, but it still doesn't tell me
17   how you calculated the floor.
18              MR. SHEA:  So -- so -- so the calculation was just a
19   simple math exercise.
20              THE COURT:  Based on what?
21              MR. SHEA:  It was based on their trimester reports,
22   which contain their -- the amount of -- the trimester report
23   contains the amount of claim submissions that ran through a
24   given network for -- for that period.  So the trimester
25   reports are every four months.  So say --
```

```
 1              THE COURT:  The 1.7 is based on the number of --
 2    numbers that appear in the trimester reports?
 3              MR. SHEA:  Correct, trimester reports and they would
 4    -- so it would -- so that's an overall aggregate for the
 5    entire time they're in the network.
 6              THE COURT:  Didn't the Arbitrator reject the
 7    trimester reports?
 8              MR. SHEA:  No, I don't -- the Arbitrator didn't
 9    reject trimester reports and to -- to your point, on the
10    adverse inferences --
11              THE COURT:  The Arbitrator rejects Caremark's
12    measurements of Mission Wellness' performance for the years
13    2016 to 2021.
14              MR. SHEA:  So he rejected the measurements but --
15              THE COURT:  And then he rejects the conversion of
16    the FOPS to the variable rate.  I have no idea what that
17    means.
18              MR. SHEA:  Again, these are all --
19              THE COURT:  What?
20              MR. SHEA:  Pardon me?
21              THE COURT:  He rejects that.  Is that used at all in
22    the trimester reports?
23              MR. SHEA:  It is used to determine a fee within the
24    range; and so they get a score, say 86 percent, and then
25    Caremark says, "That puts you in the middle."  So it's --
```

1      THE COURT:  So the Arbitrator's rejected that, and

2 in doing that did he reject your alternative fee calculation?

3      MR. SHEA:  Well, again, we have some problems

4 because he didn't really explain much but he -- if he rejects

5 that, he rejects our measurements of their performance within

6 the range.

7      It does not -- there's still a contractual

8 limitation that takes you to the floor of the range.  It

9 doesn't mean that they get their fees back in their entirety.

10      THE COURT:  Well, so is there anywhere in your

11 briefing where you've showed me what the components of your

12 alternative calculation are and why they are in the contract

13 and why the Arbitrator ignored them and why his rejection of

14 all the other stuff doesn't reject the basis for your fees?

15      Do you understand what I'm asking?  Multiple

16 questions, but those are the questions that I have.

17      MR. SHEA:  Yeah, I think so.  So we have provided to

18 you -- we have provided to you in Exhibits, I think, 4 and 6

19 of our motion two network enrollment forms and those

20 demonstrate the construct of the -- the fee ranges.

21      So those provide the fee ranges; and, obviously,

22 we've provided testimony of claimant's primary witness to you

23 that they understood that there was always going to be a

24 minimum fee, that the fee was never going to be zero.

25      We have provided to you the overall calc --

1    THE COURT:  What do I do with that, though?

2    So he -- if that can be viewed as a necessary

3 imputation against the plaintiffs, it doesn't give me any

4 particular amount, does it?

5    MR. SHEA:  That particular testimony, sir, does not

6 give you a set amount.

7    THE COURT:  So if I'm going to -- you know, I think

8 you'd agree that before I reject an Arbitrator's decision as

9 being arbitrary, I got to understand why it's arbitrary,

10 right?

11    So you have to convince me that there really is no

12 way, even when the Arbitrator has granted every adverse

13 inference that the claimants have asked for factually, that he

14 still screwed it up beyond repair, right?

15    MR. SHEA:  I understand, Judge, but I think you can

16 -- I believe you can get there because, again, the adverse

17 inferences deal with the performance range.

18    It does not get you -- I mean, they've established a

19 breach of contract based on those and, obviously, we disagree

20 with those; but they still have to establish the appropriate

21 measure of damages, and the damages have to flow from the

22 parties' agreement.

23    THE COURT:  Well, is it unfair to determine what the

24 Arbitrator said -- and I think he did directly say -- that

25 they prevailed on all their claims?  They prevailed on the

```
 1   burden of proof on all their claims.  I think he said exactly
 2   that, didn't he?
 3           MR. SHEA:  He did -- he did say that and, again, we
 4   don't believe that was --
 5           THE COURT:  I mean, I understand that you
 6   disagree --
 7           MR. SHEA:  No, I understand.
 8           THE COURT:  -- but I have to understand why that is
 9   an irresponsible decision by the Arbitrator in light of the
10   actual contract terms, right?
11           MR. SHEA:  Understood.  And maybe I can -- you know,
12   if I could cite to a couple of cases that we've cited, which I
13   think might help you a little bit.
14           THE COURT:  Okay, go ahead.
15           MR. SHEA:  So just the fact that he agreed with them
16   doesn't mean he had the contractual authority to provide that
17   relief.  So, for instance, in the --
18           THE COURT:  I can completely understand that point.
19   So if you're arguing that as a matter of law, don't waste your
20   time.
21           MR. SHEA:  Okay.
22           THE COURT:  But tell me how in the facts of this
23   case you have established that -- even rejecting everything
24   that he did, the Arbitrator could not have made this award.
25           MR. SHEA:  Because he hasn't made any finding tying
```

1  the damages to the contractual breach and he is ignoring --

2  the effect of his order is to ignore the contractual floor

3  that was placed on these fees that no pharmacy was going to

4  pay zero.  He gave them --

5          THE COURT:  Okay.  So, again, help me understand how

6  the contractual floor is established in the contract between

7  you and the claimants.

8          MR. SHEA:  Sure.  So, again, Exhibits 4 and 6 of

9  our --

10          THE COURT:  I understand you're saying that, but

11  you're not showing me how it's established, the "4" and "6."

12  That's what I need you to tell me.

13          MR. SHEA:  Okay.  So those -- those are the

14  network -- Exhibit 4 and 6 are the network enrollment forms

15  and those delineate the fees that are subject to the networks.

16          So those provide that the --

17          THE COURT:  So when you say "subject to the

18  networks," Mission Wellness is in a network or is it its own

19  network?

20          MR. SHEA:  Mission Wellness enrolls in a Caremark

21  network, a Medicare Part D network.

22          THE COURT:  And so is the minimum and the maximum

23  established by the performance of the network as a whole and

24  not Mission Wellness' performance?

25          MR. SHEA:  Well, the floor that I'm talking about

```
 1    applies to the network as a whole, every pharmacy, and that's
 2    in the contractual document.  It provides the range of
 3    floor --
 4              THE COURT:  Okay, I want to see that.  I want to see
 5    that in the record, and then I want to see how you use that
 6    calculation and come up with your number; and then I want to
 7    understand how what the Arbitrator did allows you still to use
 8    that number, because it's a matter of undisputed contract.
 9              The fact that plaintiff's expert may have said he
10    understood that there was a minimum does something, but it
11    doesn't do much to help me on that road.  So go ahead.
12              MR. SHEA:  Okay.  So, obviously, we have -- we have
13    that in the record and we have the chart, which outlines the
14    calculations that underlie -- that provided the overall
15    calculations which detail the minimum and the maximum fees,
16    and then we have the award itself which we know from the
17    record awards them a hundred percent of their fees back.
18              I mean, that's -- it's not disputed that they got --
19              THE COURT:  It isn't disputed, they just admitted
20    it.
21              MR. SHEA:  So they -- so it's disputed that they got
22    every single penny back --
23              THE COURT:  It's not disputed.
24              MR. SHEA:  -- and then --
25              THE COURT:  Well, they didn't get anything back yet,
```

1    but they got it awarded.

2          MR. SHEA:  They got an award for every single thing

3    back, and then the contracts that we provided to you provide

4    that there is going to be -- that's not a contractual scenario

5    that's possible, that there is a minimum in every network in

6    the -- in the network, and those are all outlined in the

7    enrollment forms.

8          THE COURT:  Yeah.  So if the Arbitrator rejects

9    virtually everything you have said about how you calculate

10   those fees and about the legitimacy of your calculations,

11   which it seems to me he's done, how do I conclude that what

12   he's done is without basis, especially when a lot of that

13   comes from sanctions he entered against you?

14         MR. SHEA:  So -- so, again, if you -- if you

15   consider the sanctions, which obviously, you know, we disagree

16   with, but if you consider --

17         THE COURT:  I understand that, but what basis do I

18   have to reconsider his sanctions?

19         MR. SHEA:  I understand.  Well, I mean, the second

20   part of our -- one of our arguments is that he -- the parties

21   stipulated to a reasoned award, and his award doesn't

22   constitute a reasoned award.

23         THE COURT:  Well, even if that's true, you haven't

24   given me any basis to determine that his sanctions are wrong,

25   have you, or have I missed it?

 1          MR. SHEA:  No, I understand, Judge; but, again, what

 2    those sanctions get to, it gets to a limited window of

 3    damages.  It gets to the floor because those -- it doesn't

 4    get --

 5          THE COURT:  Well, that's what I'm asking you to show

 6    me, to explain to me how.  Excepting all the sanctions that

 7    the Arbitrator entered, he still could not have given you an

 8    award that was less than the minimums you claim.  That's what

 9    I need.  You've hit it right there.

10          MR. SHEA:  Okay.  So if you -- if you review his

11    sanctions, they are -- they all deal with how the plaintiff

12    was scored, so how we -- he says we didn't properly calculate

13    their score, we didn't provide backup damage for their score,

14    we didn't give them the correct rate between, say, three and

15    five percent.

16          Assuming all those issues are true and you throw

17    their scores out, that means they get the best possible rate

18    for the network, and that's the calculation of the 1.7 million

19    dollars, that they would still have been subject to the 1.7

20    million dollars even if you throw out all the scoring and all

21    the mechanisms of the program that -- it doesn't -- it doesn't

22    get them a return of all of their fees.

23          THE COURT:  Would -- would there be an argument that

24    the federal statute that's at issue here would not allow the

25    minimum that you impose?  I mean, I realize that there may not

```
 1   be any private right of action, but you haven't really argued
 2   -- I mean, you did do a citation to that, but I don't know
 3   that if the Arbitrator makes a legal ruling that's wrong,
 4   unless it's clearly wrong, it's a basis for me to overturn the
 5   arbitration award.  Do you know what I'm saying?
 6           MR. SHEA:  I understand what you're saying.  So I
 7   think it's -- and, again, as you correctly point out, there's
 8   no private right of action; but the Any Willing Provider was
 9   the basis for their Count 1 breach of contract and --
10           THE COURT:  Is the federal statute incorporated into
11   the contract?
12           MR. SHEA:  Well, we would argue that it's not --
13   it's not specifically referenced and it's not incorporated.
14   There's also language that provides that you don't -- you
15   wouldn't get contract damages for a statute that doesn't have
16   a private right of action.
17           Obviously, the Arbitrator disagreed with us on those
18   points, but it -- but that gets them -- that gets them a
19   breach of contract.  It does not get them -- we still have a
20   separate damage component, and we believe this case is similar
21   to cases where an arbitrator has, say, for instance, found
22   lost profits in a contract that doesn't allow for lost
23   profits; and he agrees with the plaintiff that that particular
24   provision shouldn't apply, and the Court says, "You didn't
25   have the contractual authority to deviate from that
```

1    contractual provision."

2           We also cited to a case *Collins* and *Ackerman*

3    where -- it was a sales commission case, and the contract

4    provided sales commissions would -- upon termination he would

5    only get commissions on sales through the end of the

6    termination date, and the Arbitrator felt that was an

7    unreasonable provision and gave commissions beyond the

8    termination date and agreed with the plaintiff on that

9    situation, and they argued that was just a matter of contract

10   interpretation; and the Court said that the Arbitrator didn't

11   have authority to just ignore and disregard that particular

12   contractual provision.

13          And then we cited to the *Aspic* case, a Ninth Circuit

14   case where the Arbitrator said, well, there's a provision that

15   you have to comply with some federal regulations, but we're

16   dealing with an Afghanistan company and we don't think there

17   was a meeting of the minds on that provision so we're not

18   going to enforce it; and the Court said you can't make that

19   determination.  You're obviously -- the Arbitrator's limited

20   by the contractual grant to him under the parties' agreement.

21          THE COURT:  Is there any limitation on the grant

22   here?

23          MR. SHEA:  That's what -- that's what our primary

24   argument is, that under the network enrollment forms the

25   limitation of the grant in terms of damages was to give the

 1  minimum fee possible.

 2          THE COURT:  Okay.

 3          MR. SHEA:  I don't know if I have more time or if

 4  you're --

 5          THE COURT:  You have four more minutes, if you want

 6  it.

 7          MR. SHEA:  Okay.  Thank you, Judge.

 8          The only other point I'll make is that we did cite

 9  to case law in the Ninth Circuit that provides if the parties

10  agree to a reasoned award, that the Arbitrator must deliver a

11  reasoned award; and we don't believe that meets the standard

12  here.

13          We cited to a Southern District of New York case,

14  *Smarter Tools* where, in effect, the same thing happened here.

15  He just recited the parties' position and said, "By a

16  preponderance of the evidence I find in favor of the

17  claimant," and so we believe that same scenario would apply

18  here, that he -- that he did not issue a reasoned award.

19          THE COURT:  If I were to find that, what would I do,

20  remand to the Arbitrator?

21          MR. SHEA:  That's an interesting issue.  I mean, our

22  position would be that under the Functus Officio Doctrine it

23  doesn't go back to the Arbitrator.  In the *Smarter Tools* case

24  the Court did remand it back to the Arbitrator.  So,

25  obviously, that is -- you know, obviously a remedy that is

```
 1    possible and certain circuits have recognized that a Court can
 2    remand it back to the Arbitrator.
 3          It hasn't been decided in the Ninth Circuit, to our
 4    knowledge, yet.  We did cite you some cases which said once an
 5    Arbitrator's -- issues a final award his duty is done, and
 6    that there's no such thing as a remand back to an Arbitrator
 7    but -- but I think that is an open question.
 8          THE COURT:  In this case you're not disputing that
 9    this dispute is subject to the mandatory arbitration
10    provisions of your contract?
11          MR. SHEA:  No, we are not, Judge.  No, we are not.
12          THE COURT:  Okay.
13          MR. SHEA:  So unless the Court has any further
14    questions, I will. . .
15          THE COURT:  Thank you.
16          MR. SHEA:  Thank you.
17          THE COURT:  You've reserved three minutes.
18          MR. LEVITT:  Thank you, Chief Judge.
19          Again, it's called a Performance Network Rebate
20    program and the contract says -- you haven't had the
21    opportunity to sit through three and a half years of the
22    testimony, but the contract actually says we're going to judge
23    your individual pharmacy performance.  They didn't do that.
24          THE COURT:  Where does it say that?
25          MR. LEVITT:  It says it in -- there's -- there's a
```

1   document, Judge, called -- that explains the DIR fee program.

2   It's the -- I'm blanking on the name of the document, but it's

3   crystal clear.  It's given once a year.

4          THE COURT:  Do you got it in the record and do you

5   point to it in the record?

6          MR. LEVITT:  I apologize, Judge, that I can't --

7   it's the essence of the underlying case and the

8   cross-examination and the testimony and the exhibits.

9          In the -- in a Motion to Confirm we don't reargue

10  all the -- the underlying facts.

11         THE COURT:  I understand that, but I've got to

12  decide the case based on the record that you gave me and the

13  Caremark gave me and I don't -- so if you've got it in the

14  record, show it to me.

15         MR. LEVITT:  I would need a couple -- I would need a

16  couple minutes.  Maybe I could just call back to my office and

17  I could get that to you, but it says we're going to judge your

18  individual performance and they didn't do it, and it also says

19  -- contrary to this alternative minimum damage theory, it also

20  says we're going to charge you a percentage of applicable

21  claims.

22         So this is in essence of the direct and cross.  They

23  didn't judge any of our claims.  There were no applicable

24  claims.  So when he says, oh, the best they could do is three

25  percent of all claims, that is not what the contract says.  It

1  says we're going to judge your individual performance, which

2  they didn't do, and we're going to charge you a DIR fee based

3  on your performance -- based on your performance on applicable

4  claims, and they didn't do that either.

5       The fact that counsel gets up here right now and

6  tells you that federal law is not incorporated into the

7  contract is troubling.  It's inaccurate and it's troubling.

8       The standard to vacate under 9 U.S.C. §10 is --

9  first is where the award was procured by corruption of the

10  Arbitrators.  Second ground is where the evident partiality or

11  corruption of the Arbitrator occurred.  Third is where the

12  Arbitrators were guilty of misconduct.  None of those things

13  are alleged here, where they say this award is binding on all

14  parties and can be confirmed.

15       The fourth thing is where the Arbitrator exceeded

16  their power or was so imperfectly executed their power that a

17  mutual, final and definite award upon the subject matter was

18  not made.

19       We're here today to talk about whether the

20  Arbitrator exceeded his powers, and he did not.  He had the

21  power under Triple AAA rules to render his decision and -- and

22  he did so.

23       THE COURT:  Okay.  Your time's up.  I thank you

24  both.  I will take a careful look at the record that you have

25  provided, as well as the arguments that you have made and what

1    I can discern from them, and I will issue an order as soon as

2    I can.  Thank you very much.

3              MR. LEVITT:  Thank you, Chief Judge.

4              MR. SHEA:  Thank you, Judge.

5    *(Whereupon the proceedings concluded at 3:42 p.m.)*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  *REPORTER'S CERTIFICATION*

2

3              I, TERI VERES, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6              I FURTHER CERTIFY that the foregoing pages

7    constitute a full, true, and accurate transcript of all of

8    that portion of the proceedings contained herein, had in the

9    above-entitled cause on the date specified therein, and that

10   said transcript was prepared under my direction and control.

11             DATED at Phoenix, Arizona, this 23rd of

12   October, 2023.

13
                                      _____s/Teri Veres_____
14                                    TERI VERES, RMR, CRR

15

16

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT